1  GARY R. GOODHEART
   Nevada Bar #1203
2  JONES VARGAS
   3773 Howard Hughes Parkway
3  Third Floor South
   Las Vegas, NV 89169
4  Telephone:  (702) 862-3300
   Facsimile:  (702) 737-7705
5
   STUART M. GRANT
6  MEGAN D. MCINTYRE
   CHRISTINE M. MACKINTOSH
7  GRANT & EISENHOFER P.A.
   123 Justison Street
8  Wilmington, DE 19801
   Telephone:  (302) 622-7000
9  Facsimile:  (302) 622-7100

10 *Attorneys for Plaintiffs*

11              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
12 _____
                                          )
13 OAKTREE CAPITAL MANAGEMENT, L.P., on     )
   behalf of its managed funds and accounts, )
14 LAZARD ASSET MANAGEMENT LLC, on behalf of )
   its managed funds and accounts,          )     No.
15 ANGELO, GORDON & CO., L.P.,              )
   ZAZOVE ASSOCIATES LLC, on behalf of certain of )
16 its managed funds and accounts,          )     **JURY TRIAL DEMANDED**
   CNH PARTNERS, LLC,                       )
17 ADVENT CAPITAL MANAGEMENT, LLC,          )
   AQR CAPITAL MANAGEMENT, LLC, and         )
18 HFR CA LAZARD RATHMORE MASTER TRUST,     )
                                          )
19              Plaintiffs,                 )
                                          )
20        -against-                         )
                                          )
21 KPMG, KPMG INTERNATIONAL COOPERATIVE,    )
   KPMG LLP, HANSEN, BARNETT & MAXWELL,     )
22 P.C., and MORGAN STANLEY & CO.,          )
                                          )
23              Defendants.                 )
                                          )
24 _____)
                                          )
25

26                      **COMPLAINT**

27

28

                            1

1.     Oaktree Capital Management, L.P., on behalf of its managed funds and accounts; Lazard Asset Management LLC, on behalf of its managed funds and accounts; Angelo, Gordon & Co., L.P.; Zazove Associates LLC, on behalf of certain of its managed funds and accounts; CNH Partners, LLC; Advent Capital Management, LLC; AQR Capital Management, LLC; and HFR CA Lazard Rathmore Master Trust (collectively, "Plaintiffs"), by their undersigned attorneys, allege the following upon personal knowledge as to themselves individually and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which included, among other things, review and analysis of: (1) filings by ShengdaTech, Inc. ("ShengdaTech" or the "Company") with the Securities and Exchange Commission (the "SEC"); (2) press releases published by ShengdaTech; (3) the offering memorandum (the "6.0% Notes Offering Memorandum") ShengdaTech disseminated to qualified institutional investors in connection with its offering (the "6.0% Notes Offering") of 6.0% Convertible Senior Notes due 2018 (the "6.0% Notes"); (4) the offering memorandum (the "6.5% Notes Offering Memorandum") ShengdaTech disseminated to qualified institutional investors in connection with its offering (the "6.5% Notes Offering") of 6.5% Senior Convertible Notes Due 2015 (the "6.5% Notes"); (5) filings made in connection with ShengdaTech's bankruptcy proceeding, *In re ShengdaTech, Inc.*, Case No.  BK-11-52649 (Bankr. D. Nev.); and (6) newspaper and  magazine articles (and other media coverage) regarding ShengdaTech, its business, and/or the Defendants (defined below).  Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.     NATURE OF THE CASE

2.     ShengdaTech – a once-promising participant in the burgeoning nano precipitated calcium carbonate ("NPCC") market – has spiraled into bankruptcy and has been revealed to have foisted the 6.0% Notes and the 6.5% Notes (collectively, the "Notes") on the investing public based upon falsified financial results.  Between May 15, 2008 and May 5, 2011 (the "Loss

Period"), Defendants made a number of materially false and misleading statements concerning ShengdaTech's financial results and, in the case of the Auditor Defendants (defined below), the strength of its internal controls. Plaintiffs relied on these false and misleading statements in collectively purchasing over $92 million of the Company's Notes during the Loss Period, over $75 million of which they continued to hold through the end of the Loss Period. Plaintiffs' purchases included $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering, over $54 million par amount of 6.5% Notes in the 6.5% Notes Offering, and over $38 million par amount of secondary market purchases of both series of Notes. When the truth about ShengdaTech began to be revealed, Plaintiffs and the funds and accounts for whom Plaintiffs purchased the Notes suffered substantial damages as the Company collapsed into bankruptcy and defaulted on the Notes.

3.      Plaintiffs bring this action against ShengdaTech's former auditors – KPMG, KPMG International Cooperative, and KPMG LLP (collectively, "KPMG") and Hansen, Barnett & Maxwell, P.C. ("Hansen") (together, the "Auditor Defendants") – and against the investment bank that underwrote the 6.5% Notes Offering and sold these Notes to the investing public, Morgan Stanley & Co. ("Morgan Stanley").[1]

4.      Hansen audited ShengdaTech's financial statements for the fiscal year ended December 31, 2007 (the "2007 Financial Statements"), and consented to the inclusion of its unqualified audit opinions on the  2007 Financial Statements in (1) the 6.0% Notes Offering Memorandum, (2) the 6.5% Notes Offering Memorandum, (3) the Company's amended annual report on Form 10-K/A for the year ended December 31, 2007, filed with the SEC on May 15, 2008 (the "2007 10-K/A"), (4) the Company's annual report on Form 10-K for the fiscal year ended December 31, 2008, filed with the SEC on April 1, 2009 (the "2008 10-K"), and (5) the Company's annual report on Form 10-K for the year ended December 31, 2009, filed with the

---

[1] Plaintiffs CNH (defined below), Advent (defined below), and AQR (defined below) are not asserting any claims against Morgan Stanley.  While reference may be made herein to "Plaintiffs' claims against Morgan Stanley" or the like, such references are for ease of reference only and are not to be construed as implying that CNH, Advent, or AQR are asserting any claims against Morgan Stanley.

SEC on March 15, 2010 (the "2009 10-K"), and an amendment thereto filed on September 15, 2010 (the "2009 10-K/A).

5.     KPMG audited the Company's financial statements for the fiscal years ended December 31, 2008 (the "2008 Financial Statements") and December 31, 2009 (the "2009 Financial Statements"), and consented to the inclusion of its unqualified audit reports on those financial statements in (1) the 6.5% Notes Offering Memorandum, (2) the 2008 10-K, and (3) the 2009 10-K and 2009 10-K/A.

6.     Morgan Stanley underwrote and served as an initial purchaser for ShengdaTech's 6.5% Notes Offering, and acted as sole bookrunner for that offering, in exchange for substantial fees.   Morgan Stanley purchased from ShengdaTech and immediately resold to investors $109,200,000 of the total $130,000,000 of notes offered for sale in the 6.5% Notes Offering. Pursuant to the 6.5% Notes Purchase Agreement, ShengdaTech sold these 6.5% Notes to Morgan Stanley for "a purchase price of 95.0% of the principal amount."   Accordingly, Morgan Stanley earned $5,460,000 – 5% of the $109,200,000 of 6.5% Notes that it purchased from ShengdaTech and immediately resold to investors – in connection with the 6.5% Notes Offering.

7.     Relying upon ShengdaTech's audited and unaudited financial statements, the Auditor Defendants' unqualified audit opinions on ShengdaTech's audited financial statements, and the imprimatur of legitimacy lent to the 6.5% Notes Offering by Morgan Stanley's involvement, Plaintiffs collectively invested over $6.5 million in the 6.0% Notes (both in the 6.0% Notes Offering and in the secondary market) and approximately $72.5 million in the 6.5% Notes (both in the 6.5% Notes Offering and in the secondary market).   Subsequently, and while Plaintiffs still held these Notes, ShengdaTech announced on March 15, 2011, that KPMG had uncovered "potentially serious discrepancies and unexplained issues" during the course of its audit of the Company's financial statements for the year ended December 31, 2010 (the "2010 Financial Statements").   The nature of these "potentially serious discrepancies and unexplained issues" was not disclosed at that time.

8.     ShengdaTech's board of directors formed a committee (the "Special Committee") to investigate the issues KPMG had identified, and appointed the members of the Company's

audit committee to serve on the Special Committee.  As Plaintiffs and other investors would learn many months later, ShengdaTech management thwarted the Special Committee's efforts by, *inter alia*, refusing to respond to information requests and interfering with the Special Committee's attempts to obtain confirmation of the Company's bank balances with a number of Chinese banks where the Company claimed to have deposited funds.

9.     On May 5, 2011, the Company filed a Form 8-K with the SEC that provided additional detail concerning the "potentially serious discrepancies and unexplained issues" with ShengdaTech's financial records, revealing that they include issues relating to (1) the Company's bank balances, (2) transactions with the Company's major suppliers, (3) value-added tax ("VAT") invoices and payments, (4) sales and payments for sales by third parties, (5) sales to the Company's second largest customer, (6) discrepancies between the results of KPMG's direct calls to customers and confirmations returned by mail, and (7) concerns raised when KPMG attempted to directly confirm customer sales and accounts receivable.

10.     The Company also disclosed in its May 5, 2011 filing that KPMG was disclaiming its unqualified audit opinions on the Company's 2008 and 2009 Financial Statements and its representations that the Company had adequate internal controls over financial reporting during the fiscal year ended December 31, 2009. Specifically, ShengdaTech disclosed that KPMG had informed the Company that "*disclosures should be made and action should be taken to prevent future reliance on [KPMG's] previously issued audit reports related to the consolidated balance sheets of [ShengdaTech] and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.*"

11.     KPMG's swift retraction of its audit opinions for both of the years in which it audited ShengdaTech, in conjunction with the steadfast efforts of ShengdaTech's management to block the Special Committee's investigation, indicates that fraud has been rampant at the Company for quite some time, and that the auditors had turned a blind eye to this financial fraud ever since the Company went public.

12.     The Auditor Defendants, charged with the responsibility as the Company's outside auditors to closely scrutinize the Company's financial records in search of signs of fraud or misstatements, were, at a minimum, negligent in failing to uncover the fraud and in issuing unqualified audit opinions.  Morgan Stanley, charged with the duty to make a reasonable investigation into the statements made in the 6.5% Notes Offering Memorandum upon which it knew Plaintiffs would rely in deciding to purchase the 6.5% Notes, was also, at a minimum, negligent in failing to uncover the fraud – particularly with regard to the unaudited financial statements and other financial information in the 6.5% Notes Offering Memorandum that Morgan Stanley knew had not been audited by the Auditor Defendants.  Defendants' negligence allowed the Notes to enter the market, and created the false impression that ShengdaTech had the financial wherewithal to repay the Notes with interest.

13.     Plaintiffs relied on the contents of the 2007, 2008 and 2009 Financial Statements, on the Auditor Defendants' unqualified audit opinions thereon, and on the unaudited financial statements contained in the 6.5% Notes Offering Memorandum, the contents of which were blessed by Morgan Stanley, when deciding to purchase Notes during the Loss Period.  When the truth began to be revealed, ShengdaTech defaulted on the Notes and the prices at which the Notes traded plummeted.  Accordingly, Defendants' negligence has caused Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes substantial harm.

## II.    JURISDICTION AND VENUE

14.     The claims herein arise under Sections 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78r and 78t(a); common law; the California Corporations Code; the Connecticut Uniform Securities Act; and the Illinois Securities Law.

15.     This Court has jurisdiction over this matter and over the Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1331; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1391(b)(2); and 28 U.S.C. § 1391(c).  Plaintiff Zazove Associates LLC is located in this District, and ShengdaTech's bankruptcy proceedings are proceeding in this

District.  Additionally, events giving rise to the claims at issue occurred in this District, as the Defendants' false and misleading statements were disseminated to investors in this District, including Plaintiff Zazove.  Defendants are subject to personal jurisdiction in this District because they have (or had) substantial contacts with this District by virtue of having served as auditors and underwriters for ShengdaTech, a Nevada corporation, and, with respect to the Auditor Defendants, having consented to the inclusion of their audit reports in offering documents.  Furthermore, Defendants KPMG LLP and Hansen regularly do business within this District.

**III.   PARTIES**

   **A.   Plaintiffs**

17.   Plaintiff Oaktree Capital Management, L.P. brings this action on behalf of certain investment funds that it manages and for which it purchased Notes during the Loss Period, and on behalf of clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "Oaktree"). During the Loss Period, Oaktree purchased over $15,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering and over $5,900,000 par amount of 6.5% Notes in the secondary market, which it continued to hold as of March 15, 2011.  Oaktree subsequently sold some of the 6.5% Notes at a substantial discount to par, but continues to hold over $13,200,000 par amount of 6.5% Notes, which are now in default.

18.   Plaintiff Lazard Asset Management LLC brings this action on behalf of certain investment funds that it manages and for which it purchased Notes during the Loss Period, and on behalf of clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "LAM").  During the Loss Period, LAM purchased $9,850,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering, $14,239,000 par amount of 6.0% Notes in the secondary market, and $4,425,000 par amount of 6.5% Notes in the secondary market.   LAM continues to hold $2,090,000 par amount of 6.0% Notes and $12,750,000 par amount of 6.5% Notes, which are now in default.

19. Plaintiff Angelo, Gordon & Co. brings this action on behalf of mutual funds that it manages and for which it purchased Notes during the Loss Period, and on behalf of clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "Angelo Gordon"). During the Loss Period, Angelo Gordon purchased $10,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering and $5,000,000 par amount of 6.5% Notes in the secondary market. Angelo Gordon continues to hold these 6.5% Notes, which are now in default.

20. Plaintiff Zazove Associates LLC brings this action on behalf of its managed funds for which it purchased Notes during the Loss Period, and on behalf of clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "Zazove"). During the Loss Period, Zazove purchased $10,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering. Zazove continues to hold these 6.5% Notes, which are now in default.

21. Plaintiff CNH Partners LLC brings this action against Hansen and KPMG on behalf of mutual funds that it manages or co-manages and for which it purchased Notes during the Loss Period (collectively, "CNH"). During the Loss Period, CNH purchased $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering, $2,425,000 par amount of 6.0% Notes in the secondary market, and $3,300,000 par amount of 6.5% Notes in the 6.5% Notes Offering. CNH continues to hold these 6.0% Notes and 6.5% Notes, which are now in default. CNH is not asserting any claim herein against Morgan Stanley.

22. Plaintiff Advent Capital Management LLC brings this action on behalf of a mutual fund that it manages and for which it purchased Notes during the Loss Period (collectively, "Advent"). During the Loss Period, Advent purchased $2,840,000 par amount of 6.5% Notes in the 6.5% Notes Offering. Advent continues to hold these 6.5% Notes, which are now in default. Advent is not asserting any claim herein against Morgan Stanley.

23. Plaintiff AQR Capital Management, LLC brings this action against Hansen and KPMG on behalf of mutual funds that it manages or co-manages and for which it purchased Notes during the Loss Period (collectively, "AQR"). During the Loss Period, AQR purchased

$1,450,000 par amount of 6.0% Notes in the secondary market, $1,700,000 par amount of 6.5% Notes in the 6.5% Notes Offering, and $500,000 par amount of 6.5% Notes in the secondary market.  AQR continues to hold these 6.0% Notes and 6.5% Notes, which are now in default. AQR is not asserting any claim herein against Morgan Stanley.

24.    Plaintiff HFR CA Lazard Rathmore Master Trust ("HFR") is a Bermuda unit trust whose investments are managed by Plaintiff Lazard Asset Management LLC, and on whose behalf Lazard Asset Management LLC purchased Notes during the Loss Period.  Lazard Asset Management LLC's purchases of Notes during the Loss Period included purchases on behalf of HFR of $1,390,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering, $3,661,000 par amount of 6.0% Notes in the secondary market, and $440,000 par amount of 6.5% Notes in the secondary market.  HFR continues to hold $365,000 par amount of 6.0% Notes and $1,490,000 par amount of 6.5% Notes, which are now in default.

**B.    Defendants**

25.    Defendant KPMG International Cooperative ("KPMG International") is a Swiss entity that heads a global network of professional firms providing audit, tax and advisory services in 150 countries, with 138,000 people working in member firms around the world. KPMG International and its member and network firms market themselves worldwide under the brand name "KPMG."   KPMG International is dominated and controlled by KPMG USA (defined below).

26.    Defendant KPMG ("KPMG Hong Kong") is a Hong Kong partnership and a member firm of the KPMG network of member firms affiliated with Defendant KPMG International.   KPMG Hong Kong is the entity that signed KPMG's audit reports on the Company's 2008 and 2009 Financial Statements.  KPMG Hong Kong consented to the inclusion of these audit reports in the 6.5% Notes Offering Memorandum, the 2008 10-K, and the 2009 10-K and 2009 10-K/A.

27.    Defendant KPMG LLP ("KPMG USA") is a United States-based audit, tax and advisory services firm, which operates from 87 offices with more than 23,000 employees and partners throughout the U.S.   KPMG USA is the U.S. member firm of the KPMG network of

member firms affiliated with KPMG International.  KPMG USA supervised the audit work that KPMG Hong Kong performed for ShengdaTech, and had ultimate authority over whether KPMG's audit reports would be included in the SEC filings and offering memoranda of ShengdaTech.

28.     Defendant KPMG Hong Kong was dominated and controlled by Defendants KPMG International and KPMG USA in connection with its audits of ShengdaTech. Information regarding the exact relationship among these entities is within the exclusive control of these Defendants and discovery will therefore demonstrate the full extent to which these entities act for and answer for each other.

29.     Defendant Hansen provides assurance, tax, client accounting and consulting services for a wide range of clients.  Hansen is headquartered in Salt Lake City, Utah.  Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit reports on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum, the 6.5% Notes Offering Memorandum, the 2007 10-K/A, the 2008 10-K, and the 2009 10-K and 2009 10-K/A.

30.     Defendant Morgan Stanley & Co. ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides products and services to a large and diversified group of clients and customers.  Morgan Stanley underwrote and served as an initial purchaser for ShengdaTech's 6.5% Note Offering, and acted as sole bookrunner for that Offering.  As such, Morgan Stanley purchased and immediately resold to investors $109,200,000 of the total $130,000,000 of notes offered for sale in the 6.5% Notes Offering.  As part of its duties as an underwriter, Morgan Stanley was required to conduct, prior to the 6.5% Notes Offering, a reasonable investigation of the Company to ensure that the statements contained in the 6.5% Notes Offering Memorandum contained no misstatement or omission of material fact.

IV.     **RELEVANT NON-PARTIES**

31.     ShengdaTech is a Nevada corporation with its principal place of business in China.  ShengdaTech manufactures a specialty additive known as nano-precipitated calcium carbonate ("NPCC").  NPCC is used in a variety of products to enhance their durability and

efficiency and is widely applied in the paint, paper, plastic and rubber industries and used for building materials such as PVC.  ShengdaTech conducts its manufacturing operations through several affiliated companies in China (the "PRC Companies").[2]  The PRC Companies are owned by Faith Bloom Limited ("Faith Bloom"), a wholly-owned subsidiary of ShengdaTech that is organized under the laws of the British Virgin Islands.

32.    Xiangzhi Chen ("Chen") was ShengdaTech's President and Chief Executive Officer, as well as its largest shareholder.  Chen was ousted from his position at ShengdaTech after he took deliberate steps to thwart internal investigations into financial improprieties at the Company.

## V.    FACTUAL ALLEGATIONS

### A.    Historical Background Of ShengdaTech & The Notes Offerings

33.    The company now known as ShengdaTech was formed by a "reverse merger" with a United States shell company, Zeolite Exploration Company ("Zeolite"), in March 2006. To effectuate the reverse merger, on March 31, 2006, ShengdaTech consummated a share exchange pursuant to a Securities Purchase Agreement and Plan of Reorganization with Faith Bloom, whereby ShengdaTech acquired all of the issued and outstanding capital stock of Faith Bloom in exchange for 50,957,603 shares of ShengdaTech common stock.

34.    ShengdaTech went public in late March 2006 and began trading on the NASDAQ in early 2007.  Chen served as a member of ShengdaTech's Board and was its President and CEO until his ouster on August 19, 2011.  Chen owns over 42.25% of ShengdaTech's outstanding shares, making him the Company's largest shareholder.

35.    To finance its operations, ShengdaTech conducted two private offerings of debt securities targeted to "qualified institutional buyers" as defined in Rule 144A of the Securities Act of 1933 (the "Securities Act").  In 2008, ShengdaTech conducted the 6.0% Note Offering, pursuant to which Plaintiff CNH and other qualified institutional buyers purchased $115,000,000

---

[2] The PRC Companies are Shandong Haize Nanomaterials Co., Ltd., Shandong Bangsheng Chemical Co., Ltd., Shaanxi Haize Nanomaterials Co., Ltd., Zibo Jiaze Nanomaterials Co., Ltd., and Anhui Yuanzhong Nanomaterials Co., Ltd.

of 6.0% Notes. The 6.0% Notes Offering was conducted pursuant to the 6.0% Notes Offering Memorandum, which included the Company's 2007 Financial Statements. Hansen issued an unqualified audit opinion on the Company's 2007 Financial Statements, stating that they fairly presented the Company's financial condition and the results of its operations in accordance with generally accepted accounting principles ("GAAP") and that the Company maintained effective internal controls over financial reporting. Hansen consented to the inclusion of its unqualified audit opinion on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum. Interest on the 6.0% Notes is payable semiannually on June 1 and December 1. The 6.0% Notes are convertible into shares of ShengdaTech common stock at an initial conversion rate of 100.6036 shares per $1,000 principal amount of the 6.0% Notes, subject to adjustment. As of July 6, 2011, the outstanding principal amount of the 6.0% Notes was $25,578,000.

36. On December 10, 2010, ShengdaTech announced that it had entered into a purchase agreement with Morgan Stanley relating to an offering of $130,000,000 of 6.5% Notes. The completion of the 6.5% Notes Offering was conditioned upon a certain amount of the 6.0% Notes being repurchased by ShengdaTech and surrendered to the 6.0% Notes' trustee for cancellation such that at least 75% of the original issuance amount of the 6.0% Notes was no longer outstanding. Approximately $67.2 million of the net proceeds of the 6.5% Notes Offering were to be used to repurchase a portion of the 6.0% Notes. On December 15, 2010, ShengdaTech announced that it had completed the 6.5% Notes Offering.

37. The 6.5% Notes Offering was underwritten by Morgan Stanley pursuant to the 6.5% Notes Offering Memorandum, which included the Company's 2007, 2008, and 2009 Financial Statements. The 2007 Financial Statements were audited by Hansen, and the 2008 and 2009 Financial Statements were audited by KPMG. Hansen and KPMG issued unqualified audit opinions on the respective Financial Statements that they audited, stating, *inter alia*, that the 2007, 2008, and 2009 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP. Hansen and KPMG consented to the inclusion of their respective unqualified audit opinions on the 2007, 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum. In addition to the Company's audited

financial statements, the 6.5% Notes Offering Memorandum included unaudited financial information which the investing public understood to have been reviewed by Morgan Stanley as the underwriters of the 6.5% Notes Offering and the initial purchasers of the 6.5% Notes. The 6.5% Notes are convertible into shares of ShengdaTech common stock at an initial conversion rate of 164.6904 shares per $1,000 principal amount of 6.5% Notes, subject to adjustment. Holders of 6.5% Notes had the right to require ShengdaTech to repurchase, for cash, all or any portion of their 6.5% Notes on December 15, 2013 at a price equal to 100% of the principal amount of the 6.5% Notes to be purchased, plus accrued and unpaid interest.

**B.     ShengdaTech's Financial Statements Were Riddled With Fraud**

38.     In recent months, many China-based companies that have accessed the United States capital markets through "reverse mergers" similar to the ShengdaTech/Zeolite merger have come under scrutiny by the SEC, the securities exchanges on which they are listed, and the investing public because of accounting issues and fraudulent representations concerning the companies' financial performance and liquidity. The "reverse merger" process allowed these companies to sell their shares publicly without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors. Because of this, the role of the outside auditor assumed special importance, as the audit opinion was the primary safeguard against financial fraud at these companies. The imprimatur of legitimacy that was placed on these companies' debt securities by virtue of the involvement of prominent investment banks as the underwriters of these offerings was similarly critical in convincing investors to entrust their capital to these companies. What investors did not know at that time, but have subsequently come to realize, is that these outward marks of legitimacy provided false comfort. These companies' auditors failed to follow the appropriate procedures and precautions when conducting their audits of these companies, and all too often they issued unqualified or "clean" audit opinions notwithstanding the existence of serious internal control deficiencies and non-compliance with GAAP, and the prestigious investment banks that underwrote the debt securities offered by these companies failed to conduct

reasonable investigations into the statements contained in the offering materials for these securities, most notably the unaudited financial information included in such offering materials.

39. ShengdaTech has turned out to have been a sham. ShengdaTech publicly reported strong financial results in order to dupe investors into buying over $200 million in ShengdaTech Notes, but recent disclosures have demonstrated those financial results to be a complete fantasy. While the full extent of ShengdaTech management's fraud has yet to be revealed, it is clear that management utterly misrepresented the value and, indeed, the existence of material assets that were recorded on the Company's balance sheet. For example, the Special Committee has been unable to confirm that the amount of funds on deposit with numerous Chinese banks is anywhere close to the amount reported in the Company's financial statements. Management has not only prevented the Special Committee from communicating freely with those banks, but Chen has also presented at least one certificate of deposit that appears to be falsified.

**C.    The Auditor Defendants Failed To Detect The Fraud And Instead Issued Unqualified Audit Opinions**

40. After it went public in 2006, ShengdaTech was audited by Hansen. Hansen continued to serve as ShengdaTech's auditor during the 2008 fiscal year and, in this capacity, reviewed the Company's interim condensed consolidated financial statements as of and for the quarters ended March 31, June 30, and September 30, 2008. On November 11, 2008, ShengdaTech announced that it had dismissed Hansen as its auditor and replaced Hansen with KPMG.

41. KPMG audited ShengdaTech's 2008 and 2009 Financial Statements. From the outset of its engagement, KPMG was alerted to problems with the Company's financial reporting. Within a few months after it was retained to replace Hansen, KPMG reported that it had found material weaknesses in the Company's internal controls over financial reporting. Specifically, KPMG's audit report on the Company's 2008 Financial Statements noted:

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in Internal

Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and *our report dated March 31, 2009 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting*.

(emphasis added).  KPMG's report on its audit of ShengdaTech's internal controls for the year 2008 stated:

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  **Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.**

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended.  These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

**In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008**, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(emphasis added).  The fact that KPMG uncovered "material weaknesses" mere months into its engagement raises serious questions about the rigor Hansen applied in auditing the Company's 2007 Financial Statements and the basis upon which it opined that such statements presented the Company's financial position and the results of its operations in accordance with GAAP and that the Company had effective internal controls over its financial reporting.

42.     The presence of material weaknesses in ShengdaTech's internal financial controls – which KPMG admitted created a reasonable possibility that a material misstatement of the company's annual or interim financial statements would not be prevented or detected – should

have caused KPMG to more starkly question the Company's management to ensure that the Company's financial statements were accurate.  KPMG failed to do this, instead issuing clean audit opinions on the Company's 2008 and 2009 Financial Statements.  These "material weaknesses," however, were never adequately addressed – as KPMG would soon discover.

**D.  Morgan Stanley Failed To Conduct A Reasonable Investigation Into The Accuracy Of The 6.5% Notes Offering Memorandum**

43.  As an underwriter whose name was displayed prominently on the cover of the 6.5% Notes Offering Memorandum, Morgan Stanley was required to conduct a reasonable investigation into the statements contained in that Offering Memorandum.  Morgan Stanley did not conduct a reasonable investigation of the statements contained in the 6.5% Notes Offering Memorandum and did not possess reasonable grounds for believing that the statements in the 6.5% Notes Offering Memorandum were true and not misleading.  In particular, Morgan Stanley did not conduct a reasonable investigation into the accuracy of the financial information included in the 6.5% Notes Offering Memorandum, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.  The 6.5% Notes Offering Memorandum included the Company's 2007 Financial Statements audited by Hansen, including Hansen's unqualified audit opinion thereon, and the 2008 and 2009 Financial Statements audited by KPMG, including KPMG's unqualified audit opinions thereon.  The 6.5% Notes Offering Memorandum also included the Company's Unaudited Condensed Consolidated Balance Sheets As Of September 30, 2010 and December 31, 2009; the Company's Unaudited Condensed Consolidated Statements Of Income For The Three Months Ended September 30, 2010 and September 30, 2009 And For The Nine Months Ended September 30, 2010 and September 30, 2009; and the Company's Unaudited Condensed Consolidated Statements Of Cash Flows For The Nine Months Ended September 30, 2010 And September 30, 2009.  These audited and unaudited financial statements, as set forth below, were riddled with misstatements.

. . .

. . .

**E.      Defendants' False Statements And Omissions Of Material Fact**

44.     Repeatedly throughout the Loss Period, Defendants made a number of material false and misleading statements, as detailed below.

**1.      The 2007 10-K/A and the 6.0% Notes Offering Memorandum**

45.     The 2007 10-K/A and the 6.0% Notes Offering Memorandum each included the 2007 Financial Statements, which reported, *inter alia*, cash and cash equivalents of $26,366,568; total assets of $100,943,938; sale of products of $100,654,793; and net income of $27,030,345. These statements were false and misleading because the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially misstated.

46.     Hansen consented to the inclusion of its March 14, 2008 audit opinion on ShengdaTech's 2007 Financial Statements in the 2007 10-K/A and the 6.0% Notes Offering Memorandum.  Hansen's opinion stated, in pertinent part:

> We have audited the accompanying consolidated balance sheets of ShengdaTech Inc. and subsidiaries (the Company) as of December 31, 2007 … and the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. We also have audited the Company's internal control over financial reporting as of December 31, 2007 based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)....

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects.  Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.  Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk.  Our audits also included performing such other procedures as we considered necessary in the circumstances.  We believe that our audits provide a reasonable basis for our opinions.

> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability

of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements….

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007 … and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.  Also, in our opinion, Shengdatech Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007***, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)….

(emphasis added).

47.     Hansen's audit report was materially false and misleading because:  the 2007 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen did not conduct its audits in accordance with the standards of the Public Company Accounting Oversight Board.

48.     As set forth above, KPMG found that ShengdaTech had material weaknesses over its internal controls within months of its retention by the Company.  A "material weakness," by definition, is a deficiency or a combination of deficiencies in internal control over financial reporting such that there is a *reasonable possibility* that a *material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis*.  The fact that "material weaknesses" evidently existed and were able to be uncovered by a new auditor within *months* of its retention strongly suggests that such weaknesses existed during

1   Hansen's audits of ShengdaTech's Financial Statements and that, accordingly, Hansen did not

2   have a reasonable basis for issuing unqualified audit opinions on the Company's 2007 Financial

3   Statements or for opining that the Company had adequate internal controls.  Further, the facts

4   that KPMG was unable to verify in connection with its audits of the Company's 2010 Financial

5   Statements were matters as simple as the Company's cash balances and its sales and payments to

6   third parties.  KPMG's inability to verify such basic facts as whether ShengdaTech *actually had*

7   *money in the bank* strongly suggests that Defendants were negligent, at best, in not discovering

8   the falsity of the Company's financial statements during their audits.   This conclusion is

9   bolstered by the fact that KPMG has admitted that the Company's 2008 and 2009 Financial

10  Statements and KPMG's audit reports on those financial statements should no longer be relied

11  upon, and that it has reason to doubt that the Company had effective internal controls during

12  these years.

13               **2.        The 2008 10-K**

14       49.       On April 1, 2009, ShengdaTech filed the 2008 10-K with the SEC.  The 2008 10-

15  K included the Company's 2007 and 2008 Financial Statements, which reported, *inter alia*, cash

16  of $26,366,568 and $114,287,073, respectively; total assets of $100,943,938 and $243,908,940,

17  respectively;  net sales of $100,654,793 and $149,427,139,  respectively;  and net income of

18  $27,030,345 and $40,035,451, respectively.  These statements were false and misleading because

19  the Company's reported results for cash and cash equivalents, total assets, sale of products, and

20  net income were materially misstated.

21       50.       KPMG consented to the inclusion of its audit opinion on the Company's 2008

22  Financial Statements in the 2008 10-K.  Despite the material weakness over internal controls that

23  KPMG had noted in its audits that year, it issued a clean opinion on the Company's 2008

24  Financial Statements, representing that they fairly presented the Company's financial position in

25  accordance with GAAP:

26               We have audited the accompanying consolidated balance sheet of
                 ShengdaTech, Inc. and subsidiaries (the "Company") as of
27               December 31, 2008, and the related consolidated statements of
                 income, shareholders' equity and comprehensive income, and cash
28               flows for the year then ended....

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.***

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 31, 2009 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

(emphasis added).

51.     Hansen consented to the inclusion of its audit opinion concerning the Company's 2007 Financial Statements in the 2008 10-K.  Hansen also issued a clean audit opinion, stating that the Company's 2007 Financial Statements presented fairly, in all material respects, ShengdaTech's financial position in accordance with GAAP:

We have audited the accompanying consolidated balance sheet of Shengdatech Inc. and subsidiaries (the Company) as of December 31, 2007, and the related consolidated statements of income, shareholders' equity and comprehensive income and cash flows for each of the two years in the period ended December 31, 2007….

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audits provide a reasonable basis for our opinions.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007 , and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.***

1  (emphasis added).

2    52.    The foregoing statements were materially false and misleading because:  the 2007

3  and 2008 Financial Statements violated GAAP and did not present the Company's financial

4  position fairly or accurately; and Hansen and KPMG did not conduct their audits in accordance

5  with the standards of the Public Company Accounting Oversight Board.  KPMG has admitted

6  that its audit report on the Company's 2008 Financial Statements should no longer be relied

7  upon.

8            **3.    The 2009 10-K and 2009 10-K/A**

9    53.    On March 15, 2010, ShengdaTech filed its 2009 10-K with the SEC.  The 2009

10  10-K included the 2008 and 2009 Financial Statements, which reported, *inter alia*, cash of

11  $114,287,073[3] and $115,978,763, respectively; total assets of $243,806,829 and $271,054,359,

12  respectively; net sales of $82,419,689 and $102,121,804, respectively; and net income of

13  $36,028,302 and $23,104,607, respectively.    Subsequently, on September 15, 2010,

14  ShengdaTech filed its 2009 10-K/A with the SEC, reporting the same financial results as the

15  2009 10-K.   The foregoing statements were false and misleading because the Company's

16  reported results for cash and cash equivalents, total assets, sale of products, and net income were

17  materially misstated in both the 2009 10-K and the 2009 10-K/A.

18    54.    KPMG consented to the inclusion of its audit opinion on the Company's 2008 and

19  2009 Financial Statements in the 2009 10-K and 2009 10-K/A.  KPMG issued a clean opinion on

20  those financial statements, stating that they fairly presented the Company's financial position in

21  accordance with GAAP and that the Company's internal controls were effective as of December

22  31, 2009:

23            We have audited the accompanying consolidated balance sheets of
              ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and
24            2008, and the related consolidated statements of income,
              shareholders' equity and comprehensive income, and cash flows
25            for the years then ended….

26  _____
    [3] The 2009 10-K adjusted the previously-reported 2008 Financial Statements to reflect the
27  Company's adoption of FASB ASC Subtopic 470-20, *Debt With Conversion and Other*
    *Options*, which specifies the accounting for convertible debt instruments that may be settled in
28  cash upon conversion.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audits provide a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles ….***

(emphasis added).

55.   KPMG also consented to the inclusion of its opinion on the adequacy of the Company's internal controls as of December 31, 2009 in the 2009 10-K and 2009 10-K/A. KPMG concluded that the Company maintained adequate internal controls over financial reporting:

> We have audited ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)….
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audit provides a reasonable basis for our opinion….
>
> ***In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009,*** based on criteria established in Internal Control—Integrated Framework issued by COSO….

(emphasis added).

56.   Hansen consented to the inclusion of its audit opinion on the Company's 2007 Financial Statements in the 2009 10-K and 2009 10-K/A.  Hansen also issued a clean audit opinion, finding that the Company's 2007 Financial Statements presented fairly, in all material respects, ShengdaTech's financial position in accordance with GAAP:

> We have audited the accompanying consolidated statements of income, shareholders' equity and comprehensive income, and cash flows of ShengdaTech, Inc. and subsidiaries (the Company) for the year ended December 31, 2007….
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audit provides a reasonable basis for our opinion.

1
2
3

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations of ShengdaTech, Inc. and subsidiaries and their cash flows for the year ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.*

4

(emphasis added).

5
6
7
8
9
10
11
12

57.    The foregoing statements were materially false and misleading because:   the 2007,  2008 and 2009 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen and KPMG did not conduct their audits in accordance with the standards of the Public Company Accounting Oversight Board.  KPMG has admitted that its audit reports on the Company's 2008 and 2009 Financial Statements should no longer be relied upon and that it has reason to doubt the efficacy of the Company's internal controls over financial reporting during those years.

13

**4.        The 6.5% Notes Offering Memorandum**

14
15
16
17
18
19
20

58.    The 6.5% Notes Offering Memorandum included the Company's 2007, 2008 and 2009 Financial Statements, which reported, *inter alia*, cash of $26,366,568, $114,287,073[4] and $115,978,763, respectively; total assets of $100,943,938, $243,806,829 and $271,054,359, respectively; net sales of $46,721,673, $82,419,689 and $102,121,804, respectively; and net income of $27,030,345, $36,028,302 and $23,104,607, respectively.  These statements were false and misleading because the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially misstated.

21
22
23
24
25

59.    In addition, the 6.5% Notes Offering Memorandum contained unaudited financial results that were similarly false and misleading.  Specifically, the 6.5% Notes Offering Memorandum reported unaudited cash of $120,649,206 and $115,978,763 as of September 30, 2010 and December 31, 2009, respectively; unaudited total assets of $295,426,018 and $271,054,359 as of September 30, 2010 and December 31, 2009, respectively; unaudited net

26
27
28

---

[4] The 2009 10-K adjusted the previously-reported 2008 Financial Statements to reflect the Company's adoption of FASB ASC Subtopic 470-20, *Debt With Conversion and Other Options*, which specifies the accounting for convertible debt instruments that may be settled in cash upon conversion.

sales of $34,417,385 and $25,376,060 for the three months ended September 30, 2010 and September 30, 2009, respectively; unaudited net sales of $97,881,755 and $72,066,915 for the nine months ended September 30, 2010 and September 30, 2009, respectively; unaudited net income of $6,988,578 and $4,630,411 for the three months ended September 30, 2010 and September 30, 2009, respectively; and unaudited net income of $20,648,597 and $16,441,216 for the nine months ended September 30, 2010 and September 30, 2009, respectively (together, the "6.5% Notes Offering Memorandum Unaudited Financial Statements").  The 6.5% Notes Offering Memorandum Unaudited Financial Statements were false and misleading because the Company's reported results for cash, total assets, sale of products, and net income were materially misstated.  Because KPMG had not audited any of the 6.5% Notes Offering Memorandum Unaudited Financial Statements, the investing public placed particular reliance upon Morgan Stanley as underwriter for the 6.5% Notes Offering to have investigated and verified the accuracy of the 6.5% Notes Offering Unaudited Financial Statements.

60.     Hansen consented to the inclusion of its March 14, 2008 audit opinion on the Company's 2007 Financial Statements in the 6.5% Notes Offering Memorandum.

61.     KPMG consented to the inclusion in the 6.5% Notes Offering Memorandum of its audit opinion on ShengdaTech's 2008 and 2009 Financial Statements and its opinion on the adequacy of the Company's internal controls as of December 31, 2009, which stated in pertinent part:

> We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the

financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles….***

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), ShengdaTech Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and ***our report dated March 15, 2010 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.***

(emphasis added).

62.   The foregoing statements were materially false and misleading because:  the 2007,  2008 and 2009 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen and KPMG did not conduct their audits in accordance with the standards of the Public Company Accounting Oversight Board.  KPMG has admitted that its audit reports on the Company's 2008 and 2009 Financial Statements should no longer be relied upon and that it has reason to doubt the efficacy of the Company's internal controls over financial reporting during those years.

63.   Under these circumstances, it is clear that Morgan Stanley did not conduct a reasonable investigation and had no reasonable basis to conclude that the financial results included in the 6.5% Notes Offering Memorandum were accurate.  KPMG's inability to verify such basic facts as whether ShengdaTech *actually had money in the bank* strongly suggests that whatever investigation Morgan Stanley may have conducted into the accuracy of the audited and unaudited financial statements included in the 6.5% Notes Offering Memorandum was not reasonable and that, accordingly, Morgan Stanley had no reasonable basis to conclude that these audited and unaudited financial statements were accurate.  This conclusion is bolstered by the

fact that KPMG has admitted that the Company's 2008 and 2009 Financial Statements and KPMG's audit reports on those financial statements should no longer be relied upon, and that it has reason to doubt that the Company had effective internal controls during these years.

## VI.  THE TRUTH BEGINS TO EMERGE, CAUSING DAMAGES TO PLAINTIFFS AND THE FUNDS AND ACCOUNTS THEY MANAGE

64.     On March 15, 2011, ShengdaTech stunned the market with an announcement that its board of directors had appointed a Special Committee to investigate "potentially serious discrepancies and unexplained issues relating to the Company's and its subsidiaries' financial records identified by [KPMG]" in the course of KPMG's examination of the Company's 2010 Financial Statements.  The same day, ShengdaTech announced that the Special Committee had retained O'Melveny & Myers, LLP ("O'Melveny") to conduct an independent investigation into the issues uncovered by KPMG, that the SEC had been informed of the internal investigation, and that the Company would not timely file its 2010 Form 10-K.   In response to this announcement, the NASDAQ suspended trading in the Company's shares.

65.     On April 29, 2011, the Company filed a Form 8-K with the SEC attaching a press release in which ShengdaTech disclosed that NASDAQ had informed the Company on April 20, 2011 that it was going to delist its shares.  The April 20, 2011 letter from the NASDAQ Listing Qualifications Department cited the following criteria in support of its decision to delist ShengdaTech:

> (1) *public interest concerns under Nasdaq Listing Rule 5101 raised by the serious accounting and operational issues uncovered by KPMG, the Company's independent registered public accounting firm; the deliberate and ongoing efforts of the Company's Chief Executive Officer and Acting Chief Financial Officer, Mr. Xiang Zhi Chen and Ms. Anhui Guo, respectively, to obstruct an internal investigation into these matters; the Company's failure to promptly disclose material information related to that investigation; and the Company's violation of the rules setting forth the responsibilities and authority of the Audit Committee;*

> (2) the Company's failure to make prompt public disclosure of material developments relating to the investigation, as required by Nasdaq Listing Rule 5250(b)(1) and IM-5250-1;

> (3) the Company's violations of Nasdaq Listing Rule 5605(c)(3) and IM-5605 as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the

Securities and Exchange Act of 1934 caused by the obstructive conduct of the Company's executive management, including failure to pay for advisors engaged to assist with the internal investigation by the special committee of the Board of Directors of the Company; and

(4) the Company's failures to timely file with the Securities and Exchange Commission its Annual Report on Form 10-K for the period ended December 31, 2010, as required by Nasdaq Listing Rule 5250(c)(1), and to present a definitive plan that demonstrates its ability to regain compliance within the time period permitted under Nasdaq's Listing Rules.

(emphasis added).  That same day, ShengdaTech announced that Anhui Guo ("Guo") – the Company's Chief Operating Officer, acting Chief Financial Officer, and a member of the Board of Directors – had resigned, effective immediately.

66.     On May 5, 2011, ShengdaTech filed another Form 8-K with the SEC in which it announced that KPMG had resigned, effective April 29, 2011.  KPMG, as disclosed in this 8-K, had informed the Company in a letter dated April 19, 2011, that ShengdaTech's senior management had not taken (and the board of directors had not caused management to take) timely and appropriate remedial action with respect to the discrepancies and issues KPMG had identified in the course of its 2010 audit.  In this Form 8-K, ShengdaTech provided additional details concerning the "serious discrepancies and unexplained issues" KPMG had identified in its audits of the Company's 2010 Financial Statement, noting that these "concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables."

67.     In addition, the May 5, 2011 Form 8-K made the stunning revelation that the Company's previously-issued financial statements for the 2008 and 2009 fiscal years should no longer be relied upon:

On April 29, 2011, we were also informed by KPMG, our former independent accounting firm, that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December

*31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.*

KPMG stated that the manner of management's conduct during the investigation by a special committee of the Company's Board of Directors *raised doubts about management's representations provided to KPMG in connection with KPMG's 2008 and 2009 audits of the consolidated financial statements and the effectiveness of our internal control over financial reporting of the Company.*  The Chairman of our Audit Committee discussed the foregoing issues with KPMG, and the Company will authorize KPMG to respond fully to inquiries of the successor accountant, when hired, concerning the foregoing.

(emphasis added).

68.   On June 8, 2011, the NASDAQ Listing Qualifications Panel (the "Panel") affirmed its decision to delist ShengdaTech.  In support of its decision, the Panel cited, among other things, the discrepancies found by KPMG.  The Panel further noted that ShengdaTech management was obstructing the Special Committee's ability to fulfill its duties and responsibilities under Listing Rule 5603(c)(3) and Section 10A(m)(2) of the Exchange Act.  Trading in ShengdaTech's common stock was suspended on June 10, 2011.

69.   On June 9, 2011, the Company announced that it would be defaulting on its obligations to the holders of the 6.0% Notes.  In a Form 8-K filed that day, ShengdaTech stated:

Pursuant to the terms of an Indenture, dated as of May 28, 2008 (the "Indenture"), between [ShengdaTech] and The Bank of New York (the "Trustee"), holders of the [6.0% Notes] had the contractual right (the "Put Option") to require the Company to purchase on June 1, 2011 (the "Purchase Date") any or all of the outstanding Notes held by each such holder at a purchase price of 100% of the principal amount thereof, plus any accrued and unpaid interest up to but excluding the Purchase Date, payable in cash (the "Purchase Price").  In accordance with the terms of the Indenture and the Notes, a notice of the Put Option was sent to holders of the Notes.  As of May 24, 2011, the deadline for holders to exercise the Put Option, *holders of all of the Notes had exercised the Put Option in the aggregate sum of $25,578,000.  The Company did not pay the Purchase Price for the Notes on the Purchase Date*.  Based on the nonpayment, the aggregate principal amount of the Notes, plus any accrued and unpaid interest and any other amounts due and owing on the Notes could be declared immediately due and payable by the Trustee or by holders of 25% or more of the aggregate principal amount of the Notes.

(emphasis added).

70.     On June 15, 2011, ShengdaTech became obligated to pay interest on the 6.5% Notes in the amount of approximately $4.4 million.  ShengdaTech has, to date, failed to pay any portion of this interest.

71.     On August 11, 2011, the SEC initiated a regulatory proceeding titled *In re ShengdaTech, Inc.* (LA-3397).  The formal Order entered by the SEC in connection with this proceeding challenged, among other things, false statements in the Company's financial results for the fiscal years 2009 and 2010.

72.     On August 19, 2011, the Special Committee announced that it had removed all members of ShengdaTech's management – including Chen – from their positions, effective immediately.  Michael Kang of Alvarez & Marshal North America LLP has been appointed to act as Chief Restructuring Officer ("CRO") and ShengdaTech's sole officer with responsibility to (i) manage ShengdaTech's business and operations, (ii) assist ShengdaTech in conducting its ongoing investigation, and (iii) restructure ShengdaTech's operations.  ShengdaTech filed for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada on the same day.  ShengdaTech acknowledged in a Form 8-K filed with the SEC on August 23, 2011 that the bankruptcy filing constituted an "event of default" on the 6.0%  Notes and the 6.5% Notes.

73.     On August 22, 2011, the SEC served ShengdaTech with a subpoena for documents in connection with a fact-finding investigation by the SEC with regard to the Company.

74.     On December 15, 2011, NASDAQ officially delisted ShengdaTech.  The stock had not traded on NASDAQ since its June 10, 2011 suspension.

75.     On February 15, 2012, the SEC filed a proof of claim against ShengdaTech.   In this proof of claim, the SEC indicated that its investigation into the Company continues and that it may file a civil action against ShengdaTech based on possible violations of the federal securities laws.

76.     On March 6, 2012, ShengdaTech's Official Committee of Unsecured Creditors (the "Committee") submitted a demand letter in the ShengdaTech bankruptcy seeking in excess

of $150 million in monetary damages from a variety of ShengdaTech directors and officers, stemming from their roles in ShengdaTech's financial fraud, including Chen, Guo, and Andrew Chen, ShengdaTech's former Chief Financial Officer, who resigned effective September 30, 2010.

77.     While the Special Committee's investigation is far from complete, the details that have been revealed in ShengdaTech's bankruptcy filings indicate that ShengdaTech management was engaging in a massive fraud throughout the Loss Period.   The Special Committee's investigation quickly revealed serious problems – including an inability to verify something as simple as whether ShendgaTech actually had any cash in its bank accounts – that indicate that the fraud was relatively easy to uncover, had anyone been looking.   According to a filing in ShengdaTech's bankruptcy:

> The Special Committee instructed teams of professionals from [O'Melveny] and PwC to visit financial institutions holding [ShengdaTech's] accounts in China in order to verify [the Company's] cash accounts, but managers of the PRC Companies obstructed those efforts.  The Special Committee was informed that managers:  stalled or otherwise attempted to derail trips to [ShengdaTech's] financial institutions; refused to cooperate with [O'Melveny] and PwC; once at the banks, attempted to steer the team to specific persons at the banks, rather than permit [O'Melveny] and PwC teams to speak with other identified individuals; and when [O'Melveny] and PwC teams refused to meet with particular bank employees chosen by the managers, the managers departed and refused to assist them.

The immediate ease with which such obstructionist tactics were deployed suggests that, had Defendants been asking questions earlier, the fraud would have been uncovered.  Management's complete refusal to assist in the investigation underscores the conclusion that ShengdaTech was engaged in an outright fraud.

78.     The Special Committee has also been unable to verify the authenticity of certain U.S. certificates of deposit ("CDs").   While Chen provided the Special Committee with photocopies of CDs as evidence that ShengdaTech actually had cash on hand, Chen was "unresponsive" to requests for further information about these CDs, and the Special Committee learned that the bank that purportedly issued the CDs was unable to verify them and, in fact, has no record of issuing them.   The evidence uncovered to date seems to clearly indicate that

1    ShengdaTech's management falsified evidence, in a most primitive way, to create the illusion of

2    having materially more assets than the Company truly had.

3        79.    Chen and other former members of ShengdaTech management have repeatedly

4    obstructed the Special Committee's investigation, preventing Plaintiffs from fully discovering

5    the depth of ShengdaTech management's fraud.  Chen has gone so far as to refuse to meet with

6    the Board or the Special Committee and has attempted to use his voting control over the

7    Company to appoint a new member to the Board who, presumably, would be friendly to Chen's

8    interests and would potentially empower Chen with the votes needed to remove members of the

9    Special Committee and further obstruct the investigation.  These shenanigans lead ShengdaTech

10   to file an Adversary Proceeding Complaint in the bankruptcy action to enjoin Chen from

11   interfering with the Special Committee and the CRO or taking any steps to remove any members

12   of the Special Committee or the CRO.  *See* Adversary Proceeding Complaint filed in *In re*

13   *ShengdaTech, Inc.*, Case No. BK-11-52649 (Bankr. D. Nev.).

14       80.    Details of management's efforts to thwart the Special Committee's investigation

15   continue to emerge.  On October 7, 2011, ShengdaTech filed a declaration by CRO Kang in

16   which Kang reported that he "recently visited China, with other officers of [ShengdaTech] and

17   certain of the [Company's] professionals, in an attempt to gather more information about [certain

18   affiliates of ShengdaTech who had not filed for bankruptcy]."  During that trip, Kang visited

19   ShengdaTech's operating subsidiaries in China and "among other things, requested financial

20   information and asked questions regarding the value, operations and profitability of the PRC

21   Companies."  Those requests were denied, according to Kang.  He states that the "plant

22   managers at these locations refused to provide financial information and refused to answer any

23   questions relating to the financial condition of the PRC Operating Subsidiaries" and, further, that

24   ShengdaTech's subsidiaries in China are  "currently  acting  outside  of  the  control  of

25   [ShengdaTech]."  Finally, Kang disclosed that the Company still has "limited access to its books

26   and records, limited access to Faith Bloom's books and records and no access to the PRC

27   Subsidiaries' current books and records."

28

81.     Despite the considerable roadblocks that have been placed in its path, the Special Committee persists in its investigation.  While the investigation is far from complete, it is clear that ***ShengdaTech's financial records were falsified*** and that serious issues remain unanswered regarding ShengdaTech's financial condition and its overall business operations.  Notably, in ShengdaTech's Disclosure Statement for The Chapter 11 Plan of Reorganization filed with the bankruptcy court on May 16, 2012, the Company disclosed that Faith Bloom bank accounts that had been reported to contain $73 million in reality contained only $50,000.   The Company's financial shenanigans – the full details of which cannot be presently known due to the steadfast refusal of certain former members of the Company's management to cooperate with the Special Committee or to assist in its investigation – have had a devastating impact on Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes.  Having purchased the Notes at or near par value, Plaintiffs and these funds and accounts are now left holding Notes worth only a fraction of what was paid for them, if indeed they have any value at all.

**VII.    LOSS CAUSATION**

82.     As described herein, Defendants made or caused to be made a series of materially false or misleading statements about ShengdaTech's financial condition and, in the case of the Auditor Defendants, the adequacy of its financial controls.  These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects and operations, thus fraudulently creating a market for the Notes and causing the Notes to be overvalued and artificially inflated at all times relevant hereto.  Defendants' materially false and misleading statements resulted in Plaintiffs purchasing or otherwise acquiring Notes that would never have come into the market but for the fraud or, at a minimum, would have come into the market at substantially lower prices and/or on terms far more favorable to investors.  But for Defendants' misrepresentations, Plaintiffs would not have purchased the Notes at all, or would not have purchased them on the terms and at the artificially inflated prices at which they entered the market.  As the truth about ShengdaTech began to be revealed, the inflation caused by these misrepresentations was eliminated from the

1  price of the Notes, causing damages to Plaintiffs and the funds and accounts on whose behalf

2  Plaintiffs purchased the Notes.

3       83.    On March 14, 2011 – the day before ShengdaTech disclosed that KPMG had

4  uncovered improprieties in the Company's 2010 Financial Statements – ShengdaTech's common

5  stock closed at $3.55.  Although NASDAQ halted trading in ShengdaTech common stock on

6  March 15, 2011, the stock traded on several days in June 2011.  On June 10, 2011, ShengdaTech

7  opened at $0.55; by the close of trading, its was down to $0.25.  ShengdaTech continued to trade

8  throughout the month of June at levels between $0.23 and $0.90 – far below its pre-disclosure

9  trading price of $3.55.

10      84.    Plaintiffs purchased Notes in the offerings and in the secondary market at or near

11 par, and in many cases above par value.  The Notes prices fell precipitously in response to the

12 revelations of the financial irregularities at ShengdaTech.  By June 22, 2011, 6.5% Notes traded

13 at only $19.75, and by January 3, 2012 they traded at $15.

14      85.    ShengdaTech has defaulted on both the 6.0% Notes and the 6.5% Notes.  On June

15 1, 2011, holders of 6.0% Notes became entitled to require ShengdaTech to repurchase these

16 Notes (the "Put Right"). As of May 24, 2011, all of the eligible 6.0% Note holders had exercised

17 their Put Rights, to the tune of $25,578,000.  ShengdaTech has not paid the 6.0% Notes holders –

18 including Plaintiffs – the money to which they are entitled under the Put Right.  Further, as a

19 result of ShengdaTech's failure to make payments in accordance with the Put Right,

20 ShengdaTech became obligated to pay interest on the still-outstanding 6.0% Notes on June 1,

21 2011.  ShengdaTech has failed to pay any portion of this interest to Plaintiffs who hold 6.0%

22 Notes.

23      86.    ShengdaTech is also in default on its 6.5% Notes.  ShengdaTech was required to

24 pay interest on the 6.5% Notes, in the amount of approximately $4.4 million, on June 15, 2011.

25 ShengdaTech did not make any interest payment on that date to Plaintiffs.   ShengdaTech

26 currently owes $155 million under the 6.5% Notes that it has no ability to pay.

27 . . .

28 . . .

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

87.     Plaintiffs did not know, and could not reasonably have discovered during the Loss Period, that ShengdaTech's financial statements and the Auditor Defendants' audit reports during the Loss Period were false or misleading.

88.     On March 15, 2011, ShengdaTech issued a press release announcing that it had appointed a special committee of the Board of Directors to investigate "potentially serious discrepancies and unexplained issues relating to the Company's and its subsidiaries' financial records identified by [KPMG]" in the course of KPMG's examination of the Company's 2010 Financial Statements.  It was not until May 5, 2011 that there was a public statement indicating that KPMG no longer stood behind its audit reports concerning the Company's 2008 and 2009 Financial Statements.  Prior to this time, Plaintiffs had no reason to suspect that anything was amiss with any financial statements other than the Company's 2010 Financial Statements, which KPMG was in the process of auditing when it discovered the "potentially serious discrepancies and unexplained issues."  The statute of limitations remained tolled on Plaintiffs' claims until, at the earliest, May 5, 2011.

89.     On March 15, 2012, Plaintiffs entered into agreements with KPMG and Hansen whereby all statutes of limitations and repose for Plaintiffs' claims against KPMG and Hansen were tolled from March 15, 2012 through the termination of the agreements.  The agreements were later terminated, effective on June 6, 2012.

90.     All of Plaintiffs' claims have been brought within the applicable statutes of limitations, after giving effect to tolling.

## IX.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of Section 18 of the Exchange Act**
**(Against Hansen For False Statements In The 2007 10-K/A)**

91.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92.     This claim is asserted against Hansen for violation of Section 18 of the Exchange Act.

93.     As set forth above, Hansen made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2007 10-K/A.

94.     In connection with the purchase of the Company's Notes, Plaintiffs read and relied upon the Company's 2007 10-K/A.   Specifically, Plaintiffs read and relied on the Company's 2007 Financial Statements contained in the 2007 10-K/A.   Plaintiffs also read and relied upon the unqualified audit opinion issued by Hansen in connection with those Financial Statements, in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP and that the Company maintained effective internal controls over financial reporting during that year.

95.     For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2007 10-K/A refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR.

96.     Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

97.     When the truth began to emerge about the false and misleading statements in the Company's 2007 10-K/A, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

98.     As a direct and proximate result of Defendant Hansen's wrongful conduct, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damage in connection with Plaintiffs' purchases of the Notes.

99.     By virtue of the foregoing, Defendant Hansen has violated Section 18 of the Exchange Act.

. . .

. . .

. . .

. . .

### SECOND CLAIM FOR RELIEF

#### Violation of Section 18 of the Exchange Act
#### (Against Hansen and KPMG For False Statements In The 2008 10-K)

100.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101.   This claim is asserted against Defendants Hansen and KPMG for violation of Section 18 of the Exchange Act.

102.   As set forth above, Defendants Hansen and KPMG made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2008 10-K.

103.   In connection with the purchase of the Company's Notes, Plaintiffs specifically read and relied upon the Company's 2008 10-K.  Plaintiffs read and relied on the Company's 2007 Financial Statements contained in the 2008 10-K, as well as the unqualified audit opinion in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.  Plaintiffs also specifically read and relied on the Company's 2008 Financial Statements contained in the 2008 10-K, as well as the unqualified audit opinion in which KPMG stated that the 2008 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.

104.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2008 10-K refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR.

105.   Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

106.   When the truth began to emerge about the false and misleading statements and omissions in the Company's 2008 10-K, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

107.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damage in connection with Plaintiffs' purchases of the Notes.

108.   By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

## THIRD CLAIM FOR RELIEF

### Violation of Section 18 of the Exchange Act
### (Against Hansen and KPMG For False Statements In The 2009 10-K And 2009 10-K/A)

109.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.   This claim is asserted against Defendants Hansen and KPMG for violation of Section 18 of the Exchange Act.

111.   As set forth above, Hansen and KPMG made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2009 10-K and 2009 10-K/A.

112.   In connection with the purchase of the Company's Notes, Plaintiffs read and relied upon the Company's 2009 10-K and 2009 10-K/A.   Plaintiffs read and relied on the Company's 2007  Financial Statements contained in the 2009 10-K and 2009 10-K/A, as well as the unqualified audit opinion in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.  Plaintiffs also read and relied on the Company's 2008 and 2009 Financial Statements contained in the 2009 10-K and 2009 10-K/A, as well as the unqualified audit opinion in which KPMG stated that the 2008 and 2009 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP, and KPMG's statement that the Company maintained effective internal controls over financial reporting during the fiscal year ending December 31, 2009.

113.    For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR.

114.    Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

115.    When the truth began to emerge about the false and misleading statements and omissions in the Company's 2009 10-K and 2009 10-K/A, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

116.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damage in connection with Plaintiffs' purchases of the Notes.

117.    By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

**FOURTH CLAIM FOR RELIEF**

**Violation of Section 20(a) of the Exchange Act**
**(Against KPMG International and KPMG USA)**

118.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

119.    This Claim is asserted against KPMG International and KPMG USA pursuant to Section 20(a) of the Exchange Act.

120.    As alleged herein, KPMG Hong Kong violated Section 18 of the Exchange Act by making false and misleading statements in ShengdaTech's 2008 10-K, 2009 10-K and 2009 10-K/A.

121.    Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damages in connection with Plaintiffs' purchases of 6.0% Notes and 6.5% Notes as a direct and proximate result of KPMG Hong Kong's violations of Section 18.

122.    KPMG International and KPMG USA were controlling persons of KPMG Hong Kong. By virtue of the unified international structure of the auditing firm and the relationships

among member firms, KPMG International had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of its member firms, including KPMG Hong Kong.  KPMG USA reviewed and approved KPMG Hong Kong's audit work and thus influenced and controlled, directly or indirectly, KPMG Hong Kong's conduct and decision-making with respect to its audits and audit reports concerning ShengdaTech.

123.    KPMG International and KPMG USA are not entitled to a "good faith" defense, because they cannot establish that they acted in good faith and that they did not directly or indirectly induce the acts constituting the violation of Section 18 by KPMG Hong Kong.

124.    By virtue of their positions as controlling persons of KPMG Hong Kong, KPMG International and KPMG USA are each jointly and severally liable pursuant to Section 20(a) of the Exchange Act, with and to the same extent as KPMG Hong Kong, for KPMG Hong Kong's violations of Section 18 of the Exchange Act.

**FIFTH CLAIM FOR RELIEF**

**Common Law Negligent Misrepresentation**
**(On Behalf Of Plaintiff CNH Against Hansen For False**
**Statements In The 6.0% Notes Offering Memorandum)**

125.    Plaintiff CNH repeats and realleges each of the allegations set forth above as if fully set forth herein.  For the purposes of this claim, CNH expressly disclaims any claim of fraud or intentional misconduct.

126.    This claim is brought by CNH against Hansen under common law principles of negligence.

127.    Hansen is in the business or auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

128.    Hansen expressly consented to the incorporation in the 6.0% Notes Offering Memorandum of its audit opinion on the 2007 Financial Statements and its statement that the Company maintained effective internal controls over financial reporting, knowing that the 6.0% Notes Offering Memorandum would be disseminated to a limited group potential purchasers of

the 6.0% Notes for the purpose of soliciting those investors to purchase the notes. Hansen knew and intended that the potential purchasers who received the 6.0% Notes Offering Memorandum would rely on its, contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.0% Notes.

129. CNH is a member of the limited group of potential purchasers of the 6.0% Notes that received the 6.0% Notes Offering Memorandum and were solicited to purchase notes in the 6.0% Notes Offering.

130. Hansen owed a duty of reasonable care to the investors and investment managers that received the 6.0% Notes Offering Memorandum, including CNH, and to the funds and accounts managed by CNH, because they were foreseeable and intended beneficiaries of Hansen's audit opinions.

131. Hansen breached this duty by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in its audit opinion that it had audited the financial statements in accordance with applicable auditing standards and that those financial statements were presented fairly and in accordance with GAAP.

132. At the time of the misrepresentations and omissions of material fact by Hansen, CNH was ignorant of their falsity and believed them to be true. CNH relied upon the superior knowledge and expertise of Hansen, and read and justifiably relied (to its detriment and to the detriment of the funds and accounts on whose behalf CNH purchased the Notes) on the audited financial statements in the 6.0% Notes Offering Memorandum, on the unqualified opinion issued by Hansen in connection with those financial statements, and on Hansen's report concerning the Company's internal controls, when purchasing the 6.0% Notes in the 6.0% Notes Offering. Had CNH been aware of the true facts, it would not have purchased the 6.0% Notes.

133. Hansen's conduct constitutes the making of negligent misrepresentations under applicable state law. As a direct and proximate result of the negligent misrepresentations by Hansen, and in reliance thereon, CNH purchased 6.0% Notes in the 6.0% Notes Offering and CNH and the funds and accounts on whose behalf CNH purchased the Notes suffered damages.

. . .

### SIXTH CLAIM FOR RELIEF

**Common Law Negligent Misrepresentation**
**(On Behalf Of All Plaintiffs Against Defendants Hansen And KPMG**
**For False Statements In The 6.5% Notes Offering Memorandum)**

134.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  For the purposes of this claim, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.

135.   This claim is brought by Plaintiffs against Hansen and KPMG under common law principles of negligence.

136.   Defendants are in the business or auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

137.   Hansen expressly consented to the incorporation of its audit opinion on the 2007 Financial Statements in the 6.5% Notes Offering Memorandum, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group potential purchasers of the 6.5% Notes for the purpose of soliciting those investors to purchase the notes.  Hansen knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its, contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.5% Notes.

138.   KPMG expressly consented to the incorporation of its audit opinions on the 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum, as well as KPMG's statement that the Company maintained effective internal controls over financial reporting during the fiscal year ending December 31, 2009, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the Notes for the purpose of soliciting those investors to purchase the 6.5% Notes.  KPMG knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its contents, including the 2008 and 2009 Financial Statements and KPMG's audit reports, when deciding to purchase the 6.5% Notes.

139.   Plaintiffs were members of the limited group of potential purchasers of the 6.5% Notes that received the 6.5% Notes Offering Memorandum and were solicited to purchase notes in the 6.5% Notes Offering.

140.   Defendants owed a duty of reasonable care to the investors and investment managers that received the 6.5% Notes Offering Memorandum, including Plaintiffs, and to the funds and accounts managed by Plaintiffs, because they were foreseeable and intended beneficiaries of Defendants' audit opinions.

141.   Defendants breached this duty  by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in their audit opinions that they had audited the financial statements in accordance with applicable auditing standards, that those financial statements were presented fairly and in accordance with GAAP, and that the Company had adequate internal controls during 2009.

142.   At the time of the misrepresentations of material fact by Defendants, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs relied upon the superior knowledge and expertise of Defendants, and read and justifiably relied (to Plaintiffs' detriment and to the detriment of the funds and accounts on whose behalf Plaintiffs purchased the Notes) on the audited financial statements in the 6.5% Notes Offering Memorandum, on the unqualified opinions issued by Defendants in connection with those financial statements, and on KPMG's report concerning the Company's internal controls, when purchasing 6.5% Notes in the 6.5% Notes Offering.  Had Plaintiffs been aware of the true facts, they would not have purchased the 6.5% Notes.

143.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR.

144.   Defendants' conduct constitutes the making of negligent misrepresentations under applicable state law.  As a direct and proximate result of the negligent misrepresentations by Defendants, and in Plaintiffs' reliance thereon, Plaintiffs purchased 6.5% Notes in the 6.5%

Notes Offering and Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damages.

## SEVENTH CLAIM FOR RELIEF

**Common Law Negligent Misrepresentation**
**(Against Defendants KPMG International And KPMG USA Under The Doctrine Of**
***Respondeat Superior*, Based On KPMG Hong Kong's**
**False Statements In The 6.5% Notes Offering Memorandum)**

145.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

146.   This claim is brought by Plaintiffs against Defendants KPMG International and KPMG USA based on KPMG Hong Kong's false statements contained in the 6.5% Notes Offering Memorandum under the doctrine of *respondeat superior*.

147.   As alleged above, KPMG Hong Kong breached its duty of care to Plaintiffs and made negligent misrepresentations in its audit reports on the 2008 and 2009 Financial Statements as contained in the 6.5% Notes Offering Memorandum, and Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damages as a result of Plaintiffs' reliance on those misrepresentations.

148.   KPMG Hong Kong was an agent of Defendants KPMG International and KPMG USA with respect to its audits of the 2008 and 2009 Financial Statements and with respect to its issuance of unqualified audit opinions on the 2008 and 2009 Financial Statements.  KPMG Hong Kong took actions in connection with its audits of the 2008 and 2009 Financial Statements and its issuance of unqualified audit opinions on the 2008 and 2009 Financial Statements at the behest of KPMG International and KPMG USA, and such actions were within the scope of KPMG Hong Kong's agency.

149.   Under principles of *respondeat superior*, KPMG International and KPMG USA are responsible for the actions and liabilities of their agent, KPMG Hong Kong, in connection with its issuance of unqualified audit opinions on  the 2008 and 2009 Financial Statements as contained in the 6.5% Notes Offering Memorandum.

. . .

. . .

## EIGHTH CLAIM FOR RELIEF

### Common Law Negligent Misrepresentation
### (Against Morgan Stanley For False Statements In
### The 6.5% Notes Offering Memorandum)

150.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  For the purposes of this claim, Plaintiffs expressly disclaims any claim of fraud or intentional misconduct.  Plaintiffs CNH, Advent, and AQR do not join in this claim.

151.   This claim is brought against Morgan Stanley under common law principles of negligence.

152.   Morgan Stanley underwrote the 6.5% Notes Offering.  As part of its duties as an underwriter, Morgan Stanley was required to conduct, prior to the 6.5% Notes Offering, a reasonable investigation to ensure that the 6.5% Notes Offering Memorandum contained no misstatement or omission of material fact.

153.   Morgan Stanley consented to its name being prominently displayed on the front cover of the 6.5% Notes Offering Memorandum, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group potential purchasers of the 6.5% Notes for the purpose of soliciting those investors to purchase the notes.  Morgan Stanley knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its contents, including the Company's audited and unaudited financial statements described above, when deciding to purchase the 6.5% Notes.

154.   Plaintiffs are members of the limited group of potential purchasers of the 6.5% Notes that received the 6.5% Notes Offering Memorandum and were solicited to purchase notes in the 6.5% Notes Offering.

155.   Morgan Stanley owed a duty of reasonable care to the investors and investment managers that received the 6.5% Notes Offering Memorandum, including Plaintiffs, and to the funds and accounts managed by Plaintiffs, because they were foreseeable and intended beneficiaries of the 6.5% Notes Offering Memorandum.

156.   Morgan Stanley breached this duty by failing to conduct a reasonable investigation into the accuracy of the 6.5% Notes Offering Memorandum.

157.   At the time of the misrepresentations and omissions of material fact by Morgan Stanley, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs relied upon the superior knowledge and expertise of Morgan Stanley, and read and justifiably relied (to their detriment and to the detriment of the funds and accounts on whose behalf Plaintiffs purchased the Notes) on the audited and unaudited financial statements in the 6.5% Notes Offering Memorandum when purchasing the 6.5% Notes in the 6.5% Notes Offering.  Had Plaintiffs been aware of the true facts, they would not have purchased the 6.5% Notes.

158.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR.

159.   Morgan Stanley's conduct constitutes the making of negligent misrepresentations under applicable state law.  As a direct and proximate result of the negligent misrepresentations by Morgan Stanley, and in reliance thereon, Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering and Plaintiffs and the funds and accounts on whose behalf Plaintiffs purchased the Notes suffered damages.

## NINTH CLAIM FOR RELIEF

**For Violation of California Corporations Code § 25504.2**
**(Against Hansen Based On False Statements In The**
**6.5% Notes Offering Memorandum)**

160.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

161.   This claim is brought by all Plaintiffs located in California, all Plaintiffs who purchased Notes on behalf of any funds, accounts or clients located in California, and all Plaintiffs who purchased Notes in California (together, the "California Plaintiffs") against Hansen pursuant to California Corporations Code § 25504.2.

162.   Although ShengdaTech is not a party to this action, ShengdaTech violated California Corporations Code § 25401 by selling the 6.5% Notes by means of the false and misleading 6.5% Notes Offering Memorandum, and would be subject to liability for that violation under California Corporations Code § 25501.

163.   The 6.5% Notes Offering Memorandum was distributed in connection with the offer and sale of the 6.5% Notes.

164.   The 6.5% Notes Offering Memorandum contained untrue statements of material facts required to be stated therein and/or necessary to make the statements in the 6.5% Notes Offering Memorandum not misleading, including, but not limited to, the 2007 Financial Statements audited by Hansen and Hansen's unqualified audit opinion thereon.

165.   Defendant Hansen was the auditor for ShengdaTech with respect to the 2007 Financial Statements, and consented to the inclusion (or incorporation by reference) of its audit opinions in the 6.5% Notes Offering Memorandum, and to being named in the 6.5% Notes Offering Memorandum as a party who certified the financial statements contained therein. Hansen certified the 2007 Financial Statements in the 6.5% Notes Offering Memorandum as being prepared in accordance with GAAP and audited in accordance with GAAS.  These certifications, as well as the 2007 Financial Statements themselves, were materially false and misleading.

166.   Hansen failed to exercise reasonable care in conducting its audits and, in failing to reasonably investigate, did not detect, disclose and/or correct the material omissions and materially false and misleading statements in the 2007 Financial Statements contained in the 6.5% Notes Offering Memorandum.

167.   The California Plaintiffs did not know of the false or misleading statements contained in the 6.5% Notes Offering Memorandum, or the omissions therefrom, and read and relied to their detriment, and/or to the detriment of the funds and accounts the California Plaintiffs managed, on the accuracy and completeness of those statements.

168.   These materially false and misleading statements proximately caused the California Plaintiffs to purchase the 6.5% Notes and proximately caused the California Plaintiffs and/or the funds and accounts managed by the California Plaintiffs to suffer damages.

. . .

. . .

. . .

**TENTH CLAIM FOR RELIEF**

**For Violation of California Corporations Code § 25504.2**
**(Against KPMG Based On False Statements In The**
**6.5% Notes Offering Memorandum)**

169.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

170.   This claim is brought by the California Plaintiffs against KPMG pursuant to California Corporations Code § 25504.2.

171.   Although ShengdaTech is not a party in this action, ShengdaTech violated California Corporations Code § 25401 by selling the 6.5% Notes by means of the false and misleading 6.5% Notes Offering Memorandum, and would be subject to liability for that violation under California Corporations Code § 25501.

172.   The 6.5% Notes Offering Memorandum was distributed in connection with the offer and sale of the 6.5% Notes.

173.   The 6.5% Notes Offering Memorandum contained untrue statements of material facts required to be stated therein and/or necessary to make the statements in the 6.5% Notes Offering Memorandum not misleading, including, but not limited to, the 2008 and 2009 Financial Statements audited by KPMG and KPMG's unqualified audit opinion thereon.

174.   KPMG was the auditor for ShengdaTech with respect to the 2008 and 2009 Financial Statements, and consented to the inclusion (or incorporation by reference) of its audit opinions in the 6.5% Notes Offering Memorandum, and to being named in that Offering Memorandum as a party who certified the 2008 and 2009 Financial Statements contained therein. KPMG certified the 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum as being prepared in accordance with GAAP and audited in accordance with GAAS.  These certifications, as well as the 2008 and 2009 Financial Statements themselves, were materially false and misleading.

175.   KPMG failed to exercise reasonable care in conducting its audits and, in failing to reasonably investigate, did not detect, disclose and/or correct the material omissions and

materially false and misleading statements in the 2008 and 2009 Financial Statements contained in the 6.5% Notes Offering Memorandum.

176.   The California Plaintiffs did not know of the false or misleading statements contained in the 6.5% Notes Offering Memorandum, or the omissions therefrom, and read and relied to their detriment, and/or to the detriment of the funds and accounts the California Plaintiffs managed, on the accuracy and completeness of those statements.

177.   These materially false and misleading statements proximately caused the California Plaintiffs to purchase the 6.5% Notes and proximately caused the California Plaintiffs and/or the funds and accounts managed by the California Plaintiffs to suffer damages.

## ELVENTH CLAIM FOR RELIEF

**For Violation of California Corporations Code §§ 25401 And 25501**
**(Against Morgan Stanley Based On False Statements**
**In The 6.5% Notes Offering Memorandum)**

178.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.  Plaintiffs CNH, Advent, and AQR do not join in this claim.

179.   This claim is brought by the California Plaintiffs who purchased Notes in the 6.5% Notes Offering Memorandum from Morgan Stanley, against Morgan Stanley pursuant to California Corporations Code §§ 25401 and 25501.

180.   Morgan Stanley sold the 6.5% Notes to the California Plaintiffs on whose behalf this Count is brought, pursuant to the 6.5% Notes Offering Memorandum.

181.   The 6.5% Notes Offering Memorandum contained untrue statements of material fact, including, but not limited to, the audited and unaudited financial statements of ShengdaTech.

182.   Morgan Stanley owed a duty to the California Plaintiffs to make a reasonable and diligent investigation of the statements contained in the 6.5% Notes Offering Memorandum  to

ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

183.    Morgan Stanley did not make a reasonable investigation of the statements contained in the 6.5% Notes Offering Memorandum, and did not possess reasonable grounds for believing that the 6.5% Notes Offering Memorandum did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

184.    The California Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.5% Notes Offering Memorandum when they purchased or acquired the 6.5% Notes.

185.    By virtue of the foregoing, Morgan Stanley has violated California Corporation Code § 25400(d) and Morgan Stanley is liable to the California Plaintiffs who purchased Notes from it in the 6.5% Notes Offering pursuant to California Corporation Code § 25500.

## TWELFTH CLAIM FOR RELIEF

**For Violation of Connecticut Uniform Securities Act § 36b-29(a)**
**(Against Hansen and KPMG Based On False Statements**
**In The 6.5% Notes Offering Memorandum)**

186.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

187.    This claim is brought by all Plaintiffs located in Connecticut, all Plaintiffs who purchased Notes on behalf of any funds, clients or accounts located in Connecticut, and all Plaintiffs who purchased Notes in Connecticut (together, the "Connecticut Plaintiffs") against Hansen and KPMG pursuant to Connecticut Uniform Securities Act § 36b-29(a).

188.    Although ShengdaTech is not a party in this action, ShengdaTech sold the 6.5% Notes by means of untrue statements made in the 6.5% Notes Offering Memorandum.

189.    Hansen and KPMG materially assisted ShengdaTech in selling the 6.5% Notes. Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit opinions on the 2007 Financial Statements in the 6.5% Notes Offering Memorandum.    KPMG audited ShengdaTech's 2008 and 2009 Financial Statements and

consented to the inclusion of its unqualified audit opinions on the 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum.   As set forth above, ShengdaTech accessed the United States capital markets via a "reverse merger" transaction, a process that allowed ShengdaTech to sell its securities publicly without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors.   Because of this, the role of Hansen and KPMG as ShengdaTech's outside auditors assumed special importance, as their audit opinions were the primary safeguard against financial fraud at ShengdaTech.   The inclusion in the 6.5% Notes Offering Memorandum of Hansen's and KPMG's unqualified audit opinions materially assisted ShengdaTech to sell the 6.5% Notes.

190.   Hansen and KPMG should have known, through the exercise of reasonable care, that the Company's financial statements in the 6.5% Notes Offering Memorandum were materially false and misleading and that, therefore, Hansen's and KPMG's unqualified audit opinions on those financial statements were also materially false and misleading.

191.   Hansen and KPMG owed the Connecticut Plaintiffs the duty to make a reasonable and diligent investigation of ShengdaTech's financial statements and their own unqualified audit opinions in the 6.5% Notes Offering Memorandum, to ensure that they did not contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

192.   As alleged in detail herein, Hansen did not make a reasonable investigation of the 2007 Financial Statements or its unqualified audit opinion thereon and did not possess reasonable grounds for believing that the 2007 Financial Statements and its unqualified audit opinions thereon did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. KPMG did not make a reasonable investigation of the 2008 and 2009 Financial Statements or its unqualified audit opinions thereon and did not possess reasonable grounds for believing that the 2008 and 2009 Financial Statements and its unqualified audit opinions thereon did not contain an

untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

193.   The Connecticut Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements or omissions of material facts in the 2007, 2008 or 2009 Financial Statements or in Hansen's and KPMG's unqualified audit opinions in the 6.5% Notes Offering Memorandum.

194.   The material false statements and omissions in the financial statements and audit opinions in the 6.5% Notes Offering Memorandum proximately caused the Connecticut Plaintiffs to purchase the Notes and proximately caused the Connecticut Plaintiffs and/or the funds and accounts managed by the Connecticut Plaintiffs to suffer damages.

195.   By reason of the foregoing, Hansen and KPMG are liable to the Connecticut Plaintiffs for violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

### THIRTEENTH CLAIM FOR RELIEF

**For Violation of Connecticut Uniform Securities Act § 36b-29(c)**
**(Against KPMG International And KPMG USA, Based On KPMG Hong Kong's False Statements In The 6.5% Notes Offering Memorandum)**

196.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

197.   This claim is asserted by the Connecticut Plaintiffs against KPMG International and KPMG USA pursuant to Section 36b-29(c) of the Connecticut Uniform Securities Act.

198.   As alleged herein, KPMG Hong Kong violated Section 36b-29(a) of the Connecticut Uniform Securities Act by making false and misleading statements in the 6.5% Notes Offering Memorandum.

199.   The Connecticut Plaintiffs suffered damages in connection with their purchases of 6.5% Notes as a direct and proximate result of KPMG Hong Kong's violations of Section 36b-29(a).

200.   KPMG International and KPMG USA were controlling persons of KPMG Hong Kong.  By virtue of the unified international structure of the auditing firm and the relationships among member firms, KPMG International had the power to influence and control, and did

influence and control, directly or indirectly, the decision-making of its member firms, including KPMG Hong Kong.  KPMG USA reviewed and approved KPMG Hong Kong's audit work and thus influenced and controlled, directly or indirectly, KPMG Hong Kong's conduct and decision-making with respect to its audits and audit reports concerning ShengdaTech.

201.   KPMG International and KPMG USA are not entitled to a "good faith" defense, because they cannot establish that they did not know, nor in the exercise of reasonable care could they have known, of the falsity of KPMG Hong Kong's false statements in the 6.5% Notes Offering Memorandum.

202.   By virtue of their positions as controlling persons of KPMG Hong Kong, KPMG International and KPMG USA are each jointly and severally liable to the Connecticut Plaintiffs pursuant to Section 36b-29(c) of the Connecticut Uniform Securities Act, with and to the same extent as KPMG Hong Kong, for KPMG Hong Kong's violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

## FOURTEENTH CLAIM FOR RELIEF

**For Violation of Connecticut Uniform Securities Act § 36b-29(a)**
**(Against Morgan Stanley Based On False Statements**
**In The 6.5% Notes Offering Memorandum)**

203.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

204.   This claim is brought by the Connecticut Plaintiffs against Morgan Stanley pursuant to Connecticut Uniform Securities Act § 36b-29(a).  Plaintiffs CNH, Advent, and AQR do not join in this claim.

205.   Morgan Stanley sold the 6.5% Notes by means of untrue statements made in the 6.5% Notes Offering Memorandum.

206.   Morgan Stanley should have known, through the exercise of reasonable care, that the 6.5% Notes Offering Memorandum was materially false and misleading.

207.   Morgan Stanley owed the Connecticut Plaintiffs the duty to make a reasonable and diligent investigation of the 6.5% Notes Offering Memorandum, to ensure that it did not

contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

208.   As alleged in detail herein, Morgan Stanley did not make a reasonable investigation of the 6.5% Notes Offering Memorandum and therefore did not possess reasonable grounds for believing that 6.5% Notes Offering Memorandum did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

209.   The Connecticut Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements or omissions of material facts in the 6.5% Notes Offering Memorandum.

210.   The material false statements and omissions in the 6.5% Notes Offering Memorandum proximately caused the Connecticut Plaintiffs to purchase the Notes and proximately caused the Connecticut Plaintiffs and/or the funds and accounts managed by the Connecticut Plaintiffs to suffer damages.

211.   By reason of the foregoing, Morgan Stanley is liable to the Connecticut Plaintiffs for violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

### FIFTEENTH CLAIM FOR RELIEF

**For Violation of Illinois Securities Law §§ 12(G) And 13(A)**
**(Against Morgan Stanley Based On False Statements**
**In The 6.5% Notes Offering Memorandum)**

212.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

213.   This claim is brought by the Illinois Plaintiffs against Morgan Stanley pursuant to Illinois Securities Law §§ 12(G) and 13(A).  Plaintiffs CNH, Advent, and AQR do not join in this claim.

214.   Morgan Stanley sold the 6.5% Notes pursuant to the 6.5% Notes Offering Memorandum.

215.   The 6.5% Notes Offering Memorandum contained untrue statements of material fact, including, but not limited to, the audited and unaudited financial statements of ShengdaTech.

216.   Morgan Stanley owed a duty to the Illinois Plaintiffs to make a reasonable and diligent investigation of the statements contained in the 6.5% Notes Offering Memorandum  to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

217.   Morgan Stanley did not make a reasonable investigation of the statements contained in the 6.5% Notes Offering Memorandum, and did not possess reasonable grounds for believing that the 6.5% Notes Offering Memorandum did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

218.   The Illinois Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.5% Notes Offering Memorandum when they purchased or acquired the 6.5% Notes.

219.   By virtue of the foregoing, Morgan Stanley has violated Illinois Securities Law § 12(G) and Morgan Stanley is liable to the Illinois Plaintiffs pursuant to Illinois Securities Law § 13(A).

## X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment on their behalf as follows:

A.   Awarding Plaintiffs compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law (except that Plaintiffs CNH, Advent, and AQR do not seek an award of compensatory damages against Morgan Stanley);

B.   Ordering Morgan Stanley to disgorge to Plaintiffs (other than CNH, Advent, and AQR) the fees and other benefits it received in connection with the 6.5% Notes Offering;

1        C.     Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and

2  accountants' and experts' fees and other disbursements; and

3        D.     Awarding Plaintiffs such other and further relief as this Court may deem just and

4  proper.

5  JURY TRIAL DEMANDED

6        Plaintiffs demand a trial by jury.

7        Dated:  June 6, 2012

8

9                           /s/ Gary R. Goodheart
                            GARY R. GOODHEART

10                          Nevada Bar #1203
                            JONES VARGAS

11                          3773 Howard Hughes Parkway
                            Third Floor South

12                          Las Vegas, NV 89169
                            Telephone:  (702) 862-3300

13                          Facsimile:  (702) 737-7705

14                          STUART M. GRANT
                            MEGAN D. MCINTYRE

15                          CHRISTINE M. MACKINTOSH
                            GRANT & EISENHOFER P.A.

16                          123 Justison Street
                            Wilmington, DE 19801

17                          Telephone:  (302) 622-7000
                            Facsimile:  (302) 622-7100

18

19                          *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28