1   GARY R. GOODHEART
    Nevada Bar #1203
2   FENNEMORE CRAIG JONES VARGAS
    300 S. Fourth Street, Suite 1400
3   Las Vegas, NV 89101
    Telephone:  (702) 692-8000
4   Facsimile:  (702) 692-8099

5   *Local Counsel for all Plaintiffs*

6   STUART M. GRANT (*Pro Hac Vice*)
    GRANT & EISENHOFER P.A.
7   123 Justison Street
    Wilmington, DE 19801
8   Telephone:  (302) 622-7000
    Facsimile:  (302) 622-7100

9   *Counsel for Plaintiffs Oaktree Capital Management,*
    *L.P., Lazard Asset Management LLC, Angelo, Gordon*
10  *& Co., L.P., Zazove Associates, LLC, CNH Partners,*
    *LLC, Advent Capital Management, LLC, AQR Capital*
11  *Management, LLC, and HFR CA Lazard Rathmore*
    *Master Trust*

12
    CYNTHIA L. COLLINS (*Pro Hac Vice*)
13  STATE OF DELAWARE
    Deputy Attorney General
14  Carvel State Office Building
    820 North French Street, 6th Floor
15  Wilmington, DE 19801
    Telephone:  (302) 577-8400
16  Facsimile:  (302) 577-6630

17  *Counsel for Plaintiff Delaware Public Employees'*
    *Retirement System*

18              UNITED STATES DISTRICT COURT

19                 DISTRICT OF NEVADA

20  OAKTREE CAPITAL MANAGEMENT,          No. 2:12-CV-00956-JCM(GWF)
21  L.P., on behalf of its managed funds and
    accounts, LAZARD ASSET               **JURY TRIAL DEMANDED**
22  MANAGEMENT LLC, on behalf of its
    managed funds and accounts, ANGELO,
23  GORDON & CO., L.P., on behalf of one of
    its managed funds, ZAZOVE ASSOCIATES
24  LLC, on behalf of certain of its managed
    funds and accounts, CNH PARTNERS,
25  LLC, on behalf of its managed funds,
    ADVENT CAPITAL MANAGEMENT,
26  LLC, on behalf of one of its managed funds,
    AQR CAPITAL MANAGEMENT, LLC, on
27  behalf of its managed funds, HFR CA
    LAZARD RATHMORE MASTER TRUST,
28  and DELAWARE PUBLIC EMPLOYEES'
    RETIREMENT SYSTEM,

                         1

Plaintiffs,

-against-

KPMG, a Hong Kong partnership, KPMG INTERNATIONAL COOPERATIVE, KPMG LLP, HANSEN, BARNETT & MAXWELL, P.C., and MORGAN STANLEY & CO.,

Defendants.

## CONSOLIDATED COMPLAINT

1.      Oaktree Capital Management, L.P., on behalf of its managed funds and accounts; Lazard Asset Management LLC, on behalf of its managed funds and accounts; Angelo, Gordon & Co., L.P., on behalf of one of its managed funds; Zazove Associates LLC, on behalf of certain of its managed funds and accounts; CNH Partners, LLC, on behalf of its managed funds; Advent Capital Management, LLC, on behalf of one of its managed funds; AQR Capital Management, LLC, on behalf of its managed funds; HFR CA Lazard Rathmore Master Trust; and Delaware Public Employees' Retirement System (collectively, "Plaintiffs"), by their undersigned attorneys, allege the following upon personal knowledge as to themselves individually and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which included, among other things, review and analysis of: (1) filings by ShengdaTech, Inc. ("ShengdaTech" or the "Company") with the Securities and Exchange Commission (the "SEC"); (2) press releases published by ShengdaTech; (3) the offering memorandum (the "6.0% Notes Offering Memorandum") ShengdaTech disseminated to qualified institutional investors in connection with its offering (the "6.0% Notes Offering") of 6.0% Convertible Senior Notes due 2018 (the "6.0% Notes"); (4) the offering memorandum (the "6.5% Notes Offering Memorandum") ShengdaTech disseminated to qualified institutional investors in connection with its offering (the

"6.5% Notes Offering") of 6.5% Senior Convertible Notes Due 2015 (the "6.5% Notes"); (5) filings made in connection with ShengdaTech's bankruptcy proceeding, *In re ShengdaTech, Inc.*, Case No. BK-11-52649 (Bankr. D. Nev.); and (6) newspaper and magazine articles (and other media coverage) regarding ShengdaTech, its business, and/or the Defendants (defined below). Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE CASE</u>

2.    ShengdaTech – a once-promising participant in the burgeoning nano-precipitated calcium carbonate ("NPCC") market – has spiraled into bankruptcy and has been revealed to have foisted the 6.0% Notes and the 6.5% Notes (collectively, the "Notes") on the investing public based upon falsified financial results. Between May 15, 2008 and May 5, 2011 (the "Loss Period"), Defendants made a number of materially false and misleading statements concerning ShengdaTech's financial results and, in the case of the Auditor Defendants (defined below), the strength of its internal controls. Among other things, ShengdaTech's financial statements materially inflated the Company's sales and reflected ownership of assets that did not, in fact, exist.

3.    Plaintiffs relied on Defendants' false and misleading statements in collectively purchasing over $94 million of the Company's Notes during the Loss Period, over $76 million of which they continued to hold through the end of the Loss Period. Plaintiffs' purchases included $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering, over $56 million par amount of 6.5% Notes in the 6.5% Notes Offering, and over $38 million par amount of secondary market purchases of both series of Notes. When the truth about ShengdaTech began to be revealed, the funds and accounts for whom Plaintiffs purchased the Notes suffered substantial

damages as the Company collapsed into bankruptcy and defaulted on the Notes.

4.     Plaintiffs bring this action against ShengdaTech's former auditors – KPMG, a Hong Kong partnership ("KPMG HK"), KPMG International Cooperative ("KPMG International"), and KPMG LLP ("KPMG USA") (collectively, "KPMG") and Hansen, Barnett & Maxwell, P.C. ("Hansen") (together, the "Auditor Defendants") – and against the investment bank that underwrote the 6.5% Notes Offering and sold these Notes to the investing public, Morgan Stanley & Co. ("Morgan Stanley").[1]

5.     Hansen audited ShengdaTech's financial statements for the fiscal year ended December 31, 2007 (the "2007 Financial Statements"), and consented to the inclusion of its unqualified audit opinions on the  2007 Financial Statements in (1) the 6.0% Notes Offering Memorandum, (2) the 6.5% Notes Offering Memorandum, (3) the Company's amended annual report on Form 10-K/A for the year ended December 31, 2007, filed with the SEC on May 15, 2008 (the "2007 10-K/A"), (4) the Company's annual report on Form 10-K for the fiscal year ended December 31, 2008, filed with the SEC on April 1, 2009 (the "2008 10-K"), and (5) the Company's annual report on Form 10-K for the year ended December 31, 2009, filed with the SEC on March 15, 2010 (the "2009 10-K"), and an amendment thereto filed on September 15, 2010 (the "2009 10-K/A").

6.     KPMG HK audited the Company's financial statements for the fiscal years ended December 31, 2008 (the "2008 Financial Statements") and December 31, 2009 (the "2009 Financial Statements"), and consented to the inclusion of its unqualified audit reports on those financial statements in (1) the 6.5% Notes Offering Memorandum, (2) the 2008 10-K, and (3) the 2009 10-K and 2009 10-K/A.  KPMG HK's affiliation with KPMG International added to KPMG HK's

---

[1] Plaintiffs CNH (defined below) and AQR (defined below) are not asserting any claims against Morgan Stanley.  While reference may be made herein to "Plaintiffs' claims against Morgan Stanley" or the like, such references are for ease of reference only and are not to be construed as implying that CNH or AQR are asserting any claims against Morgan Stanley.

reputational prestige, and KPMG HK's ability to consult with KPMG USA as a result of their common affiliations with KPMG International positioned KPMG HK to secure its retention as ShengdaTech's auditor.  Because KPMG HK's audits required application of United States accounting rules pursuant to SEC regulations, KPMG USA reviewed and supervised the audit work KPMG HK performed for ShengdaTech, and had ultimate authority over whether KPMG HK's audit reports would be included in ShengdaTech's United States SEC filings and offering memoranda.  KPMG International facilitated communication between KPMG HK and KPMG USA concerning the audits.

7.     Morgan Stanley underwrote and served as an initial purchaser for ShengdaTech's 6.5% Notes Offering and acted as sole bookrunner for that Offering in exchange for substantial fees.  Morgan Stanley purchased from ShengdaTech and immediately resold to investors $109,200,000 of the total $130,000,000 of 6.5% Notes offered for sale in the 6.5% Notes Offering.  Pursuant to the 6.5% Notes Purchase Agreement, ShengdaTech sold these 6.5% Notes to Morgan Stanley for "a purchase price of 95.0% of the principal amount." Accordingly, Morgan Stanley earned $5,460,000 – 5% of the $109,200,000 of 6.5% Notes that it purchased from ShengdaTech and immediately resold to investors – in connection with the 6.5% Notes Offering.

8.     Relying upon ShengdaTech's audited and unaudited financial statements, Hansen's and KPMG HK's unqualified audit opinions on ShengdaTech's audited financial statements, and (with respect to the 6.5% Notes) the imprimatur of legitimacy lent to the 6.5% Notes Offering and to the statements contained in the 6.5% Notes Offering Memorandum by Morgan Stanley's involvement, Plaintiffs collectively invested over $22 million in the 6.0% Notes (both in the 6.0% Notes Offering and in the secondary market) and approximately $73 million in the 6.5% Notes (both in the 6.5% Notes Offering and in the secondary market).  Subsequently, and while Plaintiffs still held these Notes,

ShengdaTech announced on March 15, 2011, that KPMG had uncovered "potentially serious discrepancies and unexplained issues" during the course of its audit of the Company's financial statements for the year ended December 31, 2010 (the "2010 Financial Statements").   The nature of these "potentially serious discrepancies and unexplained issues" was not disclosed at that time.

9.    ShengdaTech's board of directors formed a committee (the "Special Committee") to investigate the issues KPMG had identified, and appointed the members of the Company's audit committee to serve on the Special Committee. As Plaintiffs and other investors would learn many months later, ShengdaTech management thwarted the Special Committee's efforts by, *inter alia*, refusing to respond to information requests and interfering with the Special Committee's attempts to obtain confirmation of the Company's bank balances with a number of Chinese banks where the Company claimed to have deposited funds.

10.    On May 5, 2011, the Company filed a Form 8-K with the SEC that provided additional detail concerning the "potentially serious discrepancies and unexplained issues" with ShengdaTech's financial records, revealing that they included issues relating to (1) the Company's bank balances, (2) transactions with the Company's major suppliers, (3) value-added tax ("VAT") invoices and payments, (4) sales and payments for sales by third parties, (5) sales to the Company's second largest customer, (6) discrepancies between the results of KPMG's direct calls to customers and confirmations returned by mail, and (7) concerns raised when KPMG attempted to directly confirm customer sales and accounts receivable.

11.    The Company also disclosed in its May 5, 2011 filing that KPMG was disclaiming its unqualified audit opinions on the Company's 2008 and 2009 Financial Statements and its representations that the Company had adequate internal controls over financial reporting during the fiscal year ended December 31, 2009. Specifically, ShengdaTech disclosed that KPMG had informed the

Company that "*disclosures should be made and action should be taken to prevent future reliance on [KPMG's] previously issued audit reports related to the consolidated balance sheets of [ShengdaTech] and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.*"

12.    KPMG's swift retraction of its audit opinions for both of the years in which it audited ShengdaTech, in conjunction with the steadfast efforts of ShengdaTech's management to block the Special Committee's investigation, indicate that fraud had been rampant at the Company for quite some time, and that the auditors had turned a blind eye to this financial fraud ever since the Company went public.

13.    The Auditor Defendants, charged with the responsibility as the Company's outside auditors to closely scrutinize the Company's financial records in search of signs of fraud or misstatements, were, at a minimum, negligent in failing to uncover the fraud and in issuing unqualified audit opinions.  Morgan Stanley, charged with the duty to make a reasonable investigation into the statements made in the 6.5% Notes Offering Memorandum upon which it knew Plaintiffs would rely in deciding to purchase the 6.5% Notes, was also, at a minimum, negligent in failing to uncover the fraud – particularly with regard to the unaudited financial statements and other financial information in the 6.5% Notes Offering Memorandum that Morgan Stanley knew had not been audited by the Auditor Defendants.  Defendants' negligence allowed the Notes to enter the market, and created the false impression that ShengdaTech had the financial wherewithal to repay the Notes with interest.

14.    Plaintiffs relied on the 2007, 2008 and 2009 Financial Statements, on the Auditor Defendants' unqualified audit opinions thereon, and on the unaudited

financial statements and other information contained in the 6.5% Notes Offering Memorandum, the contents of which were blessed by Morgan Stanley, when deciding to purchase Notes during the Loss Period.  When the truth began to be revealed, the trading prices of the Notes plummeted, and ShengdaTech soon defaulted on the Notes.  Accordingly, Defendants' negligence has caused substantial harm to the funds and accounts on whose behalf Plaintiffs purchased the Notes.

## II.    JURISDICTION AND VENUE

15.    The claims herein arise under Sections 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78r and 78t(a); common law; the California Corporations Code; and the Connecticut Uniform Securities Act.

16.    This Court has jurisdiction over this matter and over the Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1331; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

17.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1391(b)(2); and 28 U.S.C. § 1391(c). Plaintiff Zazove Associates LLC is located in this District, and ShengdaTech's bankruptcy proceedings were proceeding in this District at the time this suit was filed.  Additionally, events giving rise to the claims at issue occurred in this District, as the Defendants' false and misleading statements were disseminated to investors in this District, including Plaintiff Zazove.  Defendants are subject to personal jurisdiction in this District because they have (or had) substantial contacts with this District by virtue of having served as auditors and underwriters for ShengdaTech, a Nevada corporation, and, with respect to the Auditor Defendants, by virtue of having consented to the inclusion of their audit reports in ShengdaTech's SEC filings and offering documents.  Furthermore, KPMG USA and Hansen regularly do business within this District.

### III.   PARTIES

#### A.   Plaintiffs

18.    Plaintiff Oaktree Capital Management, L.P., an asset management company headquartered in California, brings this action on behalf of eight investment funds that it manages and for which it purchased Notes during the Loss Period, and on behalf of sixteen clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "Oaktree").  During the Loss Period, Oaktree purchased over $15,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering and over $5,900,000 par amount of 6.5% Notes in the secondary market, which Oaktree continued to hold at the end of the Loss Period. Oaktree subsequently sold some of the 6.5% Notes at a substantial discount to par, but continues to hold over $13,200,000 par amount of 6.5% Notes, which are now in default.

19.    Plaintiff Lazard Asset Management LLC, an asset management company headquartered in New York, brings this action on behalf of an investment fund that it manages and for which it purchased Notes during the Loss Period, and on behalf of four clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "LAM").  During the Loss Period, LAM purchased $9,850,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering, $14,239,000 par amount of 6.0% Notes in the secondary market, and $4,425,000 par amount of 6.5% Notes in the secondary market.  At the end of the Loss Period, LAM continued to hold $2,090,000 par amount of 6.0% Notes and $12,750,000 par amount of 6.5% Notes, which LAM still holds and are now in default.

20.    Plaintiff Angelo, Gordon & Co., an investment advisory firm based in New York, brings this action on behalf of a fund that it manages and for which it purchased Notes during the Loss Period (collectively, "Angelo Gordon").  During

the Loss Period, Angelo Gordon purchased $10,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering and $5,000,000 par amount of 6.5% Notes in the secondary market. Angelo Gordon continues to hold these 6.5% Notes, which are now in default.

21.    Plaintiff Zazove Associates LLC, an investment advisory firm based in Nevada, brings this action on behalf of two managed funds for which it purchased Notes during the Loss Period, and on behalf of six clients on whose behalf it purchased Notes during the Loss Period and from whom it has received valid assignments of claims pertaining to the Notes (collectively, "Zazove"). One of the clients on whose behalf Zazove Associates LLC is bringing this action is also one of the clients on whose behalf Oaktree Capital Management, L.P. is bringing this action, albeit on behalf of a different account owned by that client. During the Loss Period, Zazove purchased $10,000,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering. Zazove continues to hold these 6.5% Notes, which are now in default.

22.    Plaintiff CNH Partners LLC, an investment management company based in Connecticut, brings this action against Hansen and the KPMG entities on behalf of two funds that it manages or co-manages and for which it purchased Notes during the Loss Period (collectively, "CNH"). During the Loss Period, CNH purchased $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering, $1,800,000 par amount of 6.0% Notes in the secondary market, and $3,300,000 par amount of 6.5% Notes in the 6.5% Notes Offering. CNH continues to hold these 6.0% Notes and 6.5% Notes, which are now in default. CNH is not asserting any claim herein against Morgan Stanley.

23.    Plaintiff Advent Capital Management LLC, an investment advisory firm based in New York, brings this action on behalf of a closed-end fund that it manages and for which it purchased Notes during the Loss Period (collectively, "Advent"). During the Loss Period, Advent purchased $2,840,000 par amount of

6.5% Notes from Morgan Stanley in the 6.5% Notes Offering.  Advent continues to hold these 6.5% Notes, which are now in default.

24.   Plaintiff AQR Capital Management, LLC, an investment management company based in Connecticut, brings this action against Hansen and the KPMG entities on behalf of five funds that it manages or co-manages and for which it purchased Notes during the Loss Period (collectively, "AQR").  During the Loss Period, AQR purchased $2,075,000 par amount of 6.0% Notes in the secondary market, $1,700,000 par amount of 6.5% Notes in the 6.5% Notes Offering, and $500,000 par amount of 6.5% Notes in the secondary market.  AQR continues to hold these 6.0% Notes and 6.5% Notes, which are now in default.  AQR is not asserting any claim herein against Morgan Stanley.

25.   Plaintiff HFR CA Lazard Rathmore Master Trust ("HFR") is a Bermuda unit trust whose investments are managed by Plaintiff Lazard Asset Management LLC, and on whose behalf Lazard Asset Management LLC purchased Notes during the Loss Period.  During the Los Period, Lazard Asset Management LLC purchased on behalf of HFR $1,390,000 par amount of 6.5% Notes from Morgan Stanley in the 6.5% Notes Offering, $3,661,000 par amount of 6.0% Notes in the secondary market, and $440,000 par amount of 6.5% Notes in the secondary market.  HFR continues to hold $365,000 par amount of 6.0% Notes and $1,490,000 par amount of 6.5% Notes, which are now in default.

26.   Plaintiff Delaware Public Employees Retirement System ("DPERS") is a system created by Title 29, Chapter 83 of the Delaware Code to hold and invest the retirement funds of public employees of the State of Delaware.  DPERS is administered by the State of Delaware Board of Pension Trustees who are statutorily authorized to administer the retirement system and invest, on a commingled basis, the trust fund monies of DPERS.  During the Loss Period, Oaktree Capital Management, L.P. was DPERS' investment manager with authority to make investments on behalf of DPERS, and as such Oaktree Capital

Management, L.P. purchased $2,520,000 par value of the 6.5% Notes for DPERS from Morgan Stanley in the 6.5% Notes Offering.   After the end of the Loss Period, on June 22, 2011, DPERS sold $845,000 par value of the Notes, realizing a loss of $678,112.50.   DPERS has sustained a substantial unrealized loss on the $1,675,000 par value of the 6.5% Notes it continues to hold.

27.   Plaintiffs collectively are seeking damages in this action on behalf of fifty (50) or fewer persons.

**B.   Defendants**

28.   Defendant KPMG International Cooperative ("KPMG International") is a Swiss entity that does not provide audit services to clients, but instead coordinates the global network of professional KPMG-affiliate firms that do provide audit, tax and advisory services to clients in 150 countries, with 138,000 people working in member firms around the world.   KPMG International and its member and network firms market themselves worldwide under the brand name "KPMG."   All KPMG member firms commit to abide by a common set of KPMG values that are established by the Global Board, which is KPMG International's principal oversight and governance body.   The Global Board Council, which includes representation of 54 member firms, focuses on high-level governance tasks and facilitates discussion with and between member firms.   KPMG International is dominated and controlled by KPMG USA.

29.   Defendant KPMG, a Hong Kong Partnership ("KPMG HK") is a member firm of the KPMG network of member firms affiliated with Defendant KPMG International.   KPMG HK is the entity that signed KPMG's audit reports on the Company's 2008 and 2009 Financial Statements.   KPMG HK consented to the inclusion of these audit reports in the 6.5% Notes Offering Memorandum, the 2008 10-K, and the 2009 10-K and 2009 10-K/A.

30.   Defendant KPMG LLP ("KPMG USA") is a United States-based audit, tax and advisory services firm, which operates from 87 offices with more

than 23,000 employees and partners throughout the United States.   KPMG USA is the United States member firm of the KPMG network of member firms affiliated with KPMG International.   KPMG USA supervised and reviewed the audit work that KPMG HK performed for ShengdaTech, and had ultimate authority over whether KPMG HK's audit reports would be included in the SEC filings and offering memoranda of ShengdaTech.

31.   Defendant KPMG HK was dominated and controlled by Defendants KPMG International and KPMG USA in connection with its audits of ShengdaTech.  Information regarding the exact relationship among these entities is within the exclusive control of these Defendants and discovery will therefore demonstrate the full extent to which these entities act for and answer for each other.

32.   Defendant Hansen, Barnett & Maxwell, P.C. ("Hansen") provides auditing, assurance, tax, client accounting and consulting services for a wide range of clients.   Hansen is headquartered in Salt Lake City, Utah.   Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit reports on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum, the 6.5% Notes Offering Memorandum, the 2007 10-K/A, the 2008 10-K, and the 2009 10-K and 2009 10-K/A.

33.   Defendant Morgan Stanley & Co. ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides products and services to a large and diversified group of clients and customers. Morgan Stanley underwrote and served as an initial purchaser for ShengdaTech's 6.5% Note Offering, and acted as sole bookrunner for that Offering.   As such, Morgan Stanley purchased and immediately resold to investors $109,200,000 of the total $130,000,000 of 6.5% Notes offered for sale in the 6.5% Notes Offering. As part of its duties as an underwriter, Morgan Stanley was required to conduct, prior to the 6.5% Notes Offering, a reasonable investigation to ensure that the 6.5%

Notes Offering Memorandum contained no misstatement or omission of material fact.

## IV.   **RELEVANT NON-PARTIES**

34.   ShengdaTech was, prior to its bankruptcy, a Nevada corporation with its principal place of business in China.  ShengdaTech manufactured a specialty additive known as nano-precipitated calcium carbonate ("NPCC").  NPCC is used in a variety of products to enhance their durability and efficiency and is widely applied in the paint, paper, plastic and rubber industries and used for building materials such as PVC.  ShengdaTech conducted its manufacturing operations through several affiliated companies in China (the "PRC Companies").[2]  The PRC Companies are owned by Faith Bloom Limited ("Faith Bloom"), a wholly-owned subsidiary of ShengdaTech that is organized under the laws of the British Virgin Islands.

35.   Xiangzhi Chen ("Chen") was ShengdaTech's President and Chief Executive Officer and a member of its board of directors from March 31, 2006 through its bankruptcy.  Chen was also the Company's largest shareholder, owning over 42.25% of ShengdaTech's outstanding shares.  Chen was ousted from his position at ShengdaTech on August 19, 2011, after he took deliberate steps to thwart the Special Committee's internal investigation into financial improprieties at the Company.

36.   Anhui Guo ("Guo") was, at all relevant times prior to her resignation on April 29, 2011, the Company's Chief Operating Officer, acting Chief Financial Officer, and a member of the Board of Directors.

---

[2] The PRC Companies are Shandong Haize Nanomaterials Co., Ltd., Shandong Bangsheng Chemical Co., Ltd., Shaanxi Haize Nanomaterials Co., Ltd., Zibo Jiaze Nanomaterials Co., Ltd., and Anhui Yuanzhong Nanomaterials Co., Ltd.

## V.   FACTUAL ALLEGATIONS

### A.   Historical Background Of ShengdaTech & The Notes Offerings

37.   The company known as ShengdaTech was formed by a "reverse merger" with a United States shell company, Zeolite Exploration Company ("Zeolite"), in March 2006.  To effectuate the reverse merger, on March 31, 2006, ShengdaTech consummated a share exchange pursuant to a Securities Purchase Agreement and Plan of Reorganization with Faith Bloom, whereby ShengdaTech acquired all of the issued and outstanding capital stock of Faith Bloom in exchange for 50,957,603 shares of ShengdaTech common stock.  ShengdaTech went public in late March 2006 and its stock began trading on the NASDAQ in early 2007.

38.   To finance its operations, ShengdaTech conducted two private offerings of debt securities targeted to "qualified institutional buyers" as defined in Rule 144A of the Securities Act of 1933 (the "Securities Act").

39.   First, in 2008, ShengdaTech conducted the 6.0% Note Offering, pursuant to which Plaintiff CNH and other qualified institutional buyers purchased $115,000,000 of 6.0% Notes.  The 6.0% Notes Offering was conducted pursuant to the 6.0% Notes Offering Memorandum, which included the Company's 2007 Financial Statements.   Hansen issued an unqualified audit opinion on the Company's 2007 Financial Statements, stating that they fairly presented the Company's financial condition and the results of its operations in accordance with generally accepted accounting principles ("GAAP") and that the Company maintained effective internal controls over financial reporting.  Hansen consented to the inclusion of its unqualified audit opinion on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum.  Interest on the 6.0% Notes was payable semiannually on June 1 and December 1.  The 6.0% Notes were convertible into shares of ShengdaTech common stock at an initial conversion rate of 100.6036 shares per $1,000 principal amount of the 6.0% Notes, subject to adjustment.

40.   Second, on December 10, 2010, ShengdaTech announced that it had

entered into a purchase agreement with Morgan Stanley relating to an offering of $130,000,000 of 6.5% Notes. The completion of the 6.5% Notes Offering was conditioned upon a certain amount of the 6.0% Notes being repurchased by ShengdaTech and surrendered to the 6.0% Notes' trustee for cancellation such that at least 75% of the original issuance amount of the 6.0% Notes was no longer outstanding. Approximately $67.2 million of the net proceeds of the 6.5% Notes Offering were to be used to repurchase a portion of the 6.0% Notes. On December 15, 2010, ShengdaTech announced that it had completed the 6.5% Notes Offering. The 6.5% Notes were convertible into shares of ShengdaTech common stock at an initial conversion rate of 164.6904 shares per $1,000 principal amount of 6.5% Notes, subject to adjustment. Holders of 6.5% Notes had the right to require ShengdaTech to repurchase, for cash, all or any portion of their 6.5% Notes on December 15, 2013 at a price equal to 100% of the principal amount of the 6.5% Notes to be purchased, plus accrued and unpaid interest.

41. The 6.5% Notes Offering was underwritten by Morgan Stanley pursuant to the 6.5% Notes Offering Memorandum, which included the Company's 2007, 2008, and 2009 Financial Statements. The 2007 Financial Statements were audited by Hansen, and the 2008 and 2009 Financial Statements were audited by KPMG HK. Hansen and KPMG HK issued unqualified audit opinions on the respective Financial Statements that they audited, stating, *inter alia*, that those Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP. With the consent of Hansen and KPMG HK, their unqualified audit opinions on the 2007, 2008 and 2009 Financial Statements were included in the 6.5% Notes Offering Memorandum.

42. Because ShengdaTech was required to file its financial statements with the SEC, KPMG's United States member firm – KPMG USA – reviewed and supervised KPMG HK's audits of ShengdaTech's 2008 and 2009 Financial

Statements to ensure that these audits were conducted in accordance with United States Generally Accepted Auditing Standards ("GAAS") and that ShengdaTech's 2008 and 2009 Financial Statements accurately presented the Company's financial condition and the results of its operations in accordance with United States GAAP. KPMG USA reviewed and approved the issuance of KPMG HK's unqualified audit opinions on the 2008 and 2009 Financial Statements, and approved their inclusion in the 6.5% Notes Offering Memorandum.

43.    In addition to the Company's audited financial statements, the 6.5% Notes Offering Memorandum included unaudited financial information, which the investing public, including Plaintiffs, understood to have been reviewed by Morgan Stanley as the lead underwriter of the 6.5% Notes Offering in order to ensure that the 6.5% Notes Offering Memorandum did not include any material misstatements or omit any material facts.

44.    Each of the Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering, and some of the Plaintiffs subsequently purchased additional 6.5% Notes in the secondary market.  All of these purchases were made in reliance on the financial statements and other information, including the Auditor Defendants' unqualified audit opinions, in the 6.5% Notes Offering Memorandum and in ShengdaTech's other SEC filings during the Loss Period.

**B.     ShengdaTech's Default On The Notes**

45.    ShengdaTech has turned out to have been a sham.  ShengdaTech duped investors into buying over $200 million in Notes by publicly reporting strong financial results, but later disclosures have demonstrated that those financial results were a complete fantasy.  ShengdaTech management utterly misrepresented the value and, indeed, the existence of material assets that were recorded on the Company's balance sheet, and materially overstated the Company's sales by recording unsupported and fictitious transactions.  The Company's auditors and lead underwriter failed to detect this rather blatant and rudimentary fraud.

46.     On March 15, 2011, ShengdaTech stunned the market with an announcement that its board of directors had appointed a Special Committee to investigate "potentially serious discrepancies and unexplained issues relating to the Company's and its subsidiaries' financial records identified by [KPMG]" in the course of KPMG's examination of the Company's 2010 Financial Statements, and that the Special Committee had retained O'Melveny & Myers, LLP ("O'Melveny") to conduct an independent investigation into these issues.  According to an August 2011 bankruptcy court filing by ShengdaTech, the issues that KPMG identified included the existence of undisclosed related party transactions and the inability to confirm sales amounts, sales terms, and outstanding balances.  Although not publicly disclosed until March 15, 2011, these discrepancies and issues had existed in prior years as well, but had not been uncovered until ShengdaTech's audit committee asked KPMG to perform additional audit testing during its audit of the 2010 Financial Statements, beyond what it had done in prior years' audits.

47.     Also on March 15, 2011, ShengdaTech announced that the SEC had been informed of the internal investigation, and that the Company would not timely file its 2010 Form 10-K.  In response to this announcement, the NASDAQ suspended trading in the Company's shares.

48.     Although not publicly disclosed until April 29, 2011, (i) KPMG informed the Company on April 19, 2011 that ShengdaTech's senior management had not taken timely and appropriate remedial action with respect to the discrepancies and issues that KPMG had identified in the course of its 2010 audit, and (ii) NASDAQ informed the Company on April 20, 2011 that its shares would be delisted.

49.     On April 29, 2011, the Company issued a press release disclosing NASDAQ's April 20, 2011 decision to delist ShengdaTech's shares.  The press release stated that the April 20, 2011 letter from the NASDAQ Listing Qualifications Department had cited the following criteria in support of its decision

to delist ShengdaTech:

(1) public interest concerns under Nasdaq Listing Rule 5101 raised by the ***serious accounting and operational issues uncovered by KPMG, the Company's independent registered public accounting firm; the deliberate and ongoing efforts of the Company's Chief Executive Officer and Acting Chief Financial Officer, Mr. Xiang Zhi Chen and Ms. Anhui Guo, respectively, to obstruct an internal investigation into these matters; the Company's failure to promptly disclose material information related to that investigation; and the Company's violation of the rules setting forth the responsibilities and authority of the Audit Committee***;

(2) the Company's failure to make prompt public disclosure of material developments relating to the investigation, as required by Nasdaq Listing Rule 5250(b)(1) and IM-5250-1;

(3) the Company's violations of Nasdaq Listing Rule 5605(c)(3) and IM-5605 as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the Securities and Exchange Act of 1934 caused by the obstructive conduct of the Company's executive management, including failure to pay for advisors engaged to assist with the internal investigation by the special committee of the Board of Directors of the Company; and

(4) the Company's failures to timely file with the Securities and Exchange Commission its Annual Report on Form 10-K for the period ended December 31, 2010, as required by Nasdaq Listing Rule 5250(c)(1), and to present a definitive plan that demonstrates its ability to regain compliance within the time period permitted under Nasdaq's Listing Rules.

(emphasis added).

50.    Also on April 29, 2011, ShengdaTech announced that Guo had resigned, effective immediately.

51.   On May 5, 2011, ShengdaTech filed another Form 8-K with the SEC in which it announced that KPMG had resigned, effective April 29, 2011.  In this Form 8-K, ShengdaTech provided additional details concerning the "serious discrepancies and unexplained issues" KPMG had identified in its audits of the Company's 2010 Financial Statement, noting that these "concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG HK's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables."

52.   In addition, the May 5, 2011 Form 8-K made the stunning revelation that the Company's previously-issued financial statements for the 2008 and 2009 fiscal years should no longer be relied upon:

> *On April 29, 2011, we were also informed by KPMG, our former independent accounting firm, that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.*

> KPMG stated that the manner of management's conduct during the investigation by a special committee of the Company's Board of Directors *raised doubts about management's representations provided to KPMG in connection with KPMG's 2008 and 2009 audits of the consolidated financial statements and the effectiveness of our internal control over financial reporting of the Company.*   The Chairman of our Audit Committee discussed the foregoing issues with KPMG, and the

> Company will authorize KPMG to respond fully to inquiries of the successor accountant, when hired, concerning the foregoing.

(emphasis added).

53.   On June 8, 2011, the NASDAQ Listing Qualifications Panel (the "Panel") affirmed its decision to delist ShengdaTech.  In support of its decision, the Panel cited, among other things, the discrepancies found by KPMG.  The Panel further noted that ShengdaTech management was obstructing the Special Committee's ability to fulfill its duties and responsibilities under Listing Rule 5603(c)(3) and Section 10A(m)(2) of the Exchange Act.   Trading in ShengdaTech's common stock was suspended on June 10, 2011.

54.   On June 9, 2011, the Company announced that it would be defaulting on its obligations to the holders of the 6.0% Notes.  In a Form 8-K filed that day, ShengdaTech stated:

> Pursuant to the terms of an Indenture, dated as of May 28, 2008 (the "Indenture"), between [ShengdaTech] and The Bank of New York (the "Trustee"), holders of the [6.0% Notes] had the contractual right (the "Put Option") to require the Company to purchase on June 1, 2011 (the "Purchase Date") any or all of the outstanding Notes held by each such holder at a purchase price of 100% of the principal amount thereof, plus any accrued and unpaid interest up to but excluding the Purchase Date, payable in cash (the "Purchase Price").   In accordance with the terms of the Indenture and the Notes, a notice of the Put Option was sent to holders of the Notes.  As of May 24, 2011, the deadline for holders to exercise the Put Option, *holders of all of the Notes had exercised the Put Option in the aggregate sum of $25,578,000.  The Company did not pay the Purchase Price for the Notes on the Purchase Date.*   Based on the nonpayment, the aggregate principal amount of the Notes, plus any accrued and unpaid interest and any other amounts due and owing on the Notes could be declared immediately due and payable by

the Trustee or by holders of 25% or more of the aggregate principal amount of the Notes.

(emphasis added).

55.     On June 15, 2011, ShengdaTech became obligated to pay interest on the 6.5% Notes in the amount of approximately $4.4 million.  ShengdaTech failed to pay any portion of this interest, and defaulted on the 6.5% Notes.

56.     On August 11, 2011, the SEC initiated a regulatory proceeding titled *In re ShengdaTech, Inc.* (LA-3397).  The formal Order entered by the SEC in connection with this proceeding challenged, among other things, false statements in the Company's financial results for the fiscal years 2009 and 2010.

57.     On August 19, 2011, ShengdaTech filed for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada.  ShengdaTech acknowledged in a Form 8-K filed with the SEC on August 23, 2011 that the bankruptcy filing constituted an "event of default" on the 6.0% Notes and the 6.5% Notes.

58.     Also on August 19, 2011, the Special Committee announced that it had removed all members of ShengdaTech's management – including Chen – from their positions, effective immediately.  Chen had been ShengdaTech's President and CEO at all times during Hansen's and KPMG's respective audits of the Company's 2007, 2008 and 2009 Financial Statements.  Michael Kang of Alvarez & Marshal North America LLP was appointed to act as Chief Restructuring Officer ("CRO") and ShengdaTech's sole officer with responsibility to (i) manage ShengdaTech's business and operations, (ii) assist ShengdaTech in conducting its ongoing investigation, and (iii) restructure ShengdaTech's operations.

59.     On August 22, 2011, the SEC served ShengdaTech with a subpoena for documents in connection with a fact-finding investigation by the SEC with regard to the Company.

60.     On December 15, 2011, NASDAQ officially delisted ShengdaTech.

The stock had not traded on NASDAQ since its June 10, 2011 suspension.

61.    On February 15, 2012, the SEC filed a proof of claim against ShengdaTech.   In this proof of claim, the SEC indicated that its investigation into the Company was continuing and that it may file a civil action against ShengdaTech based on possible violations of the federal securities laws.

62.    On October 12, 2012, ShengdaTech announced the findings of the Special Committee investigation in a tersely-worded press release:

> The Special Committee's investigation, among other key findings, confirmed KPMG's initial reports concerning discrepancies and/or issues relating to the Company's financial records that were identified during the course of the audit for the year ended December 31, 2010.

63.    The few details concerning the Special Committee's investigation that have been revealed in ShengdaTech's bankruptcy filings indicate that ShengdaTech management was engaged in a massive fraud throughout the Loss Period.  The Special Committee's investigation quickly revealed serious problems – including an inability to verify matters as simple as whether ShendgaTech actually had any cash in its bank accounts – that indicate that the fraud would have been relatively easy for ShengdaTech's auditors and underwriters to uncover during the Loss Period, had they been looking.   According to a filing in ShengdaTech's bankruptcy:

> The Special Committee instructed teams of professionals from [O'Melveny] and PwC to visit financial institutions holding [ShengdaTech's] accounts in China in order to verify [the Company's] cash accounts, but managers of the PRC Companies obstructed those efforts.   The Special Committee was informed that managers:  stalled or otherwise attempted to derail trips to [ShengdaTech's] financial institutions; refused to cooperate with [O'Melveny] and PwC; once at the banks, attempted to steer the team to specific persons at the banks, rather than permit [O'Melveny] and PwC teams to speak with other

> identified individuals; and when [O'Melveny] and PwC teams refused to meet with particular bank employees chosen by the managers, the managers departed and refused to assist them.

64.     Management's complete refusal to assist in the investigation underscores the conclusion that ShengdaTech was engaged in an outright fraud. Moreover, the immediate ease with which such obstructionist tactics were deployed suggests that, had Defendants been asking questions earlier, they would have uncovered the fraud or, at the very least, they would have encountered similar obstructionism, and would have refused to issue unqualified audit opinions and/or to participate in ShengdaTech's securities offerings.

65.     The Special Committee was also unable to verify the authenticity of certain United States certificates of deposit ("CDs") that ShengdaTech had reported as assets on its balance sheet during the Loss Period.   While Chen provided the Special Committee with photocopies of the CDs as evidence that ShengdaTech had certain cash on hand, Chen was "unresponsive" to requests for further information about these CDs, and the Special Committee learned that the bank that purportedly issued the CDs was unable to verify them and, in fact, had no record of issuing them to the ShengdaTech subsidiary (Faith Bloom) that reportedly held them.   The evidence uncovered to date seems to clearly indicate that ShengdaTech's management falsified evidence, in a most primitive way, to create the illusion of having materially more assets than the Company truly had. Had Defendants undertaken the simple step during the Loss Period of verifying these CDs with the banks that were reported to have issued them, they would have discovered the fraud.

66.     The Special Committee also uncovered evidence that ShengdaTech materially overstated its sales figures during the Loss Period by, among other things, reporting fictitious transactions with customers and with entities owned by

Chen.  According to a bankruptcy court filing by ShengdaTech in August 2011, a report prepared by the Special Committee's counsel "calls into serious question the accuracy of payments allegedly made to [ShengdaTech] by various customers or the sales allegedly made, transactions [ShengdaTech] is reported to have engaged in with related parties owned by Mr. Chen which have not been supported, and suggests that sales are vastly overstated."

67.    Chen and other former members of ShengdaTech management repeatedly obstructed the Special Committee's investigation, preventing Plaintiffs from fully discovering the depth of ShengdaTech management's fraud.  Chen refused to meet with the Board or the Special Committee, and even attempted to use his voting control over the Company to appoint a new member to the Board who, presumably, would be friendly to Chen's interests and would empower Chen with the votes needed to remove members of the Special Committee and further obstruct the investigation.  These shenanigans led ShengdaTech to file an Adversary Proceeding Complaint in the bankruptcy action to enjoin Chen from interfering with the Special Committee and the CRO or taking any steps to remove any members of the Special Committee or the CRO.  *See* Adversary Proceeding Complaint filed on August 20, 2011 in *In re ShengdaTech, Inc.*, Case No. BK-11-52649 (Bankr. D. Nev.).

68.    On October 7, 2011, ShengdaTech filed a declaration by CRO Kang in which Kang reported that he had "recently visited China, with other officers of [ShengdaTech] and certain of the [Company's] professionals, in an attempt to gather more information about [certain affiliates of ShengdaTech who had not filed for bankruptcy]."    During that trip, Kang visited ShengdaTech's operating subsidiaries in China and "among other things, requested financial information and asked questions regarding the value, operations and profitability of the PRC Companies."  Those requests were denied, according to Kang.  He stated that the "plant managers at these locations refused to provide financial information and

refused to answer any questions relating to the financial condition of the PRC Operating Subsidiaries" and, further, that ShengdaTech's subsidiaries in China were "acting outside of the control of [ShengdaTech]." Finally, Kang disclosed that the Company had "limited access to its books and records, limited access to Faith Bloom's books and records and no access to the PRC Subsidiaries' current books and records."

69. It is clear that *ShengdaTech's financial records were falsified* and that serious issues remain unanswered regarding ShengdaTech's financial condition and its overall business operations. Notably, in ShengdaTech's Disclosure Statement for The Chapter 11 Plan of Reorganization filed with the bankruptcy court on May 16, 2012, the Company disclosed that Faith Bloom bank accounts that had been reported to contain $73 million in reality contained only about $50,000.

70. The falsification of ShengdaTech's financial statements by ShengdaTech management, and the failure of Hansen, KPMG and Morgan Stanley to detect and correct the false statements, caused substantial harm to Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes. Having purchased the Notes at or near par value, these investors are now left holding Notes worth only a small fraction of what was paid for them, if indeed they have any value at all. ShengdaTech's Plan of Reorganization has been confirmed by the Bankruptcy Court, and to date the Note holders have recovered nothing on their Notes.

**C.** **The False Statements And Omissions Of Material Fact In ShengdaTech's Form 10-K Filings And Offering Memoranda**

71. Though Plaintiffs had no way of knowing it at the time they purchased the Notes during the Loss Period, the documents upon which they relied in making those purchases – ShengdaTech's Form 10-K filings and Offering Memoranda – contained material false statements and omitted material facts.

72.     Among other things, the 2007, 2008 and 2009 Financial Statements contained in the Form 10-K filings and Offering Memoranda were not presented in conformity with GAAP.  As a result, they violated SEC regulations.

73.     The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."  SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23, 120, at 17, 095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).  SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP.  Financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading.  17 C.F.R. § 210.4-01(a)(1).

74.     Some of the GAAP principles that were applicable to ShengdaTech during the Loss Period include:

a)      that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Financial Accounting Standards Board Statements ("FASB") Statement of Concepts No. 1, ¶ 40);

b)      that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

c)      that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it – to the extent that  management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

d)      that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

e)      that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶¶ 79, 80).

75.     ShengdaTech's 2007, 2008 and 2009 Financial Statements violated the foregoing GAAP principles and SEC regulations because, *inter alia*, they provided inaccurate information about ShengdaTech, its resources, and the claims against those resources; omitted information that was material to the investment and credit decisions of present and prospective investors and creditors; and presented information that was neither reliable nor complete.

### 1.      The 2007 10-K/A and the 6.0% Notes Offering Memorandum

76.     The 2007 10-K/A and the 6.0% Notes Offering Memorandum each included the Company's 2007 Financial Statements, which reported, *inter alia*, cash and cash equivalents of $26,366,568; total assets of $100,943,938; sale of products of $100,654,793; and net income of $27,030,345.  These statements were false and misleading because the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially overstated.

77.     Hansen consented to the inclusion of its March 14, 2008 audit opinion on ShengdaTech's 2007 Financial Statements in the 2007 10-K/A and the 6.0% Notes Offering Memorandum.  Hansen's opinion stated, in pertinent part:

> We have audited the accompanying consolidated balance sheets of ShengdaTech Inc. and subsidiaries (the Company) as of December 31, 2007 … and the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. We also have audited the Company's internal control over financial reporting as of December 31, 2007 based on criteria established in *Internal Control-Integrated*

*Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)....

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the

company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements….

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007 … and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Shengdatech Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007*, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)….

(emphasis added).

78.    Hansen's audit report was materially false and misleading because: the 2007 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and, as discussed in more detail below, Hansen did not conduct its audits in accordance with the standards of GAAS and the Public Company Accounting Oversight Board.

### 2.    The 2008 10-K

79.    On April 1, 2009, ShengdaTech filed the 2008 10-K with the SEC. The 2008 10-K included the Company's 2007 and 2008 Financial Statements, which reported, *inter alia*, cash of $26,366,568 and $114,287,073, respectively; total assets of $100,943,938 and $243,908,940, respectively; net sales of $100,654,793 and $149,427,139, respectively; and net income of $27,030,345 and $40,035,451, respectively.  These statements were false and misleading because

the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially overstated.

80.     KPMG HK consented to the inclusion of its audit opinion on the Company's 2008 Financial Statements in the 2008 10-K.  Despite having identified material weaknesses in ShengdaTech's internal controls over financial reporting, KPMG HK issued a clean opinion on the Company's 2008 Financial Statements, representing that they fairly presented the Company's financial position in accordance with GAAP:

> We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries (the "Company") as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended….
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board

> (United States), the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 31, 2009 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

(emphasis added).

81.     Hansen consented to the inclusion of its audit opinion concerning the Company's 2007 Financial Statements in the 2008 10-K.  Hansen also issued a clean audit opinion, stating that the Company's 2007 Financial Statements presented fairly, in all material respects, ShengdaTech's financial position in accordance with GAAP:

> We have audited the accompanying consolidated balance sheet of Shengdatech Inc. and subsidiaries (the Company) as of December 31, 2007, and the related consolidated statements of income, shareholders' equity and comprehensive income and cash flows for each of the two years in the period ended December 31, 2007….
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audits provide a reasonable basis for our opinions.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007 , and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America.***

(emphasis added).

82.   The foregoing statements were materially false and misleading because:  the 2007 and 2008 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; and Hansen and KPMG HK did not conduct their audits in accordance with the standards of GAAS and the Public Company Accounting Oversight Board.  KPMG has admitted that KPMG HK's audit report on the Company's 2008 Financial Statements should no longer be relied upon.

### 3.   The 2009 10-K and 2009 10-K/A

83.   On March 15, 2010, ShengdaTech filed its 2009 10-K with the SEC. The 2009 10-K included the Company's 2008 and 2009 Financial Statements, which reported, *inter alia*, cash of $114,287,073[3] and $115,978,763, respectively; total assets of $243,806,829 and $271,054,359, respectively; net sales of $82,419,689 and $102,121,804, respectively; and net income of $36,028,302 and $23,104,607, respectively.  Subsequently, on September 15, 2010, ShengdaTech filed its 2009 10-K/A with the SEC, reporting the same financial results as the 2009 10-K.  The foregoing statements were false and misleading because the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially overstated in both the 2009 10-K and the 2009 10-K/A.

84.   KPMG HK consented to the inclusion of its audit opinion on the Company's 2008 and 2009 Financial Statements in the 2009 10-K and 2009 10-K/A.  KPMG HK issued a clean opinion on those financial statements, stating that they fairly presented the Company's financial position in accordance with GAAP:

> We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related

---

[3] The 2009 10-K adjusted the previously-reported 2008 Financial Statements to reflect the Company's adoption of FASB ASC Subtopic 470-20, *Debt With Conversion and Other Options*, which specifies the accounting for convertible debt instruments that may be settled in cash upon conversion.

consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended….

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)….   We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles ….***

(emphasis added).

85.   KPMG HK also consented to the inclusion of its opinion on the adequacy of the Company's internal controls as of December 31, 2009 in the 2009 10-K and 2009 10-K/A.   KPMG HK concluded that the Company maintained adequate internal controls over financial reporting:

We have audited ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)….

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)….   We believe that our audit provides a reasonable basis for our opinion….

***In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009,*** based on criteria established in Internal Control—Integrated Framework issued by COSO….

(emphasis added).

86.     Hansen consented to the inclusion of its audit opinion on the Company's 2007 Financial Statements in the 2009 10-K and 2009 10-K/A. Hansen also issued a clean audit opinion, finding that the Company's 2007 Financial Statements presented fairly, in all material respects, ShengdaTech's financial position in accordance with GAAP:

> We have audited the accompanying consolidated statements of income, shareholders' equity and comprehensive income, and cash flows of ShengdaTech, Inc. and subsidiaries (the Company) for the year ended December 31, 2007….
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audit provides a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations of ShengdaTech, Inc. and subsidiaries and their cash flows for the year ended December 31, 2007, in conformity with U.S. generally accepted accounting principles.***

(emphasis added).

87.     The foregoing statements were materially false and misleading because:  the 2007, 2008 and 2009 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen and KPMG HK did not conduct their audits in accordance with the standards of GAAS and the Public Company Accounting Oversight Board.  KPMG has admitted that KPMG HK's audit reports on the Company's 2008 and 2009 Financial Statements should no longer be relied upon and that it has reason to doubt the efficacy of the Company's internal controls over financial reporting during those years.

### 4.     The 6.5% Notes Offering Memorandum

88.     The 6.5% Notes Offering Memorandum included the Company's 2007, 2008 and 2009 Financial Statements, which reported, *inter alia*, cash of $26,366,568, $114,287,073 and $115,978,763, respectively; total assets of $100,943,938, $243,806,829 and $271,054,359, respectively; net sales of $46,721,673, $82,419,689 and $102,121,804, respectively; and net income of $27,030,345, $36,028,302 and $23,104,607, respectively.  These statements were false and misleading because the Company's reported results for cash and cash equivalents, total assets, sale of products, and net income were materially overstated.

89.     In addition, the 6.5% Notes Offering Memorandum contained unaudited financial results that were similarly false and misleading.  Specifically, the 6.5% Notes Offering Memorandum reported unaudited cash of $120,649,206 and $115,978,763 as of September 30, 2010 and December 31, 2009, respectively; unaudited total assets of $295,426,018 and $271,054,359 as of September 30, 2010 and December 31, 2009, respectively; unaudited net sales of $34,417,385 and $25,376,060 for the three months ended September 30, 2010 and September 30, 2009, respectively; unaudited net sales of $97,881,755 and $72,066,915 for the nine months ended September 30, 2010 and September 30, 2009, respectively; unaudited net income of $6,988,578 and $4,630,411 for the three months ended September 30, 2010 and September 30, 2009, respectively; and unaudited net income of $20,648,597 and $16,441,216 for the nine months ended September 30, 2010 and September 30, 2009, respectively (together, the "6.5% Notes Offering Memorandum Unaudited Financial Statements").  The 6.5% Notes Offering Memorandum Unaudited Financial Statements were false and misleading because the Company's reported results for cash, total assets, sale of products, and net income were materially overstated.

90.     Hansen consented to the inclusion of its March 14, 2008 audit opinion

on the Company's 2007 Financial Statements in the 6.5% Notes Offering Memorandum.

91.     KPMG HK consented to the inclusion in the 6.5% Notes Offering Memorandum of its audit opinion on ShengdaTech's 2008 and 2009 Financial Statements and its opinion on the adequacy of the Company's internal controls as of December 31, 2009, which stated in pertinent part:

> We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles….***

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), ShengdaTech Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and **our report dated March 15, 2010 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.**

(emphasis added).

92.   The foregoing statements were materially false and misleading because:  the 2007, 2008 and 2009 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen and KPMG HK did not conduct their audits in accordance with the standards of GAAS and the Public Company Accounting Oversight Board.  KPMG has admitted that KPMG HK's audit reports on the Company's 2008 and 2009 Financial Statements should no longer be relied upon and that it has reason to doubt the efficacy of the Company's internal controls over financial reporting during those years.

### D.   Defendants' Culpability

93.   In recent months, many China-based companies that have accessed the United States capital markets through "reverse mergers" similar to the ShengdaTech/Zeolite merger have come under scrutiny by the SEC, the securities exchanges on which they are listed, and the investing public because of accounting issues and fraudulent representations concerning the companies' financial performance and liquidity.  The "reverse merger" process allowed these companies to sell their shares publicly without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors.  Because of this, the role of the outside

auditor assumed special importance, as the audit opinion was the primary safeguard against financial fraud at these companies.  The imprimatur of legitimacy that was placed on these companies' debt securities by virtue of the involvement of prominent investment banks as the underwriters of these offerings was similarly critical in convincing investors to entrust their capital to these companies.  What investors did not know at that time, but have subsequently come to realize, is that these outward marks of legitimacy frequently provided false comfort.  All too often, these companies' auditors failed to follow the appropriate procedures and precautions when conducting their audits of these companies, and issued unqualified or "clean" audit opinions notwithstanding the existence of serious internal control deficiencies and non-compliance with GAAP, and the prestigious investment banks that underwrote the debt securities offered by these companies failed to conduct reasonable investigations into the statements contained in the offering materials for these securities, most notably the unaudited financial information included in such offering materials.

94.   In June 2011 – after the 6.0% and 6.5% Notes Offerings and after Plaintiffs' purchases of the Notes – the SEC issued a warning about investing in companies that access the United States capital markets via reverse mergers, citing "systemic concerns" with the quality of the auditing of Chinese firms' financial reporting.

95.   In November 2011, the SEC approved tougher new exchange rules for companies that wished to enter the United States markets through reverse mergers. The new rules prohibit a reverse-merger company from listing until the company has been in the United States over-the-counter market or another regulated U.S. or foreign exchange for at least a year.  The SEC further required that these companies file all required reports, including audited financial statements, with the SEC and that the companies maintain a minimum share price for 30 of 60 days immediately prior to listing.

96.    In 2011, the SEC suspended trading in more than a dozen reverse-merger companies – at least six of which were based in China – due to lack of current, accurate information about the companies.

97.    ShengdaTech is a prime example of a reverse-merger company whose auditors and underwriters, unbeknownst to the purchasers of its securities, failed to fulfill their duties of ensuring that truthful and accurate information was presented to the investing public.

   1.  **The Auditor Defendants Conducted Their Audits Negligently, Ignoring Warning Signs Of Fraud And Failing To Comply With Generally Accepted Auditing Standards**

98.    The federal securities laws require public companies to have annual audits conducted by outside audit firms.  The reason for this requirement is to provide an independent "check" on the conduct of company management, and to provide investors with a level of comfort that a company's financial condition and results are not being misrepresented by management.  In order to provide that comfort, audits are required to be conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

99.    When it became a public company in 2006, ShengdaTech retained Hansen as its auditor. Hansen issued an audit report for ShengdaTech's 2007 Financial Statements, and continued to serve as ShengdaTech's auditor during the 2008 fiscal year and, in this capacity, reviewed the Company's interim consolidated financial statements for the quarters ended March 31, June 30, and September 30, 2008.  On November 11, 2008, ShengdaTech announced that it had dismissed Hansen as its auditor and replaced Hansen with KPMG.

100.  KPMG HK audited, and issued audit reports concerning, ShengdaTech's 2008 and 2009 Financial Statements.  KPMG USA supervised KPMG HK's audit, since KPMG HK would be preparing an audit report concerning ShengdaTech's compliance with United States GAAP, and

representing that the audit had been conducted in accordance with United States PCAOB standards.

101.   As the outside auditors of the Company and its subsidiaries, Hansen and KPMG HK assisted in the preparation of ShengdaTech's financial statements, and audited the annual financial statements and the text that accompanied them in the Company's Form 10-K filings in each of the respective years that Hansen and KPMG HK served as auditors.   Hansen and KPMG HK were also responsible for, among other things, examining ShengdaTech's system of internal controls to identify and report any material weaknesses or reportable conditions that might impact the accuracy or reliability of their financial statements.   In connection with their audits, Hansen and KPMG HK had full access to the Company's books and records.

102.   Hansen and KPMG HK were fully aware at all relevant times that their audit reports would be reviewed and relied upon by investors and potential investors in ShengdaTech.   KPMG USA was similarly aware, in reviewing and approving KPMG HK's audits and audit opinions, that these audit opinions would reach and be relied upon by investors and potential investors in ShengdaTech. Indeed, Hansen and KPMG HK expressly consented to the inclusion of their audit reports for each of the relevant years in ShengdaTech's 6.0% Notes Offering Memorandum and 6.5% Notes Offering Memorandum, knowing that those documents would form the basis for investors' decisions about whether to purchase the Notes, and KPMG USA retained ultimate authority to "sign off" on the inclusion of HPMG HK's audit reports and opinions in the 6.0% Notes Offering Memorandum and the 6.5% Notes Offering Memorandum.   Under those circumstances, Hansen, KPMG HK, and KPMG USA assumed a special duty to Plaintiffs and others who purchased the Notes in the Offerings, to issue their audit reports in a careful and non-negligent fashion in compliance with applicable auditing standards.

103.   The PCAOB standards required ShengdaTech's auditors  to perform their audit services according to United States GAAS, which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue unqualified opinions only if the Company's financial statements were fairly presented in accordance with GAAP.

104.   GAAS requires that an auditor exercise due professional care in performing an audit and in preparing the audit report.  Hansen and KPMG HK (as supervised by KPMG USA) failed to exercise due professional care, thus violating GAAS, in the performance of their audits of ShengdaTech's 2007, 2008 and 2009 Financial Statements.

105.   As purchasers of ShengdaTech Notes, Plaintiffs were particularly interested in knowing how much cash ShengdaTech had on hand.  Understanding ShengdaTech's cash position was critical to Plaintiffs' ability to make a competent assessment of the likelihood that the Company would be able to make the substantial principal and interest payments required under the Notes.  The 6.0% Notes Offering Memorandum noted as a "Risk Factor" the following:

> ***We may be unable to raise the funds to pay interest on the note, to purchase the notes on the purchase dates, upon a fundamental change or at maturity****.*  The notes initially bear interest semi-annually at a rate of 6.0%, and we in certain circumstances are obligated to pay additional interest.  On June 1, 2011 and June 1, 2013, holders may require us to purchase, for cash, all or a portion of their notes, at 100% of their principal amount, plus any accrued and unpaid interest to, but excluding, that date. . . .  We are obligated to pay the principal amount of the notes outstanding at the maturity date.  We may not have sufficient funds for any required repurchase of the notes or required payment of principal return or interest, and we may have to refinance our credit facilities in order to make payments under the notes.

The 6.5% Notes Offering Memorandum contained a substantially similar warning, as well as a warning that the Company may have insufficient funds for any required repurchase of the 6.0% Notes, which were senior to the 6.5% Notes.

106.   In light of the critical importance of understanding ShengdaTech's cash position in deciding to invest in the Notes, Plaintiffs relied heavily on the Auditor Defendants, because a competently designed audit should enable an auditor – at a minimum – to verify the existence of a company's reported assets.

107.   The Auditor Defendants were required to verify that ShengdaTech's reported assets actually existed.  GAAS Standard of Fieldwork No. 3 requires an auditor to obtain "[s]ufficient competent evidential matter . . .  through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit."  This evidential matter is central to a proper audit and serves as the foundation for the auditor's opinion report.  AU § 326, Evidential Matter.

108.   Here, it is clear that the Auditor Defendants did not take the rudimentary step of verifying that ShengdaTech's reported assets actually existed during 2007-2009.  When KPMG finally did take that step during its audit of the 2010 Financial Statements – at the audit committee's request – it encountered obstructionist tactics by management, which ultimately led it to report potential problems to the audit committee.  When the Special Committee then commenced an investigation, it too was unable to confirm the balances in the Company's bank accounts, and eventually learned that Faith Bloom bank accounts that reportedly held tens of millions of dollars in reality held only $50,000.  Had the Auditor Defendants taken the basic step of trying to confirm these bank balances and CDs earlier, they would have discovered the fraud – or at least uncovered sufficient concerns that they would have declined to issue unqualified audit opinions, thus preventing (or stopping) the fraud.

109.   Similarly, when the Special Committee contacted the bank that had

reportedly issued CDs to Faith Bloom, it quickly discovered that the bank had no record of those CDs being issued. Had the Auditor Defendants sent confirmations to the bank, they, too, would have been unable to verify the existence of those CDs. Given the GAAS requirement that each audit be planned and performed with an attitude of professional skepticism, including a questioning mind and a critical assessment of audit evidence (AU §§ 230.07-08), had such obvious falsifications been discovered – as they would have if even the most rudimentary audit steps were taken – they would have sounded loud alarms to the Auditor Defendants, and the Auditor Defendants would not have issued unqualified audit reports. Absent unqualified audit reports, ShengdaTech could not have issued the Notes.

110. The Auditor Defendants also failed to send confirmations to ShengdaTech's customers to confirm its sales transactions. This is a standard auditing practice that is required by GAAS, but it is clear that the Auditor Defendants did not follow it, or did so negligently, given that Special Committee's counsel issued a report that "calls into serious question the accuracy of payments allegedly made to [ShengdaTech] by various customers or the sales allegedly made, transactions [ShengdaTech] is reported to have engaged in with related parties owned by Mr. Chen which have not been supported, and suggests that sales are vastly overstated."

111. The Auditor Defendants' failure to take the basic step of confirming ShengdaTech's assets and sales is particularly egregious here. The Auditor Defendants knew that ShengdaTech was a Chinese company formed through a reverse-merger transaction. Given the inherent lack of regulation and risk involved in such transactions, the Auditor Defendants should have been on heightened alert to the possibility of fraud. Their failure to perform basic auditing procedures like confirming bank balances and sales transactions (including sales to related parties) makes clear that they were not.

112. KPMG HK's failure to perform basic auditing procedures was not

limited to its failure to confirm balances and transactions.  Because they were based in China, ShengdaTech's five operating subsidiaries (whose results were consolidated into the financial results ShengdaTech reported to the SEC) were required to report their financial results to the Chinese Administration of Industry and Commerce (the "AIC").  Because these subsidiaries were owned by a foreign company (*i.e.*, ShengdaTech), their AIC submissions were required to be audited. These AIC filings also were required to be signed by a legal representative attesting that "the content of the submitted company's annual inspection report is true."  A competent auditor would have obtained and reviewed ShengdaTech's AIC filings as a crosscheck of what ShengdaTech was reporting to the SEC. KPMG HK either failed to obtain ShengdaTech's AIC filings at all or, if it did obtain them, conducted a grossly deficient review of these filings.

113.   The results ShengdaTech reported to the AIC so materially diverged from what was reported to the SEC as to constitute the proverbial "two sets of books."  These discrepancies were sufficiently large that they cannot be "explained away" as the result of differences between reporting standards between the AIC and the SEC.  Had KPMG HK reviewed these AIC filings, it would have readily noted these material discrepancies.

114.   In addition, while the 6.5% Notes Offering Memorandum stated that Zibo Haize – one of ShengdaTech's five operating subsidiaries – produced 13,350 metric tons of NPCC in 2009, Zibo Haize's AIC filings reported that Zibo Haize did not begin operations until June 2010.  Had KPMG HK reviewed these AIC filings, it would have realized that the 6.5% Notes Offering Memorandum contained false statements.

115.   The fact that ShengdaTech's five operating subsidiaries were all located in China, in and of itself, posed a heightened danger of fraud.  AU 316.85A.2 provides that auditors should consider fraud risk where "[s]ignificant operations [are] located or conducted across international borders in jurisdictions

where differing business environments and cultures exist." The Auditor Defendants failed to heed this warning, with KPMG HK having failed to take the most basic step of reviewing the operating subsidiaries' AIC filings.

116. The Special Committee's investigation also revealed that the Company had engaged in a number of transactions with entities owned by Chen. Related party transactions warrant particular attention during an audit, as they pose a particular danger of fraud. Under AU 334, KPMG HK was required to perform special procedures with respect to related party transactions to ensure that they were properly accounted for so as to reflect their economic substance. Specifically, AU 334 required KPMG HK, among other things, to:

- Obtain an understanding of the business purpose of the related party transactions;
- Examine invoices, executed copies of agreements, contracts, and other pertinent documents;
- Determine whether the transaction has been approved by the board of directors or other appropriate officials;
- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements; and
- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

117. KPMG HK failed to perform these procedures, allowing ShengdaTech to engage in undisclosed transactions with entities owned by Chen and to vastly overstate sales to those entities.

118. From the outset of its engagement, KPMG HK was alerted to problems with the Company's financial reporting. Within a few months after it was retained to replace Hansen, KPMG HK reported that it had found material weaknesses in the Company's internal controls over financial reporting. Specifically, KPMG HK's audit report on the Company's 2008 Financial

Statements noted:

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and *our report dated March 31, 2009 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting*.

(emphasis added).   KPMG HK's report on its audit of ShengdaTech's internal controls for the year 2008 stated:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a ***reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected*** on a timely basis.   ***Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.***

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended.   These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

> *In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008*, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(emphasis added).  KPMG USA, which reviewed KPMG HK's audit work, was similarly aware of these internal control deficiencies.

119.  The fact that "material weaknesses" existed and were uncovered by a new auditor within *months* of its retention, coupled with the fact that ShengdaTech was later revealed to have misstated such basic information such as the Company's cash balances and its sales and payments to third parties, strongly suggests that such weaknesses existed during Hansen's audit of ShengdaTech's 2007 Financial Statements and that, accordingly, Hansen did not have a reasonable basis for issuing an unqualified audit opinions on the 2007 Financial Statements or for opining that the Company had adequate internal controls.  Further, the fact that KPMG HK, in its review of the Company's 2010 Financial Statements, was unable to verify something as simple as whether ShengdaTech *actually had money in the bank* strongly suggests that Hansen and KPMG HK were negligent, at best, in not discovering the falsity of the Company's financial statements during their 2007-2009 audits.

120.   These known internal control deficiencies should have shaped KPMG HK's audit procedures.  GAAS Standard of Fieldwork No. 2 and AU § 319 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls.  "Audit risk is the risk that the auditor may unknowingly fail to appropriately modify his or her opinion on

financial statements that are materially misstated."  AU § 312. 02, Audit Risk and Materiality in Conducting an Audit.  "Internal control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories:  (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations."  AU § 319.06, Consideration of Internal Control in a Financial Statement Audit – Definition of Internal Control.  For financial statement audits, internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions."

121.  The fact that KPMG HK uncovered "material weaknesses" mere months into its engagement should have caused KPMG HK to seriously question the rigor that Hansen applied in auditing the Company's 2007 Financial Statements and the basis upon which it opined that such statements complied with GAAP and that the Company had effective internal controls over its financial reporting. Instead, KPMG HK –with KPMG USA's blessing – reassured investors that the Company's financial statements were accurate by issuing a clean audit opinion on ShengdaTech's 2008 and 2009 Financial Statements.  For example, in its March 31, 2009 audit opinion on the Company's 2008 Financial Statements, KPMG HK stated:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year ended, in conformity with U.S. generally accepted accounting principles.

Similarly, KPMG HK's March 15, 2010 audit opinion on the Company's 2009 Financial Statements, as contained in the 6.5% Notes Offering Memorandum, stated:

> In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control – Integrated Framework* issued by COSO.
>
> ***
>
> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of ShengdaTech, Inc. and subsidiaries of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended, and our report dated March 15, 2010 expressed an unqualified opinion on those consolidated financial statements.
>
> ***
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

122.   Despite KPMG HK's reassurances to investors, which were sanctioned by KPMG USA, the presence of material weaknesses in ShengdaTech's internal financial controls – which KPMG HK admitted created a reasonable possibility that a material misstatement of the company's annual or interim financial statements would not be prevented or detected – should have caused KPMG HK to more starkly question the Company's management to ensure that the Company's financial statements were accurate.  KPMG HK failed to do this, in violation of GAAS, and these "material weaknesses" were never adequately addressed.

123.   The Auditor Defendants' non-compliance with GAAS left them without a reasonable basis upon which to form an opinion concerning whether the

Company's financial statements were fairly presented in accordance with GAAP. As discussed above, the Auditor Defendants nonetheless issued, or caused to be issued, clean audit reports representing that the Company's financial statements did comply with GAAP.

**2.  Morgan Stanley Failed To Execute Its Duty To Conduct A Reasonable Investigation Into The Accuracy Of The 6.5% Notes Offering Memorandum**

124.  As the underwriter whose name was displayed prominently on the cover of the 6.5% Notes Offering Memorandum, Morgan Stanley was responsible for, and is deemed to have made, the statements therein.  Morgan Stanley knew that the 6.5% Notes Offering Memorandum would be disseminated to investors for the express purpose of soliciting them to purchase 6.5% Notes, and Morgan Stanley owed a duty to Plaintiffs, as prospective purchasers of the 6.5% Notes and recipients of the 6.5% Notes Offering Memorandum, to conduct a reasonable investigation into the accuracy of the statements contained in that Offering Memorandum.  Morgan Stanley did not do so, and did not possess reasonable grounds for believing that the statements in the 6.5% Notes Offering Memorandum were true and not misleading.  In particular, Morgan Stanley did not conduct a reasonable investigation into the accuracy of the financial information included in the 6.5% Notes Offering Memorandum, including the financial information contained in the textual portions of those documents, as well as that contained in the attached audited and unaudited financial statements.

125.  The 6.5% Notes Offering Memorandum included the Company's 2007 Financial Statements audited by Hansen, including Hansen's unqualified audit opinion thereon, and the 2008 and 2009 Financial Statements audited by KPMG, including KPMG's unqualified audit opinions thereon.  The 6.5% Notes Offering Memorandum also included the 6.5% Notes Offering Memorandum Unaudited Financial Statements.  Because KPMG HK had not audited any of the

6.5% Notes Offering Memorandum Unaudited Financial Statements, the investing public placed particular reliance upon Morgan Stanley's due diligence as underwriter for the 6.5% Notes Offering to investigate and verify the accuracy of the 6.5% Notes Offering Unaudited Financial Statements.

126.  As set forth above, the audited and unaudited financial statements contained in the 6.5% Notes Offering Memorandum were riddled with misstatements.   The 6.5% Notes Offering Unaudited Financial Statements materially overstated, *inter alia*, ShengdaTech's cash, total assets, sale of products, and net income for the period ended September 30, 2010.  Had Morgan Stanley made any effort to confirm the Company's bank balances or sales transactions for that period – which it knew had not been audited by KPMG – it would have discovered the fraud and the 6.5% Notes would never have been issued. Moreover, far from being matters that only a trained auditor could detect, the misstatements in the Company's financial statements would have been readily apparent had Morgan Stanley reviewed the AIC filings of ShengdaTech's operating subsidiaries.

127. KPMG HK's inability during its audit of the 2010 Financial Statements to verify such basic facts as whether ShengdaTech *actually had money in the bank* strongly suggests that whatever investigation Morgan Stanley may have conducted into the accuracy of the audited and unaudited financial statements included in the 6.5% Notes Offering Memorandum was not reasonable and that, accordingly, Morgan Stanley had no reasonable basis to conclude that these audited and unaudited financial statements were accurate.

128.  The fact that ShengdaTech accessed the United States capital markets via a "reverse merger" process should have placed Morgan Stanley on heightened alert to the importance of its role.  Morgan Stanley, as one of Wall Street's most profitable and prestigious banks, was undoubtedly aware that potential investors would be relying on the imprimatur of legitimacy stamped on the 6.5% Notes

1  Offering by its involvement given the circumstances of the Offering.

2  **VI.    LOSS CAUSATION**

3        129.   As described herein, Defendants made or caused to be made a series

4  of materially false or misleading statements about ShengdaTech's financial

5  condition and, in the case of the Auditor Defendants, the adequacy of its financial

6  controls.  These material misstatements and omissions had the purpose and effect

7  of creating in the market an unrealistically positive assessment of ShengdaTech

8  and its business, prospects and operations, thus fraudulently creating a market for

9  the Notes and causing the Notes to be overvalued and artificially inflated at all

10  times relevant hereto.  Defendants' materially false and misleading statements

11  resulted in Plaintiffs purchasing or otherwise acquiring Notes that would never

12  have come into the market but for the fraud or, at a minimum, would have come

13  into the market at substantially lower prices and/or on terms far more favorable to

14  investors.   But for Defendants' misrepresentations, Plaintiffs would not have

15  purchased the Notes at all, or would not have purchased them on the terms and at

16  the artificially inflated prices at which they entered the market.  As the truth about

17  ShengdaTech began to be revealed, the inflation caused by these

18  misrepresentations was eliminated from the price of the Notes and ShengdaTech

19  defaulted on the Notes, causing damages to Plaintiffs HFR and DPERS and the

20  funds and client accounts on whose behalf the other Plaintiffs purchased the Notes.

21        130.  On March 14, 2011 – the day before ShengdaTech disclosed that

22  KPMG had uncovered improprieties in the Company's 2010 Financial Statements

23  – ShengdaTech's common stock closed at $3.55.  Although NASDAQ halted

24  trading in ShengdaTech common stock on March 15, 2011, the stock traded on

25  several days in June 2011.  On June 10, 2011, ShengdaTech opened at $0.55; by

26  the close of trading, it was down to $0.25.  ShengdaTech continued to trade

27  throughout the month of June at levels between $0.23 and $0.90 – far below its

28  pre-disclosure trading price of $3.55.

131.   Plaintiffs purchased Notes in the offerings and in the secondary market at or near par, and in many cases above par value.  The Notes prices fell precipitously in response to the revelations of the financial irregularities at ShengdaTech.  After trading at or above $96 during the two weeks ended March 11, 2011, the 6.5% Notes fell to price of approximately $82 the following week.  The price declined into the $70 range in May 2011, and by mid-June 2011 the 6.5% Notes were trading at less than $20.

132.   ShengdaTech defaulted on both the 6.0% Notes and the 6.5% Notes.  Its default on the Notes was caused, in substantial part, by the revelation that ShengdaTech's financial statements for 2007-2009, as to which Hansen and/or KPMG HK had issued clean audit opinions and which were incorporated in the Offering Memoranda for the Notes, were materially false and unreliable, and that the Company did not actually possess all of the assets reflected on its financial statements.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

133.   On March 15, 2012, Plaintiffs entered into agreements with KPMG HK, KPMG USA, KPMG International and Hansen whereby all statutes of limitations and repose for Plaintiffs' claims against KPMG and Hansen were tolled from March 15, 2012 through the termination of the agreements.  The agreements were later terminated, effective on June 6, 2012.

134.   All of Plaintiffs' claims have been brought within the applicable statutes of limitations, after giving effect to tolling.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violation of Section 18 of the Exchange Act
#### (Against Hansen For False Statements In The 2007 10-K/A)

135.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

136.   This claim is asserted against Hansen for violation of Section 18 of

the Exchange Act.

137.  As set forth above, Hansen made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts in the Company's 2007 10-K/A.

138.  In connection with their decisions to purchase the Company's Notes, Plaintiffs read and relied upon the Company's 2007 10-K/A.  Specifically, Plaintiffs read and relied on the Company's 2007 Financial Statements contained in the 2007 10-K/A.  Plaintiffs also read and relied upon the unqualified audit opinion issued by Hansen in connection with those Financial Statements, in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP and that the Company maintained effective internal controls over financial reporting during that year.

139.  For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2007 10-K/A refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR, and allegations that Plaintiff DPERS read and relied upon statements in the 2007 10-K/A refer to Oaktree Capital Management, L.P.'s reading and reliance as agent on behalf of DPERS.

140.  Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

141.  When the truth began to emerge about the false and misleading statements in the Company's 2007 10-K/A, Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

142.  As a direct and proximate result of Defendant Hansen's wrongful conduct, Plaintiffs HFR and DPERS and the funds and client accounts on whose

behalf the other Plaintiffs purchased the Notes suffered damage in connection with Plaintiffs' purchases of the Notes.

143.   By virtue of the foregoing, Defendant Hansen has violated Section 18 of the Exchange Act.

### SECOND CLAIM FOR RELIEF
### Violation of Section 18 of the Exchange Act
### (Against Hansen and KPMG HK For False Statements In The 2008 10-K)

144.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.   This claim is asserted against Defendants Hansen and KPMG HK for violation of Section 18 of the Exchange Act.

146.   As set forth above, Defendants Hansen and KPMG HK made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2008 10-K.

147.   In connection with their decisions to purchase the Company's Notes, Plaintiffs specifically read and relied upon the Company's 2008 10-K. Specifically, Plaintiffs read and relied on the Company's 2007 Financial Statements contained in the 2008 10-K, as well as the unqualified audit opinion in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.   Plaintiffs also specifically read and relied on the Company's 2008 Financial Statements contained in the 2008 10-K, as well as the unqualified audit opinion in which KPMG HK stated that the 2008 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.

148.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2008 10-K refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR, and allegations that Plaintiff

DPERS read and relied upon statements in the 2008 10-K refer to Oaktree Capital Management, L.P.'s reading and reliance as agent on behalf of DPERS.

149.   Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

150.   When the truth began to emerge about the false and misleading statements and omissions in the Company's 2008 10-K, Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

151.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damage in connection with Plaintiffs' purchases of the Notes.

152.   By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

**THIRD CLAIM FOR RELIEF**
**Violation of Section 18 of the Exchange Act**
**(Against Hansen and KPMG HK**
**For False Statements In The 2009 10-K And 2009 10-K/A)**

153.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

154.   This claim is asserted against Defendants Hansen and KPMG HK for violation of Section 18 of the Exchange Act.

155.   As set forth above, Hansen and KPMG HK made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2009 10-K and 2009 10-K/A.

156.   In connection with their decisions to purchase the Company's Notes, Plaintiffs read and relied upon the Company's 2009 10-K and 2009 10-K/A.

Specifically, Plaintiffs read and relied on the Company's 2007 Financial Statements contained in the 2009 10-K and 2009 10-K/A, as well as the unqualified audit opinion in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.  Plaintiffs also read and relied on the Company's 2008 and 2009 Financial Statements contained in the 2009 10-K and 2009 10-K/A, as well as the unqualified audit opinion in which KPMG HK stated that the 2008 and 2009 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP, and KPMG HK's statement that the Company maintained effective internal controls over financial reporting during the fiscal year ending December 31, 2009.

157.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR, and allegations that Plaintiff DPERS read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Oaktree Capital Management, L.P.'s reading and reliance as agent on behalf of DPERS.

158.   Plaintiffs reasonably relied on these statements not knowing that they were false or misleading.

159.   When the truth began to emerge about the false and misleading statements and omissions in the Company's 2009 10-K and 2009 10-K/A, Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

160.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damages in connection with

Plaintiffs' purchases of the Notes.

161.   By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 20(a) of the Exchange Act**
**(Against KPMG International and KPMG USA)**

162.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

163.   This Claim is asserted against KPMG International and KPMG USA pursuant to Section 20(a) of the Exchange Act.

164.   As alleged herein, KPMG HK violated Section 18 of the Exchange Act by making false and misleading statements in ShengdaTech's 2008 10-K, 2009 10-K and 2009 10-K/A.

165.   Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damages in connection with Plaintiffs' purchases of 6.0% Notes and 6.5% Notes as a direct and proximate result of KPMG HK's violations of Section 18.

166.   KPMG International and KPMG USA were controlling persons of KPMG HK.  By virtue of the unified international structure of the auditing firm and the relationships among member firms, KPMG International had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of its member firms, including KPMG HK.  KPMG USA reviewed and approved KPMG HK's audit work and thus influenced and controlled, directly or indirectly, KPMG HK's conduct and decision-making with respect to its audits and audit reports concerning ShengdaTech.

167.   KPMG International and KPMG USA are not entitled to a "good faith" defense because they cannot establish that they acted in good faith and that they did not directly or indirectly induce the acts constituting the violation of Section 18 by KPMG HK.

168. By virtue of their positions as controlling persons of KPMG HK, KPMG International and KPMG USA are each jointly and severally liable pursuant to Section 20(a) of the Exchange Act, with and to the same extent as KPMG HK, for KPMG HK's violations of Section 18 of the Exchange Act.

### FIFTH CLAIM FOR RELIEF
#### Common Law Negligent Misrepresentation
#### (On Behalf Of Plaintiff CNH Against Hansen For False Statements In The 6.0% Notes Offering Memorandum)

169. Plaintiff CNH repeats and realleges each of the allegations set forth above as if fully set forth herein. For the purposes of this claim, CNH expressly disclaims any claim of fraud or intentional misconduct.

170. This claim is brought by CNH against Hansen under common law principles of negligence.

171. Hansen is in the business of auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

172. Hansen expressly consented to the incorporation in the 6.0% Notes Offering Memorandum of its audit opinion on the Company's 2007 Financial Statements and its statement that the Company maintained effective internal controls over financial reporting, knowing that the 6.0% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the 6.0% Notes for the purpose of soliciting those investors to purchase the notes. Hansen knew and intended that potential purchasers who received the 6.0% Notes Offering Memorandum would rely on its contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.0% Notes.

173. The 6.0% Notes Offering was open only to qualified institutional buyers. Plaintiff CNH is a member of the limited group of potential purchasers of the 6.0% Notes that received the 6.0% Notes Offering Memorandum and was

solicited to purchase notes in the 6.0% Notes Offering.

174.   Hansen owed a duty of reasonable care to the investors and investment managers that received the 6.0% Notes Offering Memorandum, including Plaintiff CNH, and to the funds and accounts managed by Plaintiff CNH, because they were foreseeable and intended beneficiaries of Hansen's audit opinions.

175.   Hansen breached this duty by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in its 2007 audit opinion that it had audited the 2007 financial statements in accordance with GAAS and PCAOB auditing standards and that those financial statements were presented fairly and in accordance with GAAP.

176.   At the time of the misrepresentations and omissions of material fact by Hansen, Plaintiff CNH was ignorant of their falsity and believed them to be true.  Plaintiff CNH relied upon the superior knowledge and expertise of Hansen, and read and justifiably relied (to the detriment of the funds on whose behalf CNH purchased the Notes) on the 2007 audited financial statements in the 6.0% Notes Offering Memorandum, on the unqualified opinion issued by Hansen in connection with those financial statements, and on Hansen's 2007 report concerning the Company's internal controls, when purchasing the 6.0% Notes in the 6.0% Notes Offering.  Had Plaintiff CNH been aware of the true facts, it would not have purchased the 6.0% Notes.

177.   Hansen's conduct constitutes the making of negligent misrepresentations under applicable state law.  As a direct and proximate result of Plaintiff CNH's reliance on the negligent misrepresentations made by Hansen, Plaintiff CNH purchased 6.0% Notes in the 6.0% Notes Offering, and the funds on whose behalf Plaintiff CNH purchased the Notes suffered damages.

/ / /

/ / /

### SIXTH CLAIM FOR RELIEF
#### Common Law Negligent Misrepresentation
#### (On Behalf Of All Plaintiffs Against Defendants Hansen And KPMG HK For False Statements In The 6.5% Notes Offering Memorandum)

178.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  For the purposes of this claim, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.

179.  This claim is brought by Plaintiffs against Hansen and KPMG HK under common law principles of negligence.

180.  Defendants are in the business of auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

181.  Hansen expressly consented  to the incorporation of its audit opinion on the Company's 2007 Financial Statements in the 6.5% Notes Offering Memorandum, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the 6.5% Notes for the purpose of soliciting those investors to purchase the notes.  Hansen knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.5% Notes.

182.  KPMG HK expressly consented to the incorporation of its audit opinions on the Company's 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum, as well as KPMG HK's statement that the Company maintained effective internal controls over financial reporting during the fiscal year ending December 31, 2009, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the Notes for the purpose of soliciting those investors to purchase the 6.5% Notes.  KPMG HK knew and intended that the potential purchasers who received the 6.5% Notes

Offering Memorandum would rely on its contents, including the 2008 and 2009 Financial Statements and KPMG HK's audit reports, when deciding to purchase the 6.5% Notes.

183.  The 6.5% Notes Offering was open only to qualified institutional buyers.  Plaintiffs were members of the limited group of potential purchasers of the 6.5% Notes that received the 6.5% Notes Offering Memorandum and were solicited to purchase notes in the 6.5% Notes Offering.

184.  Defendants owed a duty of reasonable care to the investors and investment managers that received the 6.5% Notes Offering Memorandum, including Plaintiffs, and to the funds and accounts managed by Plaintiffs, because they were foreseeable and intended beneficiaries of Defendants' audit opinions.

185.  Defendants breached this duty by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in their audit opinions that they had audited the financial statements in accordance with GAAS and PCAOB auditing standards, that those financial statements were presented fairly and in accordance with GAAP, and that the Company had adequate internal controls during 2009.

186.  At the time of the misrepresentations of material fact by Defendants, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs relied upon the superior knowledge and expertise of Defendants, and read and justifiably relied (to the detriment of the funds and accounts on whose behalf Plaintiffs purchased the Notes) on the audited financial statements in the 6.5% Notes Offering Memorandum, on the unqualified opinions issued by Defendants in connection with those financial statements, and on KPMG HK's report concerning the Company's internal controls, when purchasing 6.5% Notes in the 6.5% Notes Offering.  Had Plaintiffs been aware of the true facts, they would not have purchased the 6.5% Notes.

187.  For purposes of this Count, allegations that Plaintiff HFR read and

relied upon statements in the 6.5% Notes Offering Memorandum refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR, and allegations that Plaintiff DPERS read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Oaktree Capital Management, L.P.'s reading and reliance as agent on behalf of DPERS.

188.   Defendants' conduct constitutes the making of negligent misrepresentations under applicable state law.  As a direct and proximate result of Plaintiffs' reliance on the negligent misrepresentations made by Defendants, Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering, and Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damages.

**SEVENTH CLAIM FOR RELIEF**
**Common Law Negligent Misrepresentation**
**(Against Defendants KPMG International And KPMG USA Under The Doctrine Of *Respondeat Superior*, Based On KPMG HK's False Statements In The 6.5% Notes Offering Memorandum)**

189.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

190.   This claim is brought by Plaintiffs against Defendants KPMG International and KPMG USA based on KPMG HK's false statements contained in the 6.5% Notes Offering Memorandum under the doctrine of *respondeat superior*.

191.   As alleged above, KPMG HK breached its duty of care to Plaintiffs and made negligent misrepresentations in its audit reports on the 2008 and 2009 Financial Statements as contained in the 6.5% Notes Offering Memorandum, and Plaintiffs HFR and DEPRS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damages as a result of Plaintiffs' reliance on those misrepresentations.

192.   KPMG HK was an agent of Defendants KPMG International and KPMG USA with respect to its audits of the 2008 and 2009 Financial Statements and with respect to its issuance of unqualified audit opinions on the 2008 and 2009

Financial Statements.  KPMG HK took actions in connection with its audits of the 2008 and 2009 Financial Statements and its issuance of unqualified audit opinions on the 2008 and 2009 Financial Statements at the behest of KPMG International and KPMG USA, and such actions were within the scope of KPMG HK's agency.

193.  Under principles of *respondeat superior*, KPMG International and KPMG USA are responsible for the actions and liabilities of their agent, KPMG HK, in connection with its issuance of unqualified audit opinions on  the 2008 and 2009 Financial Statements as contained in the 6.5% Notes Offering Memorandum.

**EIGHTH CLAIM FOR RELIEF**
**Common Law Negligent Misrepresentation**
**(Against Morgan Stanley For False Statements In**
**The 6.5% Notes Offering Memorandum)**

194.  Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.  For the purposes of this claim, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.  Plaintiffs CNH and AQR do not join in this claim.

195.  This claim is brought against Morgan Stanley under common law principles of negligence.

196.  Morgan Stanley underwrote the 6.5% Notes Offering.  As part of its duties as an underwriter, Morgan Stanley was required to conduct, prior to the 6.5% Notes Offering, a reasonable investigation to ensure that the 6.5% Notes Offering Memorandum contained no misstatement or omission of material fact.

197.  Morgan Stanley consented to its name being prominently displayed on the front cover of the 6.5% Notes Offering Memorandum, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the 6.5% Notes for the purpose of soliciting those investors to purchase the notes.  Morgan Stanley knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its contents, including the Company's audited and unaudited financial statements

described above, when deciding to purchase the 6.5% Notes.

198.   The 6.5% Notes Offering was open only to qualified institutional buyers.  Plaintiffs are members of the limited group of potential purchasers of the 6.5% Notes that received the 6.5% Notes Offering Memorandum and were solicited to purchase notes in the 6.5% Notes Offering.

199.   Morgan Stanley owed a duty of reasonable care to the investors and investment managers that received the 6.5% Notes Offering Memorandum, including Plaintiffs, and to the funds and accounts managed by Plaintiffs, because they were foreseeable and intended beneficiaries of the 6.5% Notes Offering Memorandum.

200.   Morgan Stanley breached this duty by failing to conduct a reasonable investigation into the accuracy of the 6.5% Notes Offering Memorandum.

201.   At the time of the misrepresentations and omissions of material fact by Morgan Stanley, Plaintiffs were ignorant of their falsity and believed them to be true.   Plaintiffs relied upon the superior knowledge and expertise of Morgan Stanley, and read and justifiably relied (to the detriment of the funds and accounts on whose behalf Plaintiffs purchased the Notes) on the audited and unaudited financial statements in the 6.5% Notes Offering Memorandum when purchasing the 6.5% Notes in the 6.5% Notes Offering.  Had Plaintiffs been aware of the true facts, they would not have purchased the 6.5% Notes.

202.   For purposes of this Count, allegations that Plaintiff HFR read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Lazard Asset Management LLC's reading and reliance as agent on behalf of HFR, and allegations that Plaintiff DPERS read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Oaktree Capital Management, L.P.'s reading and reliance as agent on behalf of DPERS.

203.  Morgan Stanley's conduct constitutes the making of negligent misrepresentations under applicable state law.  As a direct and proximate result of

the negligent misrepresentations by Morgan Stanley, and in reliance thereon, Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering and Plaintiffs HFR and DPERS and the funds and client accounts on whose behalf the other Plaintiffs purchased the Notes suffered damages.

### NINTH CLAIM FOR RELIEF
#### For Violation of California Corporations Code §§ 25401 And 25501
#### (Against Morgan Stanley Based On False Statements
#### In The 6.5% Notes Offering Memorandum)

204.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.   For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.   Plaintiffs CNH and AQR do not join in this claim.

205.   This claim is brought by Oaktree and all other Plaintiffs who purchased 6.5% Notes from Morgan Stanley in California or who purchased 6.5% Notes from Morgan Stanley on behalf of any funds, accounts or clients located in California (together,the "California Plaintiffs"), against Morgan Stanley pursuant to California Corporations Code §§ 25401 and 25501.   The California Plaintiffs' claims are brought on behalf of 50 or fewer persons.

206.   Morgan Stanley sold 6.5% Notes to the California Plaintiffs in the 6.5% Notes Offering pursuant to the 6.5% Notes Offering Memorandum.

207.   The 6.5% Notes Offering Memorandum contained untrue statements of material fact, including, but not limited to, the audited and unaudited financial statements of ShengdaTech.

208.   Morgan Stanley owed a duty to the California Plaintiffs to make a reasonable and diligent investigation of the statements contained in the 6.5% Notes Offering Memorandum  to ensure that the statements were true and that there was no omission to state a material fact required to be stated in order to make the

1  statements contained therein not misleading.

2      209.   Morgan Stanley did not make a reasonable investigation of the

3  statements contained in the 6.5% Notes Offering Memorandum, and did not

4  possess reasonable grounds for believing that the 6.5% Notes Offering

5  Memorandum did not contain an untrue statement of a material fact or omitted to

6  state a material fact required to be stated therein or necessary to make the

7  statements therein not misleading.

8      210.   The California Plaintiffs did not know, nor in the exercise of

9  reasonable diligence could they have known, of the untrue statements of material

10  fact or omissions of material facts in the 6.5% Notes Offering Memorandum when

11  they purchased or acquired the 6.5% Notes in the 6.5% Notes Offering.

12      211.   By virtue of the foregoing, Morgan Stanley has violated California

13  Corporation Code § 25401 and Morgan Stanley is liable to the California Plaintiffs

14  pursuant to California Corporation Code § 25501 with respect to the California

15  Plaintiffs' purchases of 6.5% Notes from Morgan Stanley in the 6.5% Notes

16  Offering.

17

18                    **TENTH CLAIM FOR RELIEF**
                **For Violation of Connecticut Uniform Securities Act § 36b-29(a)**
                **(Against Hansen and KPMG HK Based On False Statements**
19                **In The 6.5% Notes Offering Memorandum)**

20      212.   Plaintiffs repeat and reallege each of the allegations set forth above as

21  if fully set forth herein.

22      213.   This claim is brought by CNH, AQR, and all other Plaintiffs who

23  purchased Notes in the 6.5% Notes Offering on behalf of any funds, clients or

24  accounts located in Connecticut, (together, the "Connecticut Plaintiffs") against

25  Hansen and KPMG HK pursuant to Connecticut Uniform Securities Act § 36b-

26  29(a).  This claim is brought on behalf of 50 or fewer persons.

27      214.   Although ShengdaTech is not a party in this action, ShengdaTech

28  offered and sold the 6.5% Notes in the 6.5% Notes Offering by means of untrue

statements and/or omissions to state material facts in the 6.5% Notes Offering Memorandum, in violation of Connecticut Uniform Securities Act § 36b-29(a).

215.   Hansen and KPMG HK materially assisted ShengdaTech in selling the 6.5% Notes in the 6.5% Notes Offering.  Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit opinions on the 2007 Financial Statements in the 6.5% Notes Offering Memorandum.   KPMG HK audited ShengdaTech's 2008 and 2009 Financial Statements and consented to the inclusion of its unqualified audit opinions on the 2008 and 2009 Financial Statements in the 6.5% Notes Offering Memorandum. As set forth above, ShengdaTech accessed the United States capital markets via a "reverse merger" transaction, a process that allowed ShengdaTech to sell its securities publicly without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors.  Because of this, the role of Hansen and KPMG HK as ShengdaTech's outside auditors assumed special importance, as their audit opinions were the primary safeguard against financial fraud at ShengdaTech.  The inclusion of Hansen's and KPMG HK's unqualified audit opinions in the 6.5% Notes Offering Memorandum materially assisted ShengdaTech to offer and sell the 6.5% Notes to the Connecticut Plaintiffs.

216.   Hansen and KPMG HK should have known, through the exercise of reasonable care in performing their auditing duties, that the Company's financial statements in the 6.5% Notes Offering Memorandum were materially false and misleading and that, therefore, Hansen's and KPMG HK's unqualified audit opinions on those financial statements were also materially false and misleading.

217.   Hansen and KPMG HK owed the Connecticut Plaintiffs a duty to make a reasonable and diligent investigation of ShengdaTech's financial statements and their own unqualified audit opinions in the 6.5% Notes Offering Memorandum, to ensure that they did not contain untrue statements of material fact

or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

218. As alleged in detail herein, Hansen did not make a reasonable investigation of the 2007 Financial Statements or its unqualified audit opinion thereon and did not possess reasonable grounds for believing that the 2007 Financial Statements and its unqualified audit opinions thereon did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. KPMG HK did not make a reasonable investigation of the 2008 and 2009 Financial Statements or its unqualified audit opinions thereon and did not possess reasonable grounds for believing that the 2008 and 2009 Financial Statements and its unqualified audit opinions thereon did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

219. The Connecticut Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering based on the 6.5% Notes Offering Memorandum. The Connecticut Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements or omissions of material facts in the 2007, 2008 or 2009 Financial Statements or in Hansen's and KPMG HK's unqualified audit opinions in the 6.5% Notes Offering Memorandum.

220. The material false statements and omissions in the financial statements and audit opinions in the 6.5% Notes Offering Memorandum proximately caused the Connecticut Plaintiffs to purchase the Notes in the 6.5% Notes Offering and proximately caused the Connecticut Plaintiffs and/or the funds and accounts managed by the Connecticut Plaintiffs to suffer damages.

221. By reason of the foregoing, Hansen and KPMG HK are liable to the Connecticut Plaintiffs for violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

## ELEVENTH CLAIM FOR RELIEF
### For Violation of Connecticut Uniform Securities Act § 36b-29(c)
### (Against KPMG International And KPMG USA, Based On KPMG HK's False Statements In The 6.5% Notes Offering Memorandum)

222.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

223.   This claim is asserted by the Connecticut Plaintiffs against KPMG International and KPMG USA pursuant to Section 36b-29(c) of the Connecticut Uniform Securities Act.  This claim is brought on behalf of 50 or fewer persons.

224.   As alleged herein, KPMG HK violated Section 36b-29(a) of the Connecticut Uniform Securities Act by materially assisting in the offering and sale of 6.5% Notes in the 6.5% Notes Offering pursuant to a 6.5% Notes Offering Memorandum containing material false statements and omitting material facts. The Connecticut Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering pursuant to the 6.5% Notes Offering Memorandum and suffered damages as a direct and proximate result of KPMG HK's violations of Section 36b-29(a).

225.   As alleged herein, KPMG International and KPMG USA directly or indirectly controlled KPMG HK. As such, they are each jointly and severally liable to the Connecticut Plaintiffs pursuant to Section 36b-29(c) of the Connecticut Uniform Securities Act, with and to the same extent as KPMG HK, for KPMG HK's violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

226.   KPMG International and KPMG USA are not entitled to a "good faith" defense, because they cannot establish that they did not know, nor in the exercise of reasonable care could they have known, of the facts giving rise to KPMG HK's liability under Section 36b-29(a).

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment on their behalf as follows:

A.      Awarding compensatory damages to Plaintiffs HFR and DPERS and the funds and client accounts managed by the other Plaintiffs, against all

Defendants, jointly and severally, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law (except that Plaintiffs CNH and AQR do not seek an award of compensatory damages against Morgan Stanley);

B.     Ordering Morgan Stanley to disgorge to Plaintiffs HFR and DPERS and the funds and client accounts managed by the other Plaintiffs (other than CNH and AQR) the fees and other benefits it received in connection with the 6.5% Notes Offering;

C.     Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

D.     Awarding Plaintiffs and the funds and client accounts managed by Plaintiffs such other and further relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## X.    JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated:  November 21, 2012                      /s/ Gary R. Goodheart
                                        GARY R. GOODHEART
                                        Nevada Bar #1203
                                        FENNEMORE CRAIG JONES VARGAS
                                        300 S. Fourth Street, Suite 1400
                                        Las Vegas, NV 89101
                                        Telephone:  (702) 692-8000
                                        Facsimile:  (702) 692-8099

                                        *Local Counsel for all Plaintiffs*

                                        STUART M. GRANT
                                        MEGAN D. MCINTYRE
                                        CHRISTINE M. MACKINTOSH
                                        GRANT & EISENHOFER P.A.
                                        123 Justison Street
                                        Wilmington, DE 19801
                                        Telephone:  (302) 622-7000
                                        Facsimile:  (302) 622-7100

                                        *Counsel for Plaintiffs Oaktree Capital
                                        Management, L.P., Lazard Asset
                                        Management LLC, Angelo, Gordon & Co.,
                                        L.P., Zazove Associates, LLC, CNH
                                        Partners, LLC, Advent Capital
                                        Management, LLC, AQR Capital
                                        Management, LLC, and HFR CA Lazard
                                        Rathmore Master Trust*

                                        CYNTHIA L. COLLINS
                                        RALPH K. DURSTEIN III
                                        STATE OF DELAWARE
                                        Deputy Attorneys General
                                        Carvel State Office Building
                                        820 North French Street, 6th Floor
                                        Wilmington, DE 19801
                                        Telephone:  (302) 577-8400
                                        Facsimile:  (302) 577-6630

                                        *Counsel for Plaintiff Delaware Public
                                        Employees' Retirement System*

73