1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**
7 **DISTRICT OF NEVADA**

8 | OAKTREE CAPITAL
MANAGEMENT, L.P., et al.,

Plaintiff(s),

v.

KPMG, et al.,

Defendant(s). | 2:12-CV-956 JCM (GWF)

14

15 **ORDER**

16          Presently before the court are defendants KPMG, a Hong Kong Partnership ("KPMG HK");

17  KPMG International Cooperative ("KPMG Int'l"); KPMG LLP ("KPMG US"); Hansen, Barnett,

18  and Maxwell, P.C. ("Hansen"); and Morgan Stanley & Co.'s ("Morgan Stanley") respective motions

19  to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). (Docs. # 124, 126,

20  127, 128, 129). Plaintiffs Oaktree Capital Management, L.P. ("Oaktree"); Lazard Asset Management

21  LLC ("Lazard"); Angelo, Gordon, and Co., L.P. ("Angelo"); Zazove Associates LLC ("Zazove");

22  CNH Partners, LLC ("CNH"); Advent Capital Management, LLC ("Advent"); AQR Capital

23  Management, LLC ("AQR"); HFR CA Lazard Rathmore Master Trust ("HFR"); and Delaware

24  Public Employee Retirement System ("DPERS") filed a consolidated response in opposition to the

25  motions. (Doc. # 137). Each defendant then filed a reply. (Docs. # 141, 142, 143, 145, and 146).

26  . . .

27  . . .

28

**James C. Mahan**
**U.S. District Judge**

# I.     BACKGROUND

## A.     ShengdaTech

The claims presented in plaintiffs' consolidated complaint (doc. # 120)[1] rest on allegedly false material statements in Securities and Exchange Commission ("SEC") filings and offering memoranda. The documents were issued by a corporation called ShengdaTech ("Shengda"). Plaintiffs purchased securities issued by Shengda. Plaintiffs are either investment funds or investment managers. Defendants are auditors and underwriters that Shengda retained in connection with the preparation of the documents. Shengda, now bankrupt, is not a party to this suit.

According to a Shengda offering memorandum, Shengda is a Nevada corporation with its principal place of business in the People's Republic of China ("China"). (Doc. # 130, Ex. C, 3). [2] Prior to its bankruptcy, Shengda manufactured a chemical additive called nano-precipitated calcium carbonate ("NPCC"). (*Id.* at 1). The additive is used to strengthen certain industrial materials such as paint, plastic, and rubber. (*Id.*).

Faith Bloom Limited ("Faith Bloom") is a holding company organized in the British Virgin Isles. (*Id.* at 3). Faith Bloom is a wholly owned subsidiary of Shengda. (*Id.*). In turn, Faith Bloom wholly owns five manufacturing companies operating and organized in China (the "PRC companies").[3] (*Id.*). The PRC companies carry out the manufacturing, marketing, and sale of NPCC

---

[1] References to plaintiffs' complaint throughout the order refer to the consolidated complaint (doc. # 120), as opposed to the original complaint under the same caption and number (doc. # 1).

[2] Defendant KPMG requests that the court take judicial notice of documents referenced in plaintiffs' complaint, defendants' motions to dismiss, and defendants' replies to plaintiffs' response in opposition. (Doc. # 130, 144). Plaintiffs have not filed any response in opposition to these requests. Under Fed. R. of Evid. 201, a court may judicially notice matters of public record. *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Therefore, the court takes notice of certain documents filed in Shengda's bankruptcy proceedings. *See infra* text accompanying note 5. Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994); *see also United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (A court may also treat documents as incorporated by reference if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim"). The court, therefore, properly considers Shengda's 6.5% notes offering memorandum, which is referenced extensively in plaintiffs' complaint.

[3] The PRC companies are Shandong Haize Nanomaterials Co., Ltd. ("Shandong Haize"); Shandong Bangsheng Chemical Co., Ltd. ("Shandong Bangsheng"); Shaanxi Haize Nanomaterials Co., Ltd. ("Shaanxi"); Zibo Jaize Nanomaterials Co., Ltd. ("Zibo"); and Anhui Yuanzhong Nanomaterials Co., Ltd. ("Anhui").

1    and other coal-based chemicals on behalf of Faith Bloom and Shengda. (*Id.*).

2    Shengda, once a publicly traded corporation registered with the SEC, was formed by the

3 process of reverse merger. Reverse mergers are complex corporate transactions utilized by private

4 companies who wish to gain access to U.S. capital markets, but also wish to avoid the expensive and

5 drawn-out process of SEC registration. Formally, the target company, a publicly traded and usually

6 asset-less corporation, acquires the private company, generally through a share exchange agreement.

7 Practically however, the private company is the acquirer, as it is the private company's management

8 and board that will eventually control and operate the surviving company.

9    On March 31, 2006, Faith Bloom and the Zeolite Exploration Company ("Zeolite"), a Nevada

10 corporation, consummated a share exchange agreement, pursuant to a securities purchase agreement

11 and a plan of reorganization. (*Id.*). Under the agreement, Faith Bloom became a wholly-owned

12 subsidiary of Zeolite. (*Id.*). Faith Bloom's management had successfully taken over Zeolite through

13 the reverse merger process. Effective January 3, 2007, Zeolite, by and through its new management,

14 changed its name to ShengdaTech, Inc. (*Id.*). Shengda's stock began trading on the NASDAQ stock

15 exchange in 2007. (Doc. # 120, 15).

16    **B.**      **Shengda's note offerings and subsequent default**

17    In an effort to raise capital, Shengda first conducted a debt offering in 2008, selling

18 $115,000,000 par amount of 6.0% debt notes (the "6.0% offering"). The notes were offered to

19 "qualified institutional buyers," which are defined by rule 144A–a regulation promulgated under the

20 Securities Act of 1933. 17 C.F.R. § 230.144A(a)(1). The investment manager plaintiffs are qualified

21 institutional buyers who purchased the notes on behalf of their funds and clients. The notes were

22 solicited via an offering memorandum (the "6.0% memo").

23    The 6.0% memo contained Shengda's audited 2007 financial statements, which included

24 defendant Hansen's unqualified audit opinions. Plaintiffs allege that Hansen consented to the

25 inclusion of its opinion in the 6.0% memo. Plaintiff CNH purchased 6.0% notes on behalf of its

26 funds both through the offering and on the secondary market. Plaintiffs Lazard, HFR, and AQR

27 purchased 6.0% notes on the secondary market on behalf themselves, their clients, or their funds.

28

**James C. Mahan**
**U.S. District Judge**

- 3 -

1    Shengda later conducted a second notes offering, this time with a rate of 6.5%. On December

2    10, 2010, Shengda announced that Morgan Stanley would be underwriting $130,000,000 of 6.5%

3    notes to be issued by Shengda (the "6.5% offering"). A condition of the offering was that Shengda

4    would repurchase at least 75% of the 6.0% notes. Again, the notes were solicited to qualified

5    institutional buyers via an offering memorandum (the "6.5% memo").

6    The 6.5% memo contained audited financial statements for 2007, 2008, and 2009, as well

7    as unaudited financial statements for 2010. The 2007 financial statements included defendant

8    Hansen's unqualified audit opinion for that year. The 2008 and 2009 financial statements included

9    defendant KPMG HK's unqualified audit opinions for those years. Plaintiffs allege that Hansen and

10   KPMG HK consented to the inclusion of their respective statements in the 6.5% memo. All plaintiffs

11   purchased 6.5% notes through the 6.5% offering on behalf of themselves, their clients, or their funds.

12   Plaintiffs Oaktree, Lazard, Angelo, AQR, HFR, and DPERS purchased additional notes on the

13   secondary market. On December 15, 2010, Shengda announced that the 6.5% offering had been

14   completed.

15   Since that time, plaintiffs have come to the uncomfortable conclusion that "ShengdaTech has

16   turned out to have been a sham." (Doc. # 120, 17). This does not seem to be in dispute between the

17   parties. Plaintiffs allege that "ShengdaTech management utterly misrepresented the value and,

18   indeed, the existence of material assets that were recorded on the [c]ompany's balance sheet, and

19   materially overstated the [c]ompany's sales by recording unsupported and fictitious transactions."

20   (*Id.*)

21   On March 15, 2011, revelations of management's allegedly long-standing fraudulent conduct

22   began. Shengda announced that its board of directors (the "board") had appointed a special

23   committee to investigate "discrepancies" and "unexplained issues relating to the [c]ompany's . . .

24   financial records" that KPMG HK unearthed in its preparation of an audit opinion on Shengda's

25   2010 financial statements. These revelations culminated on May 5, 2011, when Shengda filed a form

26   8-K with the SEC.

27   . . .

28

James C. Mahan
U.S. District Judge

- 4 -

First, the form 8-K indicated that KPMG HK believed its audit opinions regarding the 2008, and 2009, financial statements should *no longer be relied on* by investors. Secondly, the 8-K divulged more specific information about the discrepancies and issues initially raised by KPMG:

> concerns included serious discrepancies and unexplained issues relating to, among others: (I) the [c]ompany's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the [c]ompany's second largest customer; (vi) discrepancies between KPMG HK's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

(Doc. # 120, 20).

The Shengda notes allegedly traded at or above $96 for the two weeks prior to the March 15, 2011, disclosure. The price allegedly fell about 15% to $82 the following week. After the May 5, 2011, disclosure, plaintiffs contend that the notes continued to decline in value, dropping into the "$70 range."

On June 9, 2011, Shengda filed a form 8-K with the SEC, announcing, *inter alia*, that it would be defaulting on the 6.0% notes. A week later, Shengda failed to make interest payments owed to holders of the 6.5% notes. On August 19, 2011, Shengda began bankruptcy proceedings in the United States Bankruptcy Court for the District of Nevada. A few days later, Shengda acknowledged, via another form 8-K, that filing for bankruptcy was an event of default for both the 6.0% notes and the 6.5% notes.

## C.    Defendants

KPMG HK is the Hong Kong member firm of KPMG Int'l and provides professional financial services to Hong Kong-based clients. Shengda retained KPMG HK to audit its 2008, and 2009, financial statements in preparation for its SEC filings. Plaintiffs allege that KPMG HK expressly consented to the inclusion of its audit opinion in Shengda's 2008 SEC form 10-K ("2008 10-K"), its 2009 SEC form 10-K ("2009 10-K"), its 2009 SEC form 10-K/A ("2009 10-K/A"), and the 6.5% memo.

. . .

James C. Mahan
U.S. District Judge

KPMG Int'l is a cooperative organized under Swiss law. It is the international liaison for member firms bearing the KPMG name and operating in different countries around the globe. KPMG member firms provide professional financial services to clients around the world. KPMG Int'l has 54 member firms that provide services in 150 countries. Plaintiffs allege, and defendants deny, that KPMG Int'l dominates and controls KPMG HK.

KPMG US is the United States ("US") member firm of KPMG Int'l and provides professional financial services to clients in the US and coordinates with member firms in other countries whose clients are subject to US regulation. Plaintiffs allege, and defendants deny, that KPMG US dominates and controls both KPMG HK and KPMG Int'l.

Defendant Hansen is a firm based in Utah that provides professional financial services. Shengda retained Hansen to audit its 2007, financial statements for inclusion in SEC filings. Plaintiffs allege that Hansen expressly consented to the inclusion of its audit opinion in Shengda's 2007 SEC form 10-K/A, the 6.0% memo, and the 6.5% memo.

Defendant Morgan Stanley is a large financial institution headquartered in New York. One of the many financial services Morgan Stanley offers is the underwriting of private debt offerings. In that capacity, Morgan Stanley purchased $130,000,000 par value of 6.5% notes and offered those notes to qualified institutional buyers via the 6.5% offering. Plaintiffs allege that Morgan Stanley failed to conduct a reasonable investigation into the accuracy of Shengda's financial statements and thereby breached a duty to plaintiffs.

**D.      Plaintiffs and plaintiffs' claims for relief**

Plaintiffs are either investment managers or investment funds. Plaintiff Oaktree is an asset management firm based in California. Plaintiffs Lazard, Angelo, and Advent are New York-based asset management firms. Plaintiffs CHN and AQR are Connecticut-based asset management firms,[4] and plaintiff Zazove is a Nevada-based asset management firm. Plaintiff HFR is an investment fund organized under Bermuda law and managed by plaintiff Lazard. Plaintiff DPERS is a pension fund in Delaware advised by plaintiff Oaktree.

---

[4] Plaintiffs CNH and AQR do not submit claims against Morgan Stanley.

The fund plaintiffs, HFR and DPERS, are funds managed by other plaintiffs, Lazard and Oaktree respectively, and are suing on behalf of themselves. The investment company plaintiffs are suing on behalf of funds that these plaintiffs manage or co-manage, or on behalf of these plaintiffs' clients who they advise and whose accounts they manage. Plaintiffs have alleged that they possess valid assignments of the claims stemming from purchases made by clients.

Plaintiffs collectively purchased $56.6 million par value of 6.5% notes through the 6.5% offering. They also collectively purchased another $16.265 million par value of 6.5% notes on the secondary market, $250,000 par value of 6.0% notes through the 6.0% offering, and $21.775 million par value of 6.0% notes on the secondary market. Some of these notes were sold at a significant discount after Shengda's March 15, 2011 announcement, but plaintiffs continue to hold the majority of the allegedly worthless debt.

Plaintiffs allege that the series of disclosures and bankruptcy filings made by Shengda in 2011 support an inference of a long history of fraudulent reporting by Shengda management. Plaintiffs contend that Shengda management's fraudulent practices were manifested in materially overstated figures in financial statements as far back as 2007.

Plaintiffs allege that KPMG HK and Hansen failed to follow generally accepted accounting standards ("GAAS") in their audits of Shengda's financials, falsely stated that Shengda's financial statements complied with generally accepted accounting principles ("GAAP"); and falsely opined that Shengda's "internal controls" were sufficient. Plaintiffs allege that defendants consented to the inclusion of these false statements in several of Shengda's SEC filings.

Plaintiffs make other allegations supporting inferences that KPMG HK and Hansen were negligent and ignored red flags that should have prompted a more inquisitive probe into Shengda's finances and reporting. Plaintiffs allege that defendant Morgan Stanley failed to reasonably investigate the *audited* 2008 and 2009 statements *or* perform appropriate due diligence on the *unaudited* 2010 statements. They argue that by attaching its name to the 6.5% memo without performing these investigations, Morgan Stanley provided a misleading "imprimatur of legitimacy" to the notes and should incur liability for the accuracy of the statements.

James C. Mahan
U.S. District Judge

- 7 -

1    Beyond the 2011 Shengda disclosures described above, plaintiffs allege other facts they argue

2    support an inference of falsity in the financial statements included in Shengda's SEC filings and

3    offering memoranda. For instance, plaintiffs allege that there were discrepancies between Shengda's

4    SEC filings and the Chinese companies' filings with China's Administration of Industry and

5    Commerce (the "AIC"). Plaintiffs suggest that these discrepancies were so large that differences in

6    accounting standards or principles could not possibly explain the disjunct figures.

7    Plaintiffs also allege that management in China obstructed the special committee's chief

8    restructuring officer Michael Kang's ("CRO Kang") attempts to verify accounts and obtain

9    information on the assets and operations of the PRC companies. A number of Shengda filings in U.S.

10   Bankruptcy Court indicate that this was the case. *See* Adversary Proceeding Complaint filed on

11   August 20, 2011, in *In re ShengdaTech, Inc.*, Case No. BK-11-52649, Adv. Pr. No. 11-05082, doc.

12   # 1, pp. 2, 6 (Bankr. D. Nev.).[5]

13   The bankruptcy filings indicate that despite this obstructionism, the special committee

14   discovered that certificates of deposit ("CDs") reported in the financial statements could not be

15   verified by the banks that purportedly issued them. *Id.* at 6. CRO Kang allegedly discovered that

16   bank accounts held by Faith Bloom and reported by Shengda to contain US$73 million on December

17   31, 2010, in fact held only $50,000 collectively. *See* Disclosure Statement filed May 16, 2012, in *In*

18   *re ShengdaTech, Inc.*, Case No. BK-11-52649, doc. # 468, 28. Plaintiffs maintain that these

19   discrepancies are sufficiently significant to support an inference that the fraudulent conduct must

20   have been going on for years.

21   Each plaintiff contends that it read and relied upon the 6.0% memo and the 6.5% memo in

22   making its decisions to purchase the respective notes.[6] Specifically, plaintiffs allege reliance on the

23   financial statements and defendants KPMG HK and Hansen's audit opinions. In addition to the

24

25   [5] *See supra* note 2.

26   [6] Plaintiffs HFR and DPERS, both investment funds, do not allege that they themselves read and relied upon
the statements. Instead, HFR alleges that plaintiff Lazard read and relied upon the documents in its roles as the fund's
27   investment manager and agent. DPERS alleges that plaintiff Oaktree read and relied upon the document in its roles as
the fund's investment manager and agent.
28

James C. Mahan
U.S. District Judge

1  statements in the offering memoranda, plaintiffs allege reliance on a number of Shengda's SEC

2  filings and defendants KPMG HK and Hansen's audit opinions therein: the 2007 10-K/A, the 2008

3  10-K, the 2009 10-K/A, and the 2009 10-K.

4      Plaintiffs submit eleven claims for relief. Each claim arises under one or more of the

5  following: § 18 or § 20 of the 1934 Securities Exchange Act (the "Exchange Act"), the California

6  Corporations Code, the Connecticut Uniform Securities Act, or common law principles. Each claim

7  rests on plaintiffs' allegations that they justifiably relied on financial statements and audit opinions

8  in Shengda's SEC filings and offering memoranda, which contained materially false statements

9  negligently endorsed by defendants KPMG HK, Hansen, or Morgan Stanley, or some combination

10  of those defendants. Plaintiffs claim that defendants KPMG USA and KPMG Int'l are liable under

11  statutory theories of "control person liability" and the common law theory of respondeat superior.

12  (Doc. # 120).

13  **II.    LEGAL STANDARDS**

14      **A.    Rule 8**

15      A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can

16  be granted." FED. R. CIV. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain

17  statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *Bell*

18  *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual

19  allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements

20  of a cause of action." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citation omitted).

21      "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S.

22  at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to

23  "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (citation omitted).

24      In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when

25  considering motions to dismiss. First, the court must accept as true all well-pled factual allegations

26  in the complaint; however, legal conclusions are not entitled to the assumption of truth. Id. at 1950.

27

28

**James C. Mahan**
**U.S. District Judge**

1  Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not

2  suffice. *Id.* at 1949.

3       Second, the court must consider whether the factual allegations in the complaint allege a

4  plausible claim for relief. *Id.* at 1950. A claim is facially plausible when the plaintiff's complaint

5  alleges facts that allows the court to draw a reasonable inference that the defendant is liable for the

6  alleged misconduct. *Id.* at 1949.

7       Where the complaint does not permit the court to infer more than the mere possibility of

8  misconduct, the complaint has "alleged – but not shown – that the pleader is entitled to relief." *Id.*

9  (internal quotations omitted). When the allegations in a complaint have not crossed the line from

10 conceivable to plausible, plaintiff's claim must be dismissed. *Twombly*, 550 U.S. at 570.

11      The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca*, 652 F.3d 1202,

12 1216 (9th Cir. 2011). The *Starr* court stated, "First, to be entitled to the presumption of truth,

13 allegations in a complaint or counterclaim may not simply recite the elements of a cause of action,

14 but must contain sufficient allegations of underlying facts to give fair notice and to enable the

15 opposing party to defend itself effectively. Second, the factual allegations that are taken as true must

16 plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to

17 be subjected to the expense of discovery and continued litigation." *Id.*

18     **B.**    **Rule 9**

19      Rule 9 provides that for a party to allege fraud, it "must state with particularity the

20 circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's

21 mind may be alleged generally." FED. R. CIV. P. 9(b). Assertions of fraud must include "the who,

22 what, when, where, and how" of the misconduct alleged. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

23 1097, 1106 (9th Cir. 2003). Rule 9 serves several purposes, including: (1) providing defendants with

24 adequate notice so they are able to defend the charge and deter plaintiffs from filing complaints "'as

25 a pretext for the discovery of unknown wrongs'; (2) to protect those whose reputation would be

26 harmed as a result of being subject to fraud charges; and (3) to 'prohibit [ ] plaintiff[s] from

27 unilaterally imposing upon the court, the parties and society enormous social and economic costs

28

**James C. Mahan**
**U.S. District Judge**

1  absent some factual basis.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)

2  (quoting *In re Stac Elecs. Sec Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citation omitted)).

3       In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum,

4  identify the role of each defendant in the alleged fraudulent scheme to satisfy the fraud pleadings

5  rule. *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

6  **III.   DISCUSSION**

7       **A.    Applicable pleading standards**

8       Defendants argue that the heightened pleading requirements of the Private Securities

9  Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b) should be applied to the allegations in

10  plaintiffs' complaint. (Doc. # 129, 25). Plaintiffs concede that some PSLRA requirements apply to

11  the complaint's allegations, but maintain that Fed. R. Civ. P. 9(b) does not apply to plaintiffs'

12  complaint.

13       Fed. R. Civ. P. 9(b) applies, on its face, only to allegations of fraud. Plaintiffs maintain that

14  fraud is not an essential element of any of their claims, particularly their claims under § 18 and § 20

15  of the Exchange Act. The Ninth Circuit has held that in cases where fraud is not an essential element

16  of the claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirement

17  of Fed. R. Civ. P. 9(b). *See Vess* 317 F.3d at 1104-05. Allegations of non-fraudulent conduct will

18  be evaluated under the ordinary standards of Fed. R. Civ. P. 8(a), as discussed above. *See id.*

19       However, where allegations in a complaint do not use the word "fraud," but "sound in fraud,"

20  are "grounded in fraud," or allege a "unified course of fraudulent conduct," the pleading standards

21  of Fed. R. Civ. P. 9(b) still apply. *See Safron Capital Corp. v. Leadis Tech., Inc.*, 274 F. App'x 540,

22  541 (9th Cir. 2008) (unpublished) (quoting *Vess*, 317 F.3d at 1105). If fraud is not an essential

23  element of a plaintiff's claim and no uniform course of fraudulent conduct is alleged, then the court

24  is to "disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim

25  has been stated" by the remaining allegations. *Vess*, 314 F.3d at 1105 (quoting *Lone Star Ladies Inv.*

26  *Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)).

27  . . .

28

James C. Mahan
U.S. District Judge

1    In the present action, fraud is not an essential element of plaintiffs' claims. Plaintiffs' first

2    three claims, under § 18 of the Exchange Act, do not require allegations of intent or any particular

3    state of mind and, therefore, do not require fraud. *See Magna Inv. Corp. v. John Does One Through*

4    *Two Hundred*, 931 F.2d 38, 40 (11th Cir. 1991) ("[N]othing suggests that an intent to deceive is an

5    element of a civil action under [§] 18."); *see also McGann v. Ernst & Young*, 102 F.3d 390, 395 (9th

6    Cir. 1996) ("§ 10(b) requires proof of scienter while § 18 does not."). Plaintiffs' fourth claim, a §

7    20 "control person" claim, is based on the underlying liability of other defendants under § 18 and,

8    therefore, does not require allegations of fraud either. *See* 15 U.S.C. § 78t(a); (doc. # 120, 59, ¶ 164).

9    Plaintiffs' fifth through eighth claims are brought under common law theories of *negligent*

10   misrepresentation. Hopefully, it is obvious that these claims don't require a fraudulent state of mind.

11   California Corporations Code § 25401 and § 25501 form the basis for plaintiffs' ninth claim for

12   relief. § 25501 creates a civil remedy for violations of § 25401. *See* Cal. Corp. Code § 25501. From

13   its face, it is clear that § 25401 does not require an allegation of a defendant's state of mind. *See* Cal.

14   Corp. Code § 25401.

15   It is also clear from the face of § 36b-29(a) of the Connecticut Uniform Securities Act that

16   plaintiffs' tenth and eleventh claims do not require allegations of fraud or a fraudulent state of mind.

17   *See* Conn. Gen. Stat. § 36b-29(a); Conn. Gen. Stat. § 36b-29©. For liability under § 36b-29(a)–or

18   "control person" liability under § 36b-29(c)–a defendant who knew or should have known that a

19   statement it made or caused to be made was false is liable to a purchaser who relied on that statement

20   in purchasing a security. *See* Conn. Gen. Stat. § 36b-29(a); Conn. Gen. Stat. § 36b-29©. This is a

21   negligence standard, not a fraud standard.

22   Because plaintiffs' claims do not require allegations of fraudulent conduct, the court finds

23   that none of the claims are subject to the heightened standards of Fed. R. Civ. P. 9(b). Therefore, the

24   pleading standards of Rule 8(a), as expounded upon at length by the Supreme Court in *Twombly* and

25   *Iqbal*, will apply to the allegations made in the plaintiffs' complaint. *See Iqbal*, 129 S.Ct. at 1949;

26

27

28

**James C. Mahan**
**U.S. District Judge**

- 12 -

1   *see also Twombly*, 550 U.S. at 555.[7]

2         Plaintiffs concede that some of the PSLRA pleading requirements apply to their § 18 claim.

3   (Doc. # 137, 32-33). While Fed. R. Civ. P. 9(b) applies to allegations of fraud, certain PSLRA

4   pleading requirements apply to all allegedly misleading statements, regardless of the defendant's

5   state of mind. However, others are applicable only when plaintiff is pleading, as a required element

6   of his claim, that defendant has a particular state of mind. *Compare* 15 U.S.C. § 78u-4(b)(2) (stating

7   that the standard applies to claims "in which the plaintiff may recover money damages only upon

8   proof that the defendant acted with a particular state of mind"), *with* 15 U.S.C. § 78u-4(b)(1) ("[T]he

9   complaint shall specify each statement alleged to have been misleading, the reason or reasons why

10  the statement is misleading, and, if an allegation regarding the statement or omission is made on

11  information and belief, the complaint shall state with particularity all facts on which that belief is

12  formed.").

13        Plaintiffs argue, correctly, that only those PSLRA requirements that apply to all misleading

14  statements apply to analysis of this complaint. Because none of plaintiffs' claims for relief require

15  proof of state of mind as an element, § 78u-4(b)(2) does not apply. *See* 15 U.S.C. § 78u-4(b)(2).

16  Plaintiffs' allegations, therefore, are not subject to the so-called "strong inference" requirement.

17  However, because § 78u-4(b)(1) applies to "each statement alleged to have been misleading,"

18  plaintiffs' allegations are subject to the requirements of that section. *See* 15 U.S.C. § 78u-4(b)(1).

19        Under § 78u-4(b)(1), plaintiffs must (1) specify each false statement and (2) elucidate the

20  reasons why that statement is misleading. Because plaintiffs concede that all of their factual

21  allegations are made on information and belief, they must also state *with particularity* the facts that

22  underlie that belief. *See* 15 U.S.C. § 78u-4(b)(1) (emphasis added).

23        The meaning of the phrase "with particularity" within the context of pleading requirements

24  for securities litigation is not entirely clear, but the Ninth Circuit has interpreted the word according

25

26        [7] Defendants correctly point out that plaintiffs get loose with their language in two of their factual allegations.
27  (*See* doc. # 120, ¶ 12, ¶ 129:6). These particular allegations seem to aver or imply fraud. (*See id.*) As such, these
    allegations will be ignored by the court in determining whether a plausible claim has been stated by the remaining
28  allegations. *See* Vess, 314 F.3d at 1105.

**James C. Mahan**
**U.S. District Judge**

1    to its plain meaning. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999).

2    "Particularity refers to . . . dealing with or giving details; detailed; minute; circumstantial." *Id.*

3    (quoting RANDOM HOUSE COLLEGE DICTIONARY 473 (Rev. Ed. 1980)) (internal quotation

4    marks omitted).

5          Courts in this circuit and others have held that blanket, boilerplate allegations about

6    misstatements in regulatory filings, press releases, and similar documents are not sufficient to plead

7    a claim under PSLRA's particularity requirement. *See id.*; *In re Party City Sec. Litig.*, 147 F. Supp.

8    2d 282 (D.N.J. 2001). The Ninth Circuit has also held that allegations were insufficient where the

9    plaintiff did not indicate the source of information or facts that she had alleged on information and

10   belief. *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156 (9th Cir. 2009).

11         Thus, plaintiffs must allege the source of the factual knowledge that forms the basis for their

12   information and beliefs. If that source is a publicly available document, or statement, plaintiffs must

13   specify exactly what that document or statement was, such that it can be explicitly identified and

14   differentiated from similar documents or statements concerning the same subject matter.

15         **B.**    **Standing**

16                **1.**    ***Legal Standard***

17         As a preliminary matter, the court must resolve defendants' claims that plaintiffs lack

18   Constitutional standing to sue. *See Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund*

19   *v. Anchor Capital Advisors*, 498 F.3d 920, 923 (9th Cir. 2007) (standing is a threshold jurisdictional

20   issue in any federal action). "A suit brought by a plaintiff without Article III standing is not a 'case

21   or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the

22   suit. In that event, the suit should be dismissed under Rule 12(b)(1)." *MVP Asset Mgmt. (USA) LLC*

23   *v. Vestbirk*, 2:10-CV-02483-GEB, 2012 WL 2873371 (E.D. Cal. July 12, 2012) (quoting *Cetacean*

24   *Cmty. v. Bush,* 386 F.3d 1169, 1174 (9th Cir. 2004)).

25         The Supreme Court has held that in order to establish Article III standing for a particular law

26   suit, a plaintiff must show that he has suffered an injury-in-fact, that the injury is traceable to the

27   defendant, and that a favorable disposition of the suit would redress his injury. *See Friends of the*

28

**James C. Mahan**
**U.S. District Judge**

- 14 -

1    *Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81 (2000).

2                    **2.    Discussion**

3          Defendants argue that plaintiffs Oaktree, Lazard, Angelo, Zazove, CNH, Advent, and AQR

4    (the "adviser plaintiffs") lack standing because they have failed to meet the injury-in-fact

5    requirement. (*See, e.g.*, doc. # 143, 3-5).[8]  Defendants argue that because the adviser plaintiffs are

6    bringing claims on behalf of either clients they advise, funds they manage, or both, but not on behalf

7    of themselves, the adviser plaintiffs' claims for relief do not seek to redress an injury-in-fact that they

8    themselves suffered. *See, e.g.*, *id.*

9          The Supreme Court has stated, however, that third party plaintiffs, such as the adviser

10   plaintiffs here, can pursue claims when the owner of an actionable claim has assigned that claim to

11   the third party. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008). "The

12   history and precedents that we have summarized make clear that courts have long found ways to

13   allow assignees to bring suit; that where assignment is at issue, courts—both before and after the

14   founding—have always permitted the party with legal title alone to bring suit . . . ." *Id.* Here,

15   plaintiffs allege that the individual clients have validly assigned the rights to their claims to

16   plaintiffs, but do not allege anything regarding the assignment of the managed funds' claims.

17         Because plaintiffs allege valid assignments of claims from individual clients, but concede

18   in their response in opposition to defendants' motions that they have not alleged assignment of

19   claims from managed funds, the standing analysis for the two types of claims will be conducted

20   separately. (*See* doc. # 137, 7-10, 45 n.52).

21                    *a.    The fund client claims*

22         Defendants argue that plaintiffs Oaktree, Lazard, Angelo, Zazove, CNH, Advent, and AQR's

23   (collectively, the "fund manager plaintiffs") claims on behalf of funds they manage or co-manage

24   should be dismissed because plaintiffs fail to plead that these claims have been assigned by the funds

25   to plaintiffs. Plaintiffs concede that they have not alleged any assignment with respect to the fund

26

27   _____

         [8] Defendants do not make this argument against plaintiffs HFR and DPERS (the "fund plaintiffs"), who are
28   funds suing on behalf of themselves.

**James C. Mahan**
**U.S. District Judge**                                        - 15 -

1    clients, but contend that because they have decision-making power over and control the funds, it is

2    not necessary to obtain assignments. (*See* doc. # 137, 45 n.52).

3            The question before the court then is whether the managers of an investment fund are

4    required to plead an assignment or can simply rely on their decision-making power over the fund to

5    confer standing.

6            The parties agree that the Ninth Circuit has not answered this question definitively and point

7    to persuasive authority both inside and outside of the Ninth Circuit. Defendants point to a Second

8    Circuit case and argue that the Ninth Circuit is likely to adopt the reasoning set forth by that court

9    if and when it addresses the issue. *See W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,

10   549 F.3d 100, 109 (2d Cir. 2008). Defendants urge the court the adopt the *Huff* approach.

11           Plaintiffs argue that district courts outside this jurisdiction have answered the question in

12   both the positive and the negative. *Compare Kaplan v. Gelfond*, 240 F.R.D. 88, 95 (S.D.N.Y. 2007)

13   (holding that plaintiff must be attorney in-fact and have ultimate decision-making power over

14   managed funds to establish standing), *with Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 501

15   (S.D. Tex. 2004) (finding that plaintiff had established standing to sue for claims over securities he

16   bought on behalf of his wife simply because he made the final investment decision).

17           Defendants argue that following *Sprint* and the Second Circuit's decision in *Huff* that fund

18   managers needed to produce valid assignments to sue on behalf of their managed funds, district

19   courts in many circuits, including the Ninth Circuit, have followed *Huff* and required plaintiff to

20   plead valid assignments. Reviewing the cases, this court agrees.

21           For instance, in 2009, the *Kaplan* court reconsidered its 2007 holding in light of *Huff*. *See*

22   *In re IMAX Sec. Litig.*, 06CIV6128, 2009 WL 1905033 (S.D.N.Y. June 29, 2009). It found that the

23   fund manager lacked standing without a valid assignment, despite its status as attorney in-fact. *See*

24   *id.* A variety of district courts in the Ninth Circuit have reached the same result, citing *Huff*

25   approvingly. *See MVP Asset Mgmt. (USA) LLC v. Vestbirk*, 2:10-CV-02483-GEB, 2011 WL

26   1457424, at *2 (E.D. Cal. Apr. 14, 2011); *see also Northstar Fin. Advisors, Inc. v. Schwab*

27   *Investments*, 609 F. Supp. 2d 938, 942 (N.D. Cal. 2009), *rev'd on other grounds*, 615 F.3d 1106 (9th

28

James C. Mahan
U.S. District Judge

- 16 -

1  Cir. 2010); *see also S. Ferry LP No. 2 v. Killinger*, 271 F.R.D. 653, 658 (W.D. Wash. 2011); *In re*

2  *Netflix, Inc., Sec. Litig.*, 12-0225 SC, 2012 WL 149617, at *5 (N.D. Cal. Apr. 27, 2012).

3      Plaintiffs then argue that if the court followed the *Huff* requirement that "any such

4  requirement would be circular: the [i]nvestment [m]anager [p]laintiffs, acting on behalf of the

5  [m]anaged [f]unds, would simply be assigning claims to themselves." (Doc. # 137, 29).

6      Defendant KPMG HK correctly posits that this argument ignores the status of the funds as

7  distinct legal entities. Whatever organizational structure the funds might employ, it is the fund

8  manager plaintiffs' responsibility as a voting director, partner, or member to respect the corporate

9  form and follow the proper procedure to transfer any property of the fund, including any claims

10  against other individuals. While this may seem tedious, it is important to maintain the legal

11  distinction between the two formally independent entities. Even if the fund manager plaintiffs hold

12  the power to unilaterally assign claims on behalf of their funds, they must actually *exercise* that

13  power formally, creating a manifestation of the fund entity's intention to transfer to the manager

14  entity its rights to bring a claim against defendants.

15      Plaintiffs cannot reap the legal and tax benefits of organizing the fund as a separate entity on

16  the one hand, and then disregard its separate status when it is convenient to do so on the other.

17  Moreover, plaintiffs AQR and CNH both allege that they co-manage one or more of the funds for

18  whom they are suing. This implies that some third entity is likely to hold some decision-making

19  power, which illustrates the hole in plaintiffs' reasoning generally.

20       The court finds the reasoning in *Huff* to be persuasive. Accordingly, the court holds that the

21  fund manager plaintiffs must obtain valid assignments from the funds they manage in order to

22  establish constitutional standing to submit claims on behalf of the funds. The court finds that because

23  plaintiffs have not even alleged that they possess assignments from the funds on whose behalf they

24  sue, plaintiffs do not have standing to bring claims on behalf of their managed funds.

25      Therefore, defendants' 12(b)(1) motions to dismiss for lack of subject matter jurisdiction are

26

27

28

**James C. Mahan**
**U.S. District Judge**

1  granted with respect to plaintiffs' claims brought on behalf of managed funds.[9]

2         *b. The individual client claims*

3    Defendants argue that plaintiffs Oaktree, Lazard, and Zazove (collectively, the "individual

4  client plaintiffs") fail to plead valid assignments of their clients' claims with the specificity required

5  to establish Article III standing. (*See, e.g.*, doc. # 129, 12-13). Defendants contend that plaintiffs do

6  not identify the assignors, which claims the assignors assigned to plaintiffs, or when the assignments

7  were made. (*See id.* at 13). Defendants characterize plaintiffs' allegations regarding assignment as

8  conclusory and inimical to the pleading requirements set forth in *Iqbal* and *Twombly*. *See Iqbal*, 129

9  S.Ct. at 1949; *see also Twombly*, 550 U.S. at 555.

10    Plaintiffs argue that while the Ninth Circuit has not addressed the pleading requirements for

11  investment adviser assignment, numerous courts, including district courts in the Ninth Circuit, have

12  held that there is no heightened pleading requirement. (*See* doc. #137, 9). Therefore, plaintiffs argue

13  that their rather terse allegations regarding the assignment of claims from clients are sufficient to

14  establish Article III standing as part of their efforts to state a claim for relief. (*See id.*). The

15  statements regarding assignment in the complaint are the same for each of the individual client

16  plaintiffs: "[p]laintiff brings this action . . . on behalf of . . . clients . . . on whose behalf it purchased

17  [n]otes during the [l]oss [p]eriod and from whom it has received valid assignments of claims

18  pertaining to the [n]otes." (Doc. # 120, ¶¶ 18, 19, 21).

19    Defendants argue that the court decisions that plaintiffs cite regarding what is required to

20  plead an assignment sufficiently do not actually address exactly what is required–the courts simply

21  approve of the way the plaintiffs in the cases happened to plead the assignment of claims in that

22  *particular* case without elucidating a general standard. With respect to three of the four cases cited

23  in plaintiffs' response in opposition, defendants are correct. *See Nat'l Real Estate Opportunity Fund*

24  *I, LP v. Kliment*, CV-12-0301-PHX-DGC, 2012 WL 3264519 (D. Ariz. Aug. 9, 2012) (rejecting

25

26    [9] Plaintiffs Oaktree, Lazard, Angelo, Zazove, CNH, Advent, and AQR bring claims on behalf of managed funds.
Those claims are dismissed. Plaintiffs Oaktree, Lazard, and Zazove, however, also bring claims on behalf of individual

27  clients. Plaintiffs Oaktree, Lazard, and Zazove's claims brought on behalf of their individual clients are discussed below.
Plaintiffs HFR and DPERS are suing on behalf of themselves and their standing has not been challenged. *See supra* note

28  8.

**James C. Mahan**
**U.S. District Judge**
             - 18 -

1   argument that attachment of a written assignment was necessary where plaintiff made a series of *very*

2   detailed allegations); *In re Consol. Meridian Funds*, 485 B.R. 604, 611 (Bankr. W.D. Wash. 2013)

3   (applying contract law principles to a bankruptcy liquidation plan and determining that the plan

4   assigns creditors' claims to plaintiff, but not discussing how assignment was pleaded); *De Lage*

5   *Landen Fin. Servs., Inc. v. Cardservice Int'l, Inc.*, CIV. A. 00-2355, 2000 WL 1593978, *2 (E.D. Pa.

6   Oct. 25, 2000) (simply observing that assignment gives plaintiff standing to sue with no discussion

7   of pleading whatsoever); (Doc. # 137, 26-27).

8          On the other hand, one of plaintiffs' cases, from this district, does seem to indicate that a

9   simple allegation that plaintiff has obtained an assignment and some indication of what claims have

10  been assigned is all that is necessary at the pleading stage, leaving questions of existence and validity

11  for the discovery stage. *See Righthaven LLC v. Dr. Shezad Malik Law Firm P.C.*, 2:10-CV-0636-

12  RLH-RJJ, 2010 WL 3522372, at *2 (D. Nev. Sept. 2, 2010) (holding that plaintiff has pleaded

13  assignment sufficiently and concluding that "[the assignment's] existence and validity can be

14  determined through discovery").

15         Defendants rely heavily on a decision from the U.S. District Court for the Eastern District

16  of California. *See MVP Asset Mgmt. (USA) LLC v. Vestbirk*, 2:10-CV-02483-GEB, 2012 WL 33043,

17  *3 (E.D. Cal. Jan. 6, 2012). *MVP* focused on a choice-of-law analysis regarding which jurisdiction's

18  law determines the validity of the assignment because plaintiffs alleged the assignment was made

19  orally, bringing its validity in each jurisdiction into question. *See id.*

20         The court does not find the reasoning in either *MVP* case proffered by defendants sufficiently

21  analogous to the issues here and does not believe it, or any case cited by any party, controls.[10]

22  Furthermore, *MVP* states that "at this stage of the pleading, [plaintiff] need only show that the facts

23  alleged, if proved, would confer standing upon [it]." *id.* (quoting *Warren v. Fox Family Worldwide*,

24  _____

25  [10] Both plaintiffs and defendants cite a second, later *MVP* decision. *See MVP Asset Mgmt. (USA) LLC v.
     *Vestbirk*, 2:10-CV-02483-GEB, 2012 WL 2873371 (E.D. Cal. July 12, 2012). It is not clear why either party does so.

26  The *MVP* plaintiffs alleged assignments with far more detail than plaintiffs in the instant action, so it is not particularly
     helpful for plaintiffs. Defendants suggest that the opinion holds that there are particular requirements for pleading

27  assignments–it does no such thing. In fact, the *MVP* court states, as it did in the earlier *MVP* opinion, that, "at this stage
     of the pleading, [plaintiff] need only show that the facts alleged, if proved, would confer standing upon it." *id.* (quoting

28  *Warren*, 328 F.3d at 1140).

James C. Mahan
U.S. District Judge

1    *Inc.,* 328 F.3d 1136, 1140 (9th Cir.2003)). Here, defendants are not questioning the validity of the

2    assignment, but instead, whether plaintiffs pled sufficient facts regarding the assignment. (*See* doc.

3    # 10, 4; doc. # 12, 5 n. 3). Because the court does not know of, and neither party cites, a case that

4    clearly elucidates a general standard for assignment pleading requirements, the court applies the

5    general Rule 8 framework to the standing issue.

6         The court concludes that with regard to the individual client claims, the client plaintiffs have

7    alleged facts that, "if proved, would confer standing upon [it]." *MVP*, 2012 WL 33043 at *3. The

8    court can reasonably infer from the language of the assignment allegations that the assignments were

9    received before the complaint was filed. The language also indicates that the claims assigned are

10   limited to claims related to and arising from purchases of the 6.0% notes and the 6.5% notes.

11        Finally, while the names of assignors are not pled in the complaint, the court finds plaintiffs'

12   reasoning for not disclosing the names of its clients in a public filing compelling. Defendants have

13   proper notice of who the assignors are–they need only consult plaintiffs' *sealed* certificate of

14   interested parties.[11] The court, or defendants for that matter, can reasonably infer the who, what, and

15   when of the assignments. This court agrees with the *Righthaven* court that the discovery stage is the

16   appropriate place to analyze the existence and validity of the assignments. *See* 2010 WL 3522372,

17   at *2.

18        Plaintiffs' terse statements regarding assignments may be lacking in detail, but they are not

19   conclusory. A legally conclusory statement on standing would be something like: "plaintiff has

20   Article III standing." In contrast, plaintiffs here allege that (a) they have received assignments from

21   the clients identified in the certificate of interested parties, (b) the assignments are valid, © they

22   received them before the complaint was filed, and (d) the assignments cover claims arising out of

23   the clients' purchases of Shengda notes. Assuming the truth of these factual allegations, the court

24   reasonably infers that plaintiffs have Article III standing to pursue claims on behalf of those clients.

25   . . .

26   _____

27   [11] Defendants' contention that plaintiffs are pointing to "unspecified 'examples' in a document" is meritless.
     Plaintiffs allege that the certificate of interested parties contains the name of every client on whose behalf the individual

28   client plaintiffs are bringing claims. These are not "examples"–they are a complete list of assignors.

James C. Mahan
U.S. District Judge

1   Defendants' 12(b)(1) motions to dismiss for lack of subject matter jurisdiction are denied

2   with respect to plaintiffs' claims brought on behalf of individual clients.

3   **C.      Plaintiffs' § 18 claims against Hansen and KPMG HK**

4   To state a plausible claim for relief under § 18 of the Exchange Act, plaintiffs must allege

5   facts establishing that: "(1) the defendant made or caused to be made a statement of material fact that

6   was false or misleading at the time and in light of the circumstances under which it was made, (2)

7   the statement was contained in a document filed pursuant to the Exchange Act or any rule or

8   regulation thereunder, (3) reliance on the false statement, and (4) resulting loss to the plaintiff."

9   *Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.,* 454 F.3d 1168, 1174 (10th

10  Cir. 2006); *see* 15 U.S.C. § 78r.[12]

11  Plaintiffs assert three claims for relief based on violations of § 18. (*See* doc. # 120, 54-57).

12  Each claim is based on statements made by defendant KPMG HK, defendant Hansen, or both. The

13  claims are based on allegedly false statements in audit reports prepared by defendants and included

14  by Shengda in documents filed with the SEC. Plaintiffs allege that the defendants consented to the

15  inclusion of the audit reports in a variety of Shengda's SEC filings.

16  Plaintiffs' first claim for relief is brought on behalf of all plaintiffs against Hansen for

17  allegedly false statements made in an audit report contained in Shengda's 2007 10-K/A. (*See id.* at

18  54). Hansen prepared the report based on its audit of Shengda's 2007 financial statements. Plaintiffs

19  allege that Hansen consented to the inclusion of this unqualified report in Shengda's 2007 form 10-

20  K/A. (*See id.* at 13:15).

---

22  [12] 15 U.S.C. 78r(a) states in relevant part:

23      Any person who shall make or cause to be made any statement in any application, report, or
24      document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking
        contained in a registration statement as provided in subsection (d) of section 78o of this title, which
        statement was at the time and in the light of the circumstances under which it was made false or
25      misleading with respect to any material fact, shall be liable to any person (not knowing that such
        statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold
26      a security at a price which was affected by such statement, for damages caused by such reliance,
        unless the person sued shall prove that he acted in good faith and had no knowledge that such
27      statement was false or misleading.

28  15 U.S.C. 78r(a).

**James C. Mahan**
**U.S. District Judge**

1    Plaintiffs' second claim for relief is brought on behalf of all plaintiffs against Hansen and

2    KPMG HK for allegedly false statements made in audit reports contained in Shengda's 2008 10-K.

3    (*See id.* at 56). Defendant KPMG HK prepared an audit report based on Shengda's 2008 financial

4    statements. Plaintiffs allege that KPMG HK consented to the inclusion of that report in Shengda's

5    2008 10-K. (*See id.* at 12:24). Plaintiffs allege that Hansen consented to the inclusion of its 2007

6    audit report in the 2008 10-K as well. (*See id.* at 13:15).

7    Plaintiffs' third claim for relief is brought on behalf of all plaintiffs against Hansen and

8    KPMG HK for allegedly false statements made in audit reports contained in Shengda's 2009 10-K

9    and 2009 10-K/A. (*See id.* at 57). KPMG HK prepared a second audit report based on Shengda's

10   2009 financial statements. Plaintiffs allege that KPMG HK consented to the inclusion of both its

11   2008 and 2009 audit reports in Shengda's 2009 10-K and 2009 10-K/A. (*See id.* at 12:24). Plaintiffs

12   allege that Hansen consented to the inclusion of its 2007 audit report in the 2009 10-K and 2009 10-

13   K/A as well. (*See id.* at 13:15).

14   ### 1.   *Statute of limitations*

15   Defendants Hansen and KPMG HK argue that some or all of plaintiffs' § 18 claims are

16   barred by the applicable period of limitations.[13] Plaintiffs argue that all their claims were either filed

17   within the relevant period of limitations or protected by a tolling agreement.[14] Defendants do not

18   deny the existence or validity of the tolling agreement, but, instead, base their arguments on other

19   grounds.

20   ### a.   *Plaintiffs' § 18 claims are not time-barred*

21   Claims brought under § 18 of the exchange act are subject to a period of limitations that

22

23   [13] 15 U.S.C. § 78r(c) provides the applicable period of limitations for actions brought pursuant to § 18 of the

24   Exchange Act: "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action

25   accrued." 15 U.S.C. § 78r(c).

26   [14] 15 U.S.C. § 78r(c) contains a three-year statute of repose for § 18 claims. *See supra* note 13. Per the tolling

27   agreement, this action is considered commenced on March 14, 2012, for the purposes of limitation periods. Defendants argue, and plaintiffs concede, that plaintiffs are bound by the three-year statute of repose. (*See* doc. # 127, 11; doc. # 137, 53). As such, plaintiffs concede that their § 18 claims are limited to purchases of Shengda Notes made on or after March

28   14, 2009.

James C. Mahan
U.S. District Judge

1   expires "one year after the discovery of the facts constituting the cause of action." 15 U.S.C. § 78r©).

2   The exact meaning of the phrase, "discovery of the facts," in securities-related statutes of limitations

3   has been the subject of much litigation. *See, e.g.*,  *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784,

4   1793 (2010). Statutes of limitations using the language, such as § 78r©), are regarded as codifications

5   of the court-created "discovery rules," which delayed the running of limitation periods for fraud-

6   based claims until plaintiff had "discovered" the facts supporting the claim. *See id.* They were

7   exceptions to the general limitations rule that claims accrued when plaintiff had a "complete and

8   present cause of action." *Id.* (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v.*

9   *Ferbar Corp. of Cal.,* 522 U.S. 192, 201 (1997)).

10      The discovery exception has been long-recognized by courts in fraud cases because of the

11   inherent difficulty involved with detecting and investigating fraud. *See id.* at 1794. In turn, the

12   meaning of the word, "discovery," in the context of limitation periods for securities claims has long

13   been understood to refer to the point at which fraud was actually discovered or "in the exercise of

14   reasonable diligence, it could have been discovered." *Id.*

15      After the discovery rule was codified, some courts of appeals, including that of the Ninth

16   Circuit, held that the limitations period begins to run when plaintiffs are put on "inquiry notice" by

17   discovering some fact that might lead them to question whether their legal rights had been violated.

18   *See, e.g.*, *Betz v. Trainor Wortham & Co.,* 504 F.3d 1017, 1024–25 (9th Cir. 2007); *see also Kelley*

19   *v. Rambus, Inc.*, C 07-1238JFHRL, 2008 WL 5170598, at *9 (N.D. Cal. Dec. 9, 2008).

20      Defendant Hansen argues that all plaintiffs were on "inquiry notice" of a potential claim as

21   of April 1, 2009, the date that Shengda filed the 2008 10-K. That filing included KPMG HK's audit

22   report for Shengda's 2008 financial statements, which included an adverse opinion on the quality

23   of Shengda's "internal controls" over financial reporting. Hansen argues that this opinion put

24   plaintiffs on "inquiry notice" that they may have had a claim, based upon their reliance on Hansen's

25   2007 audit report, in which Hansen opined that Shengda's "internal controls" were sufficient.

26      Since *Betz* and *Kelley* were decided, however, the Supreme Court has held that "inquiry

27   notice" is not the appropriate standard to apply to a securities claim. *See Merck*, 130 S. Ct. at 1798;

28

James C. Mahan
U.S. District Judge

- 23 -

1    *Kelley*, 2008 WL 5170598 at *9; *Betz*, 504 F.3d at 1024-25. Instead, the Court held that "reasonable

2    diligence" is the correct standard. *See id.* "We conclude that the limitations period . . . begins to run

3    once the plaintiff did discover or a reasonably diligent plaintiff would have "discover[ed] the facts

4    constituting the violation"—whichever comes first." *Id.* Plaintiffs argue that a reasonably diligent

5    investor could not have discovered facts that gave rise to a § 18 claim prior to March 15, 2011.

6         Hansen first argues that *Merck* does not apply because in that case, the Court was interpreting

7    the "discovery" language in the context of a § 10(b) Exchange Act claim. *See id.* Hansen contends

8    that the holding recited above only applies to the scienter element of a § 10(b) claim, which is not

9    a required element of a § 18 claim. (*See* doc. # 146, 4:21). Hansen suggests that because establishing

10   scienter inherently requires more intensive fact discovery than establishing negligence, the plaintiff

11   should be held to a stricter standard in a claim that does not require scienter.

12        A more careful reading of the *Merck* opinion reveals that the Court spends a considerable

13   amount of time explaining the broad role of "discovery" exceptions, goes on to hold that "reasonable

14   diligence" is the general standard, and then applies that standard to the scienter element. *See Merck*,

15   130 S. Ct. at 1796.

16        This court also notes that the statute being analyzed here, 15 U.S.C. § 78r©, imposes a

17   shorter period of limitations than the statute being analyzed in *Merck*, 28 U.S.C. § 1658(b)(1). The

18   court understands this to indicate that the legislature imposed a shorter limitation period on plaintiffs

19   in recognition that the elements of a cause of action under § 18 are less difficult to prove than a

20   fraud-based cause of action.

21        Therefore, the court applies the *Merck* standard to determine the point at which the

22   limitations period began to run. District courts in other circuits have elected to apply that standard

23   to § 18 claims as well. *See, e.g.*, *LLDVF, L.P. v. Dinicola*, CIV.A. 09-1280 JLL, 2010 WL 3210613,

24   at *4 (D.N.J. Aug. 12, 2010).

25        Hansen next argues that plaintiffs were not reasonably diligent in their investigation. (*See*

26   doc. # 146, 6:7). Hansen argues that because KPMG HK's 2008 audit report indicated that there

27   were "material weaknesses" in Shengda's "internal controls," institutional investors like plaintiffs,

28

James C. Mahan
U.S. District Judge

1   should have "discovered" facts constituting a cause of action against Hansen, who had just the year

2   before opined that Shengda maintained sufficient "internal controls." (*See id.*). Hansen points out

3   that plaintiffs allege that KPMG HK's report provides evidence that Hansen did not conduct its audit

4   in keeping with professional standards. (*See id.*).

5        The court agrees with plaintiffs that an adverse opinion on "internal controls" sufficiency,

6   in and of itself, would not alert a reasonably diligent investor that his legal rights may have been

7   infringed. This is particularly true when that opinion is coupled with an unqualified opinion that the

8   company's financial statements for that same year were accurate and complied with GAAP, as was

9   the case here. An opinion that weaknesses in a company's internal reporting may exist is nothing

10  more than an indicator that the conditions for fraudulent activity are present. While this should pique

11  the attention of a competent investor, it does not necessarily indicate than an investor should doubt

12  the thoroughness of the auditor's work.

13       Furthermore, the court agrees with plaintiffs that Hansen has failed to show how a wary

14  investor would go from a negative opinion in an audit report, to discovering the facts necessary to

15  show that an auditor was negligent in his performance of an audit. Until rampant fraud at Shengda

16  was publicly disclosed, the plaintiffs would not have had access to a single bit of evidence giving

17  rise to an inference that the auditor defendants had been negligent in their duties. This makes the case

18  distinguishable from *Kelley*, upon which Hansen relies heavily. *See* 2008 WL 5170598, at *9.

19       The court finds that a reasonably diligent plaintiff would only have discovered the facts

20  underlying these causes of action after Shengda's March 15, 2011, disclosure that KPMG HK had

21  found discrepancies in Shengda's 2010 financial statements. Plaintiffs are therefore protected by the

22  March 15, 2012, tolling agreement, and their claims are found to have been filed within the

23  limitation period.

24                    *b.      DPERS' § 18 claims are not time-barred*

25       Defendant KPMG HK argues that plaintiff DPERS' § 18 claims are time-barred because

26  DPERS was not a party to the tolling agreement. Plaintiffs allegedly discovered the "facts

27  constituting the cause of action" on March 15, 2011, and DPERS did not file its suit until June 6,

28

James C. Mahan
U.S. District Judge

1    2012. 15 U.S.C. § 78r©. As such, without a valid tolling agreement, DPERS claims are outside the

2    one-year statutory period to file a suit after discovery. *See*

3    15 U.S.C. § 78r©.

4          Plaintiffs maintain that they entered the tolling agreement "on behalf of themselves and the

5    funds and accounts on whose behalf they purchased ShengdaTech notes." (*See* doc. # 137, 58

6    (emphasis omitted)). Because plaintiff Oaktree, an undisputed party to the tolling agreement,

7    manages the DPERS fund, plaintiffs argue that Oaktree entered the tolling agreement on behalf of

8    DPERS.

9          Reviewing the tolling agreement, the court agrees with KPMG HK that DPERS is not a party

10   to the agreement.[15] (*See* doc. # 130-2, Ex. E, 138). Indeed, the tolling agreement explicitly indicates

11   that the agreement is between the listed plaintiffs, which do not include DPERS, and the potential

12   defendants. (*See id.*).

13         Regardless of DPERS' status as a party to the agreement, however, the court agrees with

14   plaintiffs that the tolling agreement does apply to the *claims* asserted by DPERS. The language of

15   the agreement states that the tolling provisions apply to "*all* claims and causes of action which *could*

16   *have been* asserted by any of the [p]laintiffs against any of the [p]otential [d]efendants." (*See id.* at

17   ¶ 1 (emphasis added)). As noted earlier in the agreement, these claims include claims brought on

18   behalf of funds of clients. (*See id.* at 138). Because plaintiff Oaktree is DPERS' investment manager,

19   Oaktree *could* have brought DPERS claims on its behalf as its investment manager.

20         No matter whether DPERS brought the claim itself or assigned its claim to Oaktree, the

21   tolling agreement covers those claims as members of the limited class of claims the fund manager

22   plaintiffs could have brought on behalf of their managed funds. As its undisputed agent, Oaktree was

23   authorized to enter into agreements affecting DPERS' substantive property rights in connection to

24   securities it managed on DPERS behalf and, therefore, acted within its authority in tying DPERS'

25   claims to the tolling agreement without DPERS having been party to the agreement formally.

26   _____

27         [15] As a document referenced extensively in the complaint and associated briefing papers, the court takes judicial
28   notice of the tolling agreement. *See supra* note 2.

James C. Mahan
U.S. District Judge
                                        - 26 -

1    The court notes that KPMG HK has not argued that it suffered any prejudice as a result of

2    DPERS not being party to the agreement or DPERS bringing the claim on behalf of itself. Being that

3    KPMG HK explicitly agreed to the tolling of the statutes with regard to every other plaintiff, and the

4    other plaintiffs agreed not to bring any claims until the expiration of the agreement, presumably at

5    the request of KPMG HK, there is no reason for the court to conclude that DPERS' assertion of its

6    claims alongside all other plaintiffs has prejudiced defendants in any way. In fact, DPERS seems to

7    have done just what defendants negotiated and bargained for with the other plaintiffs–temporarily

8    suspended the filing of its claims at defendants' request.

9                        ***2.        Plaintiffs have failed to allege falsity sufficiently***

10   In order to state a claim for relief under § 18, a plaintiff must allege that each defendant made

11   or caused to be made a material statement in a filing required by federal securities law that is false

12   or misleading in light of the circumstances under which it was made. *See* 15 U.S.C. § 78r(a). It is

13   undisputed that defendants Hansen and KPMG HK made statements in applicable SEC documents.

14   However, both Hansen and KPMG HK argue that plaintiffs in the instant action have failed to

15   properly allege falsity. That is, they argue that plaintiffs have failed to allege facts that identify a false

16   statement that was made or was caused to be made by either defendant.

17   Plaintiffs allege two forms of falsity with respect to defendant KPMG HK. First, plaintiffs

18   allege that KPMG HK's statement in its 2008 and 2009 audit reports that those audits were

19   performed in compliance with GAAS was false. Second, plaintiffs allege that KPMG HK's statement

20   that it believed that Shengda's financial reporting complied with GAAP, made in its 2008 and 2009

21   audit reports, was false.

22   Plaintiffs allege three forms of falsity with respect to defendant Hansen. First, plaintiffs allege

23   that Hansen's statement in its 2007 audit report that the audit was performed in compliance with

24   GAAS was false. Second, plaintiffs allege that Hansen's statement that it believed that Shengda's

25   financial reporting complied with GAAP, , made in its 2007 audit report, was false. Third, plaintiffs

26   allege that KPMG HK's 2008 statement that it believed that Shengda's "internal controls" displayed

27   material weaknesses creates a strong inference that Hansen's statement that it believed that Shengda

28

1    maintained sufficient "internal controls" in 2007 was false.

2                          a.      *Conformance with GAAS*

3           To successfully allege falsity, plaintiffs must, at the least, show that the auditor defendants

4    failed to perform their audits in compliance with GAAS. *See Deephaven Private Placement Trading,*

5    *Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1176 (10th Cir. 2006); *see also Edward J. Goodman*

6    *Life Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1282 (M.D. Fla. 2009) *aff'd*, 594 F.3d

7    783 (11th Cir. 2010). Failure to comply with GAAS is referred to as "objective falsity." *See, e.g.*,

8    *Deephaven*, 454 F.3d at 1168. The *Deephaven* and *Edward* courts found that GAAS compliance

9    statements were statements of objective fact and not subject to a requirement of subjective falsity.

10   *See* 454 F.3d at 1168; *see also* 595 F. Supp. 2d at 1282. Other courts, in this circuit and beyond,

11   agree. *See, e.g.*, *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192,

12   1224 (W.D. Wash. 2009).

13          Most recently, however, one court in this circuit found that, like the rest of an auditor's

14   report, GAAS compliance was a statement of opinion, requiring allegations of subjective falsity. *See*

15   *Buttonwood Tree Value Partners, LP v. Sweeney*, SACV 10-00537-CJC, 2012 WL 2086607, at *2

16   (C.D. Cal. June 7, 2012) ("This Court concludes that . . . both the GAAS assertion and GAAP

17   assertions are matters of opinion, because both GAAS and GAAP are a collection of broad standards

18   that are couched in rather general and in some cases inherently subjective terms . . . .") (internal

19   quotation marks omitted).

20          This court notes that there is a split on the issue of pleading subjective falsity–for GAAS

21   compliance in an Exchange Act claim against an auditor defendant–amongst district courts in this

22   circuit. The parties do not cite, and the court did not find, any Ninth Circuit opinion answering the

23   question directly. However, the court declines to answer the question because it finds that plaintiffs

24   have failed to adequately allege objective falsity. Therefore, the court does not reach the question

25   of subjective falsity.

26          To allege that an auditor defendant made a false statement about GAAS compliance,

27   plaintiffs must do more than simply recite a GAAS rule or procedure, claim that defendants failed

28

**James C. Mahan**
**U.S. District Judge**

1    to follow that rule, and point to adverse results down the road. *See In re Dell Inc., Sec. Litig.*, 591

2    F. Supp. 2d 877, 903 (W.D. Tex. 2008). Plaintiffs must make specific allegations about the steps an

3    auditor took, the way in which it planned its audit, and the procedures it employed. *See id.*

4         Plaintiffs must allege something specific about the way an auditor did or did not perform its

5    audit and cannot simply rely on bare allegations that fraud discovered years later speaks for itself.

6    *See U.S. ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 812 (S.D.N.Y. 2010).

7    Allegations in the form of "had defendant auditor done x, they would have unveiled y, and because

8    the court can infer that y occurred from a, b, and c, defendant must not have done x" have been

9    specifically rejected by a number of courts. *See Lindner Dividend Fund, Inc. v. Ernst & Young*, 880

10   F. Supp. 49, 58 (D. Mass. 1995) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.

11   1990)); *see also U.S. ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 813 (S.D.N.Y.

12   2010); *see also In re SmarTalk Teleservices Sec., Inc. Litig.*, 124 F. Supp. 2d 505, 517 (S.D. Ohio

13   2000).

14        Here, the court finds that plaintiffs have failed to allege violations of GAAS rules and

15   procedures with the particularity required by the PSLRA. Plaintiffs allege a number of violations of

16   GAAS standards and requirements. (*See* doc. # 120, ¶¶69, 107-14, 116-17, 120-22). The court finds

17   that none of these allegations actually touch on the procedures that the defendants did or did not

18   employ.

19        To the extent that plaintiffs do make allegations concerning the actual performance of the

20   audits, they do not identify with any particularity the facts upon which their information and beliefs

21   are based, as required by the PSLRA. Furthermore, the only basis for those beliefs are the disclosures

22   and bankruptcy filings made by Shengda over a year after the last period for which an audit report

23   was produced by defendants. As such, all of plaintiffs' allegations are in the form of "would have"

24   and "must not have," which have been rejected by most courts. *See, e.g.*, *Pervez*, 736 F. Supp. 2d

25   at 813.

26        First, plaintiffs claim that Hansen and KPMG HK violated GAAS Standard of Fieldwork

27   ("SOF") No. 3, requiring auditors to obtain sufficient evidence to support a reasonable basis for

28

forming an opinion regarding financial statements. Plaintiffs allege that defendants failed to take basic steps to verify that Shengda's assets existed as reported. (*See* doc. # 120, ¶ 108). Plaintiffs base this belief on findings announced by Shengda's special committee in late 2012 that bank balances, recorded on December 31, 2010, were vastly overstated and that purported CDs did not exist. Defendants point out that misstated financial statements from 2010 do not necessarily reflect anything about financial statements made in 2008 and 2009.

Moreover, this particular allegation is an archetypal use of the "should have, had they, must have" allegation. In fact, plaintiffs even state: "Had the auditor [d]efendants taken the basic step of trying to confirm these bank balances and CDs earlier, they would have discovered the fraud – or at least uncovered sufficient concerns that they would have declined to issue unqualified audit opinions . . . ." (*See id.*).

The problem with these types of allegations is that they are merely consistent with a failure to follow GAAS standards. *See, e.g.*, *Iqbal*, 129 S.Ct. at 1950. A number of other explanations, including a failure by Shengda's internal accountants to detect management fraud, a remarkably well-covered management fraud scheme, or fraudulent conduct that did not begin until well after the audits were performed, are equally or more likely to have resulted in the inaccurate financial reporting alleged by plaintiffs.

Indeed, plaintiffs have not even alleged exactly which financial figures endorsed by the 2007, 2008, and 2009, audit reports were false. Plaintiffs have listed many figures, such as cash, total assets, and net sales, that were included in Shengda's 2007, 2008, and 2009 SEC filings. (*See, e.g.*, doc. # 120, ¶ 79). However, if those numbers are inaccurate, the complaint does not contain any allegations of what the accurate figures are. Mere allegations that the special committee found that assets reported by Shengda in 2010 were vastly overstated creates a weak inference, at best, that the numbers in the 2007 through 2009 reports were incorrect.

The remainder of plaintiffs' allegations about GAAS compliance are of similar form. Plaintiffs' second allegation concerns purported failure to confirm sales transactions by both Hansen and KPMG HK. (*See* doc. # 120, ¶¶ 110-11). Plaintiffs fail to allege which GAAS rule covers this

**James C. Mahan**
**U.S. District Judge**

- 30 -

1    subject. (*See id.*). Furthermore, plaintiffs again rely on a retroactive "if only they had" basis for

2    information and belief.

3            Plaintiffs state that it is clear defendants did not follow the sales confirmation process, given

4    that the special committee has called into question the accuracy of payments by, and sales made to,

5    customers. (*See id.*). This is not sufficient to create an inference that defendants failed to perform

6    those confirmations or did so negligently. Again, plaintiffs allege nothing specific about what

7    defendants did, and provide no basis for the factual belief that defendants did not make the

8    confirmations besides conclusory, circumstantial observations.

9            Third, plaintiffs contend that KPMG HK did not perform a cross-check between the filings

10   Shengda's subsidiaries made with the AIC in China and the filings Shengda made with the SEC. (*See*

11   doc. # 120, ¶¶ 112-14). Plaintiffs allege that those sets of financial figures were so materially

12   different, there could be no explanation for the discrepancies. (*See id.*). However, plaintiffs fail to

13   attach the AIC documents, fail to identify facts upon which that belief is formed, and most

14   importantly, fail to allege a GAAS rule stating that the two types of documents should have been

15   compared during an audit.

16           Without any allegations about why plaintiffs believe the AIC filings diverge so materially

17   from the SEC filings or which figures are misstated in the SEC filings, the court cannot find that

18   plaintiffs meet the pleading requirements of the PSLRA with respect to this allegation. Finally,

19   plaintiffs do not plead anything to indicate whether the AIC filings, the SEC filings, or both contain

20   misstatements–only that the two sets of filings don't match. *See, e.g.*, *In re L & L Energy, Inc. Sec.*

21   *Litig.*, 2012 WL 6012787, at *4 (W.D. Wash. Dec. 3, 2012).

22           Plaintiffs allege nothing regarding whether or not the reporting periods for the two sets of

23   filings varied, whether inputs or accounting principles differed, or whether the AIC filings were even

24   audited. *See, e.g.*, *id.* The mere fact that the SEC filings don't match the AIC filings, does not, in and

25   of itself, lead to the conclusion that the SEC filings are wrong–it could be either, neither, or both.

26   *See, e.g.*, *id.*

27   . . .

28

1    Fourth, plaintiffs allege that KPMG HK violated GAAS standard AU § 334 by failing to

2  perform "appropriate" procedures to closely scrutinize transactions between Shengda and other

3  Chinese businesses owned by its executives. (*See* doc. # 120, ¶¶ 116-17). AU § 334 requires auditors

4  to do things like analyze the purpose of the transactions, examine invoices and documents, confirm

5  that the transactions are board-approved, and more. (Doc. # 120, ¶ 116). Plaintiffs do not state with

6  any particularity facts that support their sweeping conclusion that KPMG HK "failed to perform

7  these procedures." (Doc. # 120, ¶ 117).

8    In fact, one paragraph related to this allegation contains one of the complaint's most

9  conclusory allegations of all: "KPMG HK failed to perform these procedures, allowing ShengdaTech

10  to engage in undisclosed transactions with entities owned by [its chief executive officer] and to

11  vastly overstate sales to those entities." (*Id.*). Plaintiffs allege that the announcements of

12  "undisclosed related party transactions" and "unconfirmed sales records" in 2011 indicate that the

13  same discrepancies must have existed in prior years, but fail to allege any facts that support that

14  inference. (*See* doc. # 120, ¶ 46). Furthermore, even a very diligent auditor may not detect an

15  "*undisclosed* related party transaction."

16    This allegation highlights how little plaintiffs have alleged about how defendants performed

17  their audits, what information they received or didn't receive, and how the management and directors

18  of Shengda interacted with defendants. The fact that "undisclosed related party transactions" were

19  discovered over a year or more after defendants performed the audits in question suggests very little

20  about the information, or lack thereof, made available to defendants regarding those transactions.

21  (*Id.*). It says even less about whether or not defendants took the information they had and shaped

22  their audit diligently or negligently around that information.

23    Finally, plaintiffs allege that after opining that Shengda's "internal controls" were insufficient

24  in 2008, KPMG HK failed to shape its 2009 audit procedures around the weaknesses that it had

25  found. (*See* doc. # 120, ¶¶ 120-22). However, the complaint makes no assertions relating to how

26  KPMG HK performed its audit or what it should have done differently in order to appropriately

27  shape its audit procedure around the 2008 internal control findings. Yet again, this allegation relies

28

**James C. Mahan**
**U.S. District Judge**

- 32 -

1   on the idea that because Shengda later found evidence of fraudulent conduct by its management, the

2   auditors must not have done their audit right. This is not an allegation that supports a reasonable

3   inference of a plausible claim to relief–it is a hasty conclusion.

4          Absent some additional information about the way the audits were actually performed, or far

5   more specific grounds upon which the court could conclude that the 2007, 2008, and 2009 figures

6   were materially overstated, there are simply no allegations from which the court can draw a

7   *reasonable* inference that plaintiffs have plausibly pleaded objective falsity with respect to Hansen

8   and KPMG HK's GAAS compliance statements. Given the heightened pleading requirements of the

9   PSLRA with respect to allegations made on information and belief, pleading that is merely consistent

10  with unlawful behavior is not sufficient.

11         The court cannot open the pricey doors of discovery merely because alleged conduct *might*

12  explain an unfavorable and unexpected event. Plaintiffs here are speculating as to whose negligence

13  might have allowed management at Shengda to defraud its investors. Without more information on

14  how the fraud occurred, what specific misstatements in which filings reflected its occurrence, and

15  which executives and officials perpetuated it, pointing fingers at auditors for alleged GAAS

16  violations is just a guessing game.

17         Generally speaking, plaintiffs do not appear to know a single fact about the way the defendant

18  auditors performed their audits. Without knowing what these defendants *did*, this court finds it hard

19  to understand how plaintiffs can conscionably claim to know, on information and belief, that

20  defendants *did not do* certain things. That is, without having any idea what auditing procedures

21  defendants did follow, how can plaintiffs claim that they know the auditors did not follow certain

22  procedures? Nothing in the complaint indicates any factual basis for knowing how the audit reports

23  were produced.

24         For the foregoing reasons, the court finds that plaintiffs fail to allege a GAAS violation by

25  defendants KPMG HK and Hansen. Plaintiffs fail to allege that KPMG HK and Hansen made false

26  statements by stating that their audit reports–contained in Shengda SEC filings from 2007 through

27  2009–complied with GAAS.

28

**James C. Mahan**
**U.S. District Judge**

b.      *Conformance with GAAP*

Plaintiffs and defendants disagree about the liability under § 18 that an auditor incurs for issuing a clean audit opinion for financial figures that do not comply with GAAP. (*See, e.g.*, doc. # 137, 37). Plaintiffs cite *Kelley* for the proposition that an auditor can be held liable for producing a clean opinion on misstated financial statements. *See* 2008 WL 5710598, at *12; (doc. # 137, 37).

Defendants cite *Deephaven* and *Edward* for the proposition that because an auditor's GAAP opinion is not a factual statement, but an opinion based on its investigation during the audit, plaintiffs must show that the opinion was both objectively and subjectively false. *See* 454 F.3d at 1168; *see also* 595 F. Supp. 2d at 1282. Therefore, defendants contend that plaintiffs must show that their audits were not GAAS audits in order to allege subjective falsity. (*See, e.g.*, doc. # 129, 35).

Defendants and plaintiffs are actually *both* right. A defendant can be held liable for falsely producing a clean audit opinion, but because it is a statement of professional opinion, a plaintiff must allege that the defendant either didn't believe that opinion or had no reasonable basis upon which to form that opinion. *See, e.g.*, *Kelley*, 2008 WL 5710598, at *12. "Plaintiffs generally must argue either (1) that [the auditor defendant] did not believe its audit opinions were true, or (2) that it did not have a reasonable basis for its audit opinions." *Id.* Here, plaintiffs have not alleged that defendants did not believe their opinions. Instead, plaintiffs allege that defendants lacked a reasonable basis for their opinions.

Regardless of whether plaintiffs adequately alleged deviations from GAAP requirements in Shengda's financial statements, they must first show that defendants lacked a reasonable basis for their opinion on those statements. *See, e.g.*, *Deephaven*, 454 F.3d at 1168. Other courts have implied that an adequate pleading of GAAS non-compliance is necessary to show that auditors lacked a reasonable basis for their opinions. *See id.*; *see also Edward*, 595 F. Supp. 2d at 1282-3.

Here, plaintiffs allege that both Hansen and KPMG HK lacked reasonable bases for their opinions on Shengda's GAAP compliance. (*See* doc. # 120, ¶ 123). Plaintiffs specifically allege that Hansen and KPMG HK's failures to comply with GAAS left defendants without a reasonable basis upon which to opine. (*See id.*). The problem for plaintiffs, however, is that they fail to sufficiently

James C. Mahan
U.S. District Judge

1    plead GAAS non-compliance.

2         Therefore, the court finds that plaintiffs fail to allege material falsity in defendants' opinions

3    on GAAP compliance in their respective audits for the years 2007, 2008, and 2009. Because the

4    court has already found that plaintiffs failed to allege a GAAS violation, plaintiffs cannot show that

5    the auditors lacked a reasonable basis for their statements of *opinion*. *See, e.g.*, *Deephaven*, 454 F.3d

6    at 1168.

7                    c.    *Hansen's opinion on Shengda's "internal controls"*

8         The court finds plaintiffs' claim that Hansen made a false statement in its 2007 opinion on

9    Shengda's "internal controls" fails for the same reason that plaintiffs' GAAP compliance claims fail.

10   *See id.* at 1282. Again, an auditor's opinion on "internal controls" is just that–an opinion. *See id.* at

11   1282.

12        For liability under § 18 for an auditor's *opinion* on "internal controls," a plaintiff must allege

13   that defendant either did not believe its opinion or lacked a reasonable basis upon which to base its

14   opinion, as with GAAP compliance. Here, plaintiffs relied on their GAAS violation allegations to

15   form an allegation that Hansen lacked a reasonable basis for its opinions. The GAAS allegations

16   failed, and so do plaintiffs' internal control allegations along with it.

17            **3.    *Plaintiffs fail to state a claim under § 18***

18        The very first required element that a plaintiff must establish to state a § 18 claim is that the

19   defendant made or caused to be made a materially false statement in a document filed pursuant to

20   the Exchange Act. *See, e.g.*, *Deephaven*, 454 F.3d at 1174. For the foregoing reasons, plaintiffs have

21   failed to allege a false statement of material fact that can be legally attributed to defendants in

22   Shengda's 2007, 2008, or 2009 SEC filings.

23        Plaintiffs' attempts to use the benefit of hindsight to allege GAAS violations results in

24   conclusory statements that fail to demonstrate that plaintiffs are entitled to relief. Plaintiffs'

25   speculation about what defendants did or did not do in performing their audits is not a substitute for

26   factual assertions that meet the requirements of Fed. R. Civ. P. 8(a) and 15 U.S.C. § 78u-4(b)(1).

27   . . .

28

**James C. Mahan**
**U.S. District Judge**

1   Plaintiffs' first, second, and third claims for relief, all brought under § 18 of the Exchange

2   Act, are, therefore, dismissed.

3   **D.      Plaintiffs' § 20 claims**

4   Plaintiffs' fourth claim for relief is a § 20(a) Exchange Act claim brought against KPMG US

5   and KPMG Int'l. (*See* doc. # 120, 59). To adequately state a claim under § 20(a) of the Exchange

6   Act, a plaintiff must plead facts that show (1) a primary violation of the federal securities laws and

7   (2) that the defendant was a control person. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552

8   F.3d 981, 990 (9th Cir. 2009). A control person is a person or entity that has actual power or

9   influence over the primary violator. *See, e.g.*, *id.*

10   The court finds that plaintiffs' § 20(a) claim fails. As explained above, plaintiffs have failed

11   to state a claim for relief under § 18 of the Exchange Act. Plaintiffs' § 18 claims were the only

12   primary violations of federal securities law filed. As such, plaintiffs have failed to allege the first

13   required element of a § 20(a) claim. *See, e.g.*, *id.*

14   Plaintiffs' fourth claim of relief under § 20 of the Exchange Act is, therefore, dismissed.

15   **E.      Plaintiffs' remaining state law claims**

16   The court finds that plaintiffs fail to state a claim for relief under a federal cause of action.

17   Plaintiffs filed the complaint pursuant to this court's federal question jurisdiction, under 28 U.S.C.

18   § 1331, and do not contend that diversity jurisdiction, under 28 U.S.C. § 1332, exists. (*See* doc. #

19   120, ¶ 16).

20   Defendants argue that the court should decline to exercise supplemental jurisdiction over

21   plaintiffs' remaining state law claims. (*See, e.g.*, doc. # 129, 44). In their response, plaintiffs do not

22   oppose defendants' arguments. (*See* doc. # 137).

23   The court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law

24   causes of action against defendants. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to

25   exercise supplemental jurisdiction over a [state-law] claim [if] . . . the district court has dismissed

26   all claims over which it has original jurisdiction.") (emphasis added); *see also Wade v. Regional*

27   *Credit Association*, 87 F.3d 1098, 1101 (9th Cir. 1996) (holding that "where a district court

28

**James C. Mahan**
**U.S. District Judge**

- 36 -

1  dismisses a federal claim, leaving only state claims for resolution, it should decline jurisdiction over

2  the state claims and dismiss them without prejudice"); *see also United Mine Workers of America v.*

3  *Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a

4  matter of comity and to promote justice between the parties, by procuring for them a surer-footed

5  reading of applicable law.").

6  **IV.    CONCLUSION**

7       Accordingly,

8       IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant KPMG US's

9  motion to dismiss (doc. # 124) be, and the same hereby is, GRANTED.

10      IT IS FURTHER ORDERED that defendant KPMG Int'l's motion to dismiss (doc. # 126)

11  be, and the same hereby is, GRANTED.

12      IT IS FURTHER ORDERED that defendant Hansen's motion to dismiss (doc. # 127) be, and

13  the same hereby is, GRANTED.

14      IT IS FURTHER ORDERED that defendant Morgan Stanley's motion to dismiss (doc. #

15  128) be, and the same hereby is, GRANTED.

16      IT IS FURTHER ORDERED that defendant KPMG HK's motion to dismiss (doc. # 129)

17  be, and the same hereby is, GRANTED.

18      IT IS FURTHER ORDERED that any claims pursued by plaintiffs under § 18 of the

19  Exchange Act regarding purchases of Shengda securities before March 14, 2009, are barred by the

20  statute of repose. Therefore, any § 18 claims made with respect to securities purchased before March

21  14, 2009, are dismissed with prejudice. Plaintiffs' remaining claims are dismissed without prejudice.

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28

**James C. Mahan**
**U.S. District Judge**

- 37 -

1    IT IS FURTHER ORDERED that plaintiffs, if they choose to amend their complaint, file a

2  motion to amend, attaching the proposed amended consolidated complaint, within forty-five (45)

3  days of the date of this order. The court reminds plaintiffs that if they choose to amend their

4  complaint, they must comply with the requirements of Local Rule 15-1.

5    DATED August 5, 2013.

6

7  _____
   UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James C. Mahan
U.S. District Judge