GARY R. GOODHEART
Nevada Bar #1203
FENNEMORE CRAIG JONES VARGAS
300 S. Fourth Street, Suite 1400
Las Vegas, NV 89101
Telephone: (702) 692-8000
Facsimile: (702) 692-8099

*Local Counsel for all Plaintiffs*

STUART M. GRANT (*Pro Hac Vice*)
MEGAN D. MCINTYRE (*Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

*Counsel for all Plaintiffs except Delaware Public Employees' Retirement System*

ANN MARIE JOHNSON (*Pro Hac Vice*)
STATE OF DELAWARE
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 577-8400
Facsimile: (302) 577-6630

*Counsel for Plaintiff Delaware Public Employees' Retirement System*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

OAKTREE CAPITAL MANAGEMENT, L.P., on behalf of certain of its managed accounts; OAKTREE (LUX.) FUNDS – OAKTREE GLOBAL CONVERTIBLE BOND FUND; OAKTREE (LUX.) FUNDS – OAKTREE GLOBAL CONVERTIBLE BOND FUND (IB), OAKTREE (LUX.) FUNDS – OAKTREE NON-U.S. CONVERTIBLE BOND FUND; OAKTREE HIGH INCOME CONVERTIBLE FUND, L.P.; OAKTREE HIGH INCOME CONVERTIBLE FUND II, L.P; OAKTREE NON-U.S. CONVERTIBLE FUND, L.P.; OAKTREE TT MULTI-STRATEGY FUND, L.P.; LAZARD ASSET MANAGEMENT LLC, on behalf of certain of its managed accounts; LAZARD RATHMORE MASTER FUND, L.P.; AG OFCON LTD.; ZAZOVE ASSOCIATES LLC, on behalf of certain of its managed funds and accounts; CNH CA MASTER ACCOUNT, L.P.; CNH DIVERSIFIED OPPORTUNITIES MASTER ACCOUNT, L.P.;

No. 2:12-CV-00956-JCM(GWF)

**JURY TRIAL DEMANDED**

ADVENT CLAYMORE CONVERTIBLE SECURITIES AND INCOME FUND II; AQR CONVERTIBLE OPPORTUNITIES BOND UCITS FUND; AQR DELTA MASTER ACCOUNT, L.P.; AQR OPPORTUNISTIC PREMIUM OFFSHORE FUND L.P.; AQR DIVERSIFIED ARBITRAGE FUND; HFR CA LAZARD RATHMORE MASTER TRUST; and DELAWARE PUBLIC EMPLOYEES' RETIREMENT SYSTEM,

Plaintiffs,

-against-

HANSEN, BARNETT & MAXWELL, P.C.,

Defendant.

**AMENDED CONSOLIDATED COMPLAINT**

1. This action is brought by investors in the debt securities of ShengdaTech, Inc. ("ShengdaTech" or the "Company") against ShengdaTech's former outside audit firm, Hansen, Barnett & Maxwell, P.C. ("Hansen" or "Defendant"), to recover losses sustained as a result of false and misleading statements made by Hansen concerning ShengdaTech.

2. The plaintiffs are Oaktree Capital Management, L.P. (on behalf of, and pursuant to assignments of claims from, certain of its managed accounts); Oaktree (Lux.) Funds – Oaktree Global Convertible Bond Fund; Oaktree (Lux.) Funds – Oaktree Global Convertible Bond Fund (IB); Oaktree (Lux.) Funds – Oaktree Non-U.S. Convertible Bond Fund; Oaktree High Income Convertible Fund, L.P.; Oaktree High Income Convertible Fund II, L.P.; Oaktree Non-U.S. Convertible Fund, L.P.; Oaktree TT Multi-Strategy Fund, L.P.; Lazard Asset Management LLC (on behalf of, and pursuant to assignments of claims from, certain of its managed accounts); Lazard Rathmore Master Fund, L.P.; AG OFCON LTD.; Zazove Associates LLC (on behalf of, and pursuant to assignments of claims from, certain of its managed funds and accounts); CNH CA Master Account, L.P.; CNH Diversified Opportunities Master Account, L.P.; Advent Claymore Convertible Securities and Income Fund II; AQR Convertible Opportunities Bond UCITS Fund; AQR Delta Master Account, L.P.; AQR Opportunistic Premium Offshore Fund

L.P.; AQR Diversified Arbitrage Fund; HFR CA Lazard Rathmore Master Trust; and Delaware Public Employees' Retirement System (collectively, "Plaintiffs").

3. Plaintiffs, by their undersigned attorneys, make the allegations herein upon personal knowledge as to themselves individually and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which included, among other things, review and analysis of: (1) filings by ShengdaTech with the Securities and Exchange Commission (the "SEC"); (2) press releases published by ShengdaTech; (3) the offering memorandum (the "6.0% Notes Offering Memorandum") that was disseminated to qualified institutional investors in connection with ShengdaTech's offering (the "6.0% Notes Offering") of 6.0% Convertible Senior Notes due 2018 (the "6.0% Notes"); (4) the offering memorandum (the "6.5% Notes Offering Memorandum") (together with the 6.0% Notes Offering Memorandum, the "Offering Memoranda") that was disseminated to qualified institutional investors in connection with ShengdaTech's offering (the "6.5% Notes Offering") of 6.5% Senior Convertible Notes Due 2015 (the "6.5% Notes"); (5) filings made in connection with ShengdaTech's bankruptcy proceeding, *In re ShengdaTech, Inc.*, Case No. BK-11-52649 (Bankr. D. Nev.); (6) correspondence between KPMG[1] and ShengdaTech's Board of Directors ("Board") and Audit Committee, including KPMG's reports concerning the discrepancies noted during its audit of ShengdaTech's financial statements for the year 2010; (7) correspondence between Hansen and ShengdaTech's management, Board, and Audit Committee; (8) documents obtained by ShengdaTech's Special Committee and/or its advisors during the course of the internal investigation described herein, including bank statements and internal ShengdaTech documents; (9) documents generated by the Special Committee and/or its advisors during the internal investigation; (10) communications between the Audit Committee and ShengdaTech management; (11) minutes of meetings of ShengdaTech's Board, Audit Committee, and Special Committee that discuss, among other things, the Special Committee's investigation and the

[1] "KPMG" refers to KPMG, a Hong Kong partnership. KPMG succeeded Hansen as ShengdaTech's outside audit firm.

discrepancies noted in KPMG's audit of the year 2010 financial statements; (12) correspondence between ShengdaTech and NASDAQ, including correspondence and exhibits describing the discrepancies noted by KPMG; and (13) correspondence between members of ShengdaTech's Board and certain of ShengdaTech's subsidiaries' banks.

4. Plaintiffs' investigation (by and through their attorneys) also included interviews of individuals who: (1) have first-hand knowledge of the internal investigation described herein; (2) visited ShengdaTech's subsidiaries' banks in China to attempt to confirm their bank balances; (3) visited certain of ShengdaTech's subsidiaries' customers and suppliers in China to attempt to confirm the subsidiaries' transactions; and (4) communicated directly with the New York branches of ShengdaTech's Chinese banks in an attempt to confirm the Company's bank balances.

5. Many of the facts supporting the allegations contained herein are known only to the Defendant or are exclusively within its custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I. OVERVIEW OF THE CASE

6. Between May 15, 2008 and May 5, 2011 (the "Loss Period"), Plaintiffs collectively purchased over $94 million of 6.0% Notes and 6.5% Notes (the "Notes") issued by ShengdaTech – a once-promising participant in the burgeoning nano-precipitated calcium carbonate ("NPCC") market. Plaintiffs' purchases included $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering, $56,570,000 par amount of 6.5% Notes in the 6.5% Notes Offering, and $38,085,000 par amount of secondary market purchases of both series of Notes. Plaintiffs made all of these purchases in reliance on the Company's audited financial statements contained in the Company's Forms 10-K filed with the SEC and in the Offering Memoranda for the Notes, and on the unqualified audit opinions the Company's outside auditors had issued regarding those financial statements that were also contained in the Company's Forms 10-K filed with the SEC.

7. Subsequent to Plaintiffs' purchases of the Notes, and while Plaintiffs continued to hold over $76 million of the Notes, ShengdaTech revealed the discovery of financial

irregularities and discrepancies, and commenced an internal investigation. That investigation would eventually reveal that the Company's Chief Executive Officer, Xiangzhi Chen ("Chen"), and his cohorts had been siphoning cash out of the Company's subsidiaries' bank accounts for their own personal purposes, while also causing the Company to report sales revenues and income from numerous transactions that were entirely fictitious. As a result of this misconduct by certain members of ShengdaTech management, the consolidated financial statements of the Company and its subsidiaries for the years ended December 31, 2007 (the "2007 Financial Statements"), December 31, 2008 (the "2008 Financial Statements"), and December 31, 2009 (the "2009 Financial Statements") that were reported in the Company's Forms 10-K were materially false.

8. ShengdaTech defaulted on the Notes and spiraled into bankruptcy when the financial irregularities and discrepancies were revealed, and the funds and accounts for whom Plaintiffs purchased the Notes suffered substantial damages.

9. Hansen was ShengdaTech's outside auditor from the time the Company first went public in March 2006 until November 2008. As such, Hansen audited the 2007 Financial Statements and issued an unqualified audit opinion stating that it had conducted its audit in accordance with applicable auditing standards, and that it had concluded based on the audit that the 2007 Financial Statements presented ShengdaTech's financial condition fairly and accurately and that the Company had adequate internal controls. With Hansen's consent, its audit opinion on the 2007 Financial Statements was included in the following documents that were either publicly filed with the SEC or disseminated to Plaintiffs: (1) the 6.0% Notes Offering Memorandum, (2) the 6.5% Notes Offering Memorandum, (3) the Company's amended annual report on Form 10-K/A for the year ended December 31, 2007, filed with the SEC on May 15, 2008 (the "2007 10-K/A"), (4) the Company's annual report on Form 10-K for the fiscal year ended December 31, 2008, filed with the SEC on April 1, 2009 (the "2008 10-K"), and (5) the Company's annual report on Form 10-K for the fiscal year ended December 31, 2009, filed with the SEC on March 15, 2010 (the "2009 10-K"), and an amendment thereto filed on September 15, 2010 (the "2009 10-K/A). Thus, Hansen's false statements allowed the Notes to enter the

market, and created the false impression that ShengdaTech had the financial wherewithal to repay the Notes with interest.

10. When purchasing the Notes, Plaintiffs relied on Hansen's audit opinion as providing comfort concerning the Company's ability to repay the Notes and concerning the accuracy of the Company's financial statements. As Hansen understood, an outside audit opinion is particularly important in the context of a company like ShengdaTech, whose operations were based entirely in China, and which entered the U.S. capital markets through a reverse merger process that did not require the degree of due diligence that is expected of underwriters in an initial public offering. Hansen, as the Company's first outside auditor after it went public, knew that its audit opinions would be relied upon heavily by investors in the Company, including purchasers of the Notes, and had an obligation to conduct its audits competently and carefully and to issue an unqualified audit opinion only if its audit afforded it a reasonable basis for doing so.

11. Hansen's statements in its audit opinions were false and without a reasonable basis because: the 2007 Financial Statements did not present the Company's financial condition fairly or accurately; Hansen had not performed its audit in conformity with applicable auditing standards; the Company's internal controls were severely deficient; and Hansen had conducted a shoddy audit that afforded it no rational basis for a conclusion about the Company's financial statements or internal controls.[2]

12. It now appears that Chen and his colleagues consciously chose Hansen to serve as the Company's auditor because they believed that this small Utah-based auditing firm would be less likely to detect management's financial shenanigans than a "Big Four" accounting firm. Indeed, after the Audit Committee of the Company's board of directors fired Hansen and hired KPMG as ShengdaTech's new auditor in November 2008,[3] Chen lobbied the Audit Committee

---

[2] Plaintiffs' prior complaint in this action included claims against KPMG for making similar false statements in its audit opinions. Those claims have been resolved by settlement.

[3] CIBC/Oppenheimer, the underwriter for the 6.0% Notes Offering, required as part of the deal that ShengdaTech utilize a "Big Four" accounting firm to audit the Company's financial statements in conjunction with that Offering.

throughout December 2008 to terminate the contract with KPMG in favor of a smaller audit firm like Hansen. While unsuccessful, these lobbying efforts are a telltale sign that Chen had been pleased with Hansen's lax approach to its auditing responsibilities and was reticent to retain a "Big Four" firm that might have exercised greater diligence.

13. In this action, Plaintiffs seek to hold Hansen accountable for the losses that were sustained as a result of Hansen's failure to comply with applicable professional auditing standards during its audit of the 2007 Financial Statements, and its concomitant issuance of an audit opinion that was false and without any reasonable basis.

## II. JURISDICTION AND VENUE

14. The claims herein arise under Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78r; common law; and the Connecticut Uniform Securities Act.

15. This Court has jurisdiction over this matter and over the Defendant pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1331; and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; 28 U.S.C. § 1391(b)(2); and 28 U.S.C. § 1391(c). Plaintiff Zazove Associates LLC is located in this District, and ShengdaTech's bankruptcy was proceeding in this District at the time this suit was filed. Additionally, events giving rise to the claims at issue occurred in this District, as Hansen's false and misleading statements were disseminated to investors in this District, including Plaintiff Zazove. Defendant is subject to personal jurisdiction in this District because it has (or had) substantial contacts with this District by virtue of having served as auditor for ShengdaTech, a Nevada corporation, and by virtue of having consented to the inclusion of its audit reports in ShengdaTech's SEC filings and Offering Memoranda. Furthermore, Hansen regularly does business within this District.

## III. PARTIES

### A. Plaintiffs

17. Plaintiff Oaktree Capital Management, L.P. ("Oaktree"), an asset management company headquartered in California, brings this action on behalf of fifteen clients (collectively, the "Oaktree Clients") on whose behalf Oaktree purchased Notes during the Loss Period. Prior to the commencement of this action, Oaktree received valid assignments from each of the Oaktree Clients of their claims pertaining to the Notes.

18. Plaintiffs Oaktree (Lux.) Funds – Oaktree Global Convertible Bond Fund (successor in interest to Clariden Leu (Lux.) I – Global Convertible Bond Fund), Oaktree (Lux.) Funds – Oaktree Global Convertible Bond Fund (IB) (successor in interest to OCM Global Convertible Securities Fund), Oaktree (Lux.) Funds – Oaktree Non-U.S. Convertible Bond Fund (successor in interest to OCM Non-U.S. Convertible Securities Fund), Oaktree High Income Convertible Fund, L.P., Oaktree High Income Convertible Fund II, L.P., Oaktree Non-U.S. Convertible Fund, L.P. (itself and as successor to the OCM International Convertible Trust), and Oaktree TT Multi-Strategy Fund, L.P. (collectively, the "Oaktree Funds") are funds managed by Oaktree and on whose behalf (or on behalf of their respective predecessors) Oaktree purchased Notes during the Loss Period.

19. During the Loss Period, Oaktree purchased on behalf of the Oaktree Clients and the Oaktree Funds a total par amount of $15,070,000 of 6.5% Notes in the 6.5% Notes Offering, and $5,945,000 par amount of 6.5% Notes in the secondary market. All of these 6.5% Notes were still held by the Oaktree Clients and Oaktree Funds at the end of the Loss Period. Oaktree subsequently sold some of the 6.5% Notes at a substantial discount to par, but the Oaktree Clients and Oaktree Funds collectively continue to hold $7,739,000 par amount of 6.5% Notes, which are now in default.

20. Plaintiff Lazard Asset Management LLC ("LAM"), an asset management company headquartered in New York, brings this action on behalf of four clients (collectively, the "LAM Clients") that LAM manages. Prior to the commencement of this action, LAM received valid assignments from each of the LAM Clients of their claims pertaining to the Notes.

21. Plaintiff Lazard Rathmore Master Fund, L.P. (the "LAM Fund") is a fund managed by LAM and on whose behalf LAM purchased Notes during the Loss Period.

22. During the Loss Period, LAM purchased on behalf of the LAM Clients and the LAM Fund a total of $9,850,000 par amount of 6.5% Notes in the 6.5% Notes Offering, $14,239,000 par amount of 6.0% Notes in the secondary market, and $4,425,000 par amount of 6.5% Notes in the secondary market. The LAM Clients and the LAM Fund collectively continue to hold a total of $2,090,000 par amount of 6.0% Notes and $12,750,000 par amount of 6.5% Notes, which are now in default.

23. Plaintiff AG OFCON Ltd. ("AG OFCON") is a fund managed by Angelo, Gordon & Co. ("Angelo Gordon"), an investment advisory firm based in New York. During the Loss Period, Angelo Gordon purchased on behalf of AG OFCON $10,000,000 par amount of 6.5% Notes in the 6.5% Notes Offering and $5,000,000 par amount of 6.5% Notes in the secondary market. AG OFCON continues to hold these 6.5% Notes, which are now in default.

24. Plaintiff Zazove Associates LLC ("Zazove"), an investment advisory firm based in Nevada, brings this action on behalf of two managed funds and six clients for which it purchased Notes during the Loss Period (collectively, the "Zazove Clients"). Prior to the filing of this action, Zazove obtained valid assignments from each of the eight Zazove Clients of their claims pertaining to the Notes. One of the Zazove Clients is also an Oaktree Client, although Zazove and Oaktree are pursuing claims on behalf of different accounts owned by that client. During the Loss Period, Zazove purchased on behalf of the Zazove Clients $10,000,000 par amount of 6.5% Notes in the 6.5% Notes Offering. The Zazove Clients continue to hold these 6.5% Notes, which are now in default.

25. Plaintiffs CNH CA Master Account, L.P. and CNH Diversified Opportunities Master Account, L.P. (together, the "CNH Funds") are funds managed or co-managed by CNH Partners LLC ("CNH"), an investment management company based in Connecticut. During the Loss Period, CNH purchased $250,000 par amount of 6.0% Notes in the 6.0% Notes Offering on behalf of the CNH Diversified Opportunities Master Account, L.P. Additionally, during the Loss Period CNH purchased on behalf of the CNH Funds a total of $1,800,000 par amount of

6.0% Notes in the secondary market, and $3,300,000 par amount of 6.5% Notes in the 6.5% Notes Offering. The CNH Funds continue to hold these 6.0% Notes and 6.5% Notes, which are now in default.

26. Plaintiff Advent Claymore Convertible Securities and Income Fund II (the "Advent Fund") is a closed-end fund managed by Advent Capital Management LLC ("Advent"), an investment advisory firm based in New York. During the Loss Period, Advent purchased on behalf of the Advent Fund $2,840,000 par amount of 6.5% Notes in the 6.5% Notes Offering. The Advent Fund continues to hold these 6.5% Notes, which are now in default.

27. Plaintiffs AQR Convertible Opportunities Bond UCITS Fund, AQR Delta Master Account, L.P., AQR Opportunistic Premium Offshore Fund L.P., and AQR Diversified Arbitrage Fund (collectively, the "AQR Funds") are funds managed or co-managed by AQR Capital Management, LLC ("AQR"), an investment management company based in Connecticut. During the Loss Period, AQR purchased on behalf of the AQR Funds a total of $2,075,000 par amount of 6.0% Notes in the secondary market, $1,600,000 par amount of 6.5% Notes in the 6.5% Notes Offering, and $500,000 par amount of 6.5% Notes in the secondary market. The AQR Funds continue to hold these 6.0% Notes and 6.5% Notes, which are now in default.

28. Plaintiff HFR CA Lazard Rathmore Master Trust ("HFR") is a Bermuda unit trust whose investments are managed by LAM. During the Loss Period, LAM purchased on behalf of HFR $1,390,000 par amount of 6.5% Notes in the 6.5% Notes Offering, $3,661,000 par amount of 6.0% Notes in the secondary market, and $440,000 par amount of 6.5% Notes in the secondary market. HFR continues to hold $365,000 par amount of 6.0% Notes and $1,490,000 par amount of 6.5% Notes, which are now in default.

29. Plaintiff Delaware Public Employees Retirement System ("DPERS") is a system created by Title 29, Chapter 83 of the Delaware Code to hold and invest the retirement funds of public employees of the State of Delaware. DPERS is administered by the State of Delaware Board of Pension Trustees, which is statutorily authorized to administer the retirement system and invest, on a commingled basis, the trust fund monies of DPERS. During the Loss Period, Oaktree was DPERS' investment manager with authority to make investments on behalf of

DPERS, and as such Oaktree purchased $2,520,000 par value of the 6.5% Notes for DPERS in the 6.5% Notes Offering. After the end of the Loss Period, on June 22, 2011, DPERS sold $845,000 par value of the Notes, realizing a loss of $678,112.50. DPERS has sustained a substantial unrealized loss on the $1,675,000 par value of the 6.5% Notes it continues to hold, which are now in default.

30. Plaintiffs collectively are seeking damages in this action on behalf of fifty (50) or fewer persons.

31. The term "Damaged Funds" as used herein shall collectively refer to the Oaktree Clients, the Oaktree Funds, the LAM Clients, the LAM Fund, AG OFCON, the Zazove Clients, the CNH Funds, the Advent Fund, the AQR Funds, HFR, and DPERS.

**B. Defendant**

32. Defendant Hansen, Barnett & Maxwell, P.C. ("Hansen") provides auditing, assurance, tax, accounting, and consulting services for a wide range of clients. Hansen is headquartered in Salt Lake City, Utah. Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit reports on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum, the 6.5% Notes Offering Memorandum, the 2007 10-K/A, the 2008 10-K, the 2009 10-K, and the 2009 10-K/A. Hansen also reviewed the 6.0% Notes Offering Memorandum, the 6.5% Notes Offering Memorandum, the 2007 10-K/A, the 2008 10-K, and the 2009 10-K and 2009 10-K/A prior to their public dissemination and/or filing with the SEC. Indeed, Hansen's October 19, 2007 engagement letter for the audit of the 2007 Financial Statements expressly required that, if ShengdaTech intended to "publish or otherwise reproduce in any document any report issued as a result of [the] engagement, or otherwise make reference to [Hansen] in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with the SEC or other regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating [Hansen] with such document," the Company must "provide [Hansen] with a draft of the document to read and obtain [Hansen's] approval for the inclusion or incorporation by reference of any of [Hansen's] reports, or the reference to [Hansen], in such document before the

document is printed and/or distributed." The engagement letter further stated that, in addition to auditing the 2007 Financial Statements for inclusion in the Company's Annual Report(s) on Form 10-K, Hansen would "read all other information to be included in the Annual Report to determine if it is consistent with the assumptions inherent in preparing the financial statements."

## IV. RELEVANT NON-PARTIES

33. ShengdaTech was a Nevada corporation with its principal place of business in China. ShengdaTech manufactured a specialty additive known as nano-precipitated calcium carbonate ("NPCC"). NPCC is used in a variety of products to enhance their durability and efficiency and is widely applied in the paint, paper, plastic, and rubber industries and used for building materials such as PVC. ShengdaTech conducted its manufacturing operations through five operating subsidiaries located in the People's Republic of China: Shandong Haize Nanomaterials Co., Ltd. ("Shandong Haize"), Shandong Bangsheng Chemical Co., Ltd. ("Shandong Bangsheng"), Shaanxi Haize Nanomaterials Co., Ltd. ("Shaanxi Haize"), Zibo Jiaze Nanomaterials Co., Ltd. ("Zibo Jiaze"), and Anhui Yuanzhong Nanomaterials Co., Ltd. ("Anhui Yuanzhong") (collectively, the "PRC Subsidiaries"). The PRC Subsidiaries are owned by Faith Bloom Limited ("Faith Bloom"), a wholly-owned subsidiary of ShengdaTech that is organized under the laws of the British Virgin Islands.

34. Xiangzhi Chen ("Chen") was ShengdaTech's President and Chief Executive Officer and a member of its Board from March 31, 2006 until August 19, 2011. Chen was also the Company's largest shareholder, owning over 42.25% of ShengdaTech's outstanding shares. Chen was ousted from his positions at ShengdaTech on August 19, 2011, after he took deliberate steps to thwart the Special Committee's internal investigation into financial discrepancies and irregularities discovered within the Company. Based on information eventually uncovered by the Special Committee, it appears that Chen's efforts to obstruct the investigation were intended to hide the fact that he had, for years, been looting the Company by improperly diverting corporate funds to non-corporate uses.

35. Anhui Guo ("Guo") was, at all relevant times prior to her resignation on April 29, 2011, the Company's Chief Operating Officer, acting Chief Financial Officer, and a member of the Board of Directors.

36. KPMG, a Hong Kong Partnership ("KPMG") is a member firm of the KPMG network of member firms affiliated with KPMG International Cooperative. KPMG is located in Hong Kong and provides auditing, tax, and advisory services for a wide range of clients. KPMG audited ShengdaTech's 2008 and 2009 Financial Statements.

## V. <u>FACTUAL ALLEGATIONS</u>

### A. Historical Background Of ShengdaTech & The Notes Offerings

37. The company now known as ShengdaTech was formed in March 2006 through a "reverse merger" with a United States shell company, Zeolite Exploration Company ("Zeolite"). To effectuate the reverse merger, ShengdaTech consummated a share exchange with Faith Bloom, whereby ShengdaTech acquired all of the capital stock of Faith Bloom in exchange for 50,957,603 shares of ShengdaTech common stock. ShengdaTech went public in late March 2006, and its stock began trading on the NASDAQ in early 2007.

38. During its tenure as a publicly-traded company, ShengdaTech had two outside auditors – Hansen and KPMG. Hansen served as ShengdaTech's outside auditor from December 2006 until November 2008, and audited ShengdaTech's 2007 Financial Statements and its internal controls over financial reporting for the year ended December 31, 2007. KPMG served as ShengdaTech's outside auditor from November 2008 until its resignation on April 19, 2011, and audited the Company's 2008 and 2009 Financial Statements and internal controls. KPMG was in the midst of auditing the Company's financial statements for the year ended December 31, 2010 (the "2010 Financial Statements") when it resigned.

39. To finance its operations as a public company, ShengdaTech conducted two private offerings of debt securities targeted to "qualified institutional buyers" as defined in Rule 144A of the Securities Act of 1933 (the "Securities Act").

40. First, in 2008, ShengdaTech conducted the 6.0% Note Offering, pursuant to which Plaintiff CNH Diversified Opportunities Master Account, L.P. and other qualified

institutional buyers purchased $115,000,000 of 6.0% Notes. The 6.0% Notes Offering was conducted pursuant to the 6.0% Notes Offering Memorandum, which included the Company's 2007 Financial Statements. Hansen issued an unqualified audit opinion on the Company's 2007 Financial Statements, stating that they fairly presented the Company's financial condition and the results of its operations in accordance with generally accepted accounting principles ("GAAP") and that the Company maintained effective internal controls over financial reporting. As required by its engagement letter, Hansen reviewed the 6.0% Notes Offering Memorandum before it was distributed, and consented to the inclusion of its unqualified audit opinion on the 2007 Financial Statements in that document. Interest on the 6.0% Notes was payable semiannually on June 1 and December 1. The 6.0% Notes were convertible into shares of ShengdaTech common stock at an initial conversion rate of 100.6036 shares per $1,000 principal amount of the 6.0% Notes, subject to adjustment.

41. Second, on December 10, 2010, ShengdaTech announced that it had entered into a purchase agreement relating to an offering of $130,000,000 of 6.5% Notes. The completion of the 6.5% Notes Offering was conditioned upon a certain amount of the 6.0% Notes being repurchased by ShengdaTech and surrendered to the 6.0% Notes' trustee for cancellation, such that at least 75% of the original issuance amount of the 6.0% Notes was no longer outstanding. Approximately $67.2 million of the net proceeds of the 6.5% Notes Offering was to be used to repurchase 6.0% Notes. On December 15, 2010, ShengdaTech announced that it had completed the 6.5% Notes Offering. The 6.5% Notes were convertible into shares of ShengdaTech common stock at an initial conversion rate of 164.6904 shares per $1,000 principal amount of 6.5% Notes, subject to adjustment. Holders of the 6.5% Notes had the right to require ShengdaTech to repurchase, for cash, all or any portion of their 6.5% Notes on December 15, 2013 at a price equal to 100% of the principal amount of the 6.5% Notes to be purchased, plus accrued and unpaid interest.

42. The 6.5% Notes Offering was pursuant to the 6.5% Notes Offering Memorandum, which was disseminated to investors and which included the Company's 2007 Financial Statements and Hansen's audit opinion with respect thereto. Pursuant to its engagement

agreement, Hansen reviewed the 6.5% Notes Offering Memorandum and consented to the inclusion of its unqualified audit opinion on the 2007 Financial Statements in that document.

43. Each of the Plaintiffs (and each of the Damaged Funds) purchased 6.5% Notes in the 6.5% Notes Offering and/or in the secondary market. All of these purchases were made in reliance on the accuracy of the financial statements and other information, including Hansen's unqualified audit opinion, contained in the 6.5% Notes Offering Memorandum and in ShengdaTech's other SEC filings during the Loss Period. As purchasers of ShengdaTech Notes, Plaintiffs were especially interested in knowing how much cash ShengdaTech had on hand. Understanding ShengdaTech's cash position was critical to Plaintiffs' ability to make an informed assessment of the likelihood that the Company would be able to make the substantial principal and interest payments required under the terms of the Notes.

**B. ShengdaTech's Public Disclosures Of Financial Discrepancies, Leading To Its Default On The Notes**

44. ShengdaTech has turned out to have been a sham. Investors were duped into buying over $200 million in Notes based on the Company's reporting of strong financial results, but those financial results were a complete fantasy. ShengdaTech management utterly misrepresented the value and, indeed, the existence of material assets that were recorded on the Company's balance sheet, and materially overstated the Company's sales by recording unsupported and fictitious transactions.

45. On March 15, 2011, ShengdaTech stunned the market with an announcement that its Board had appointed a Special Committee to investigate "potentially serious discrepancies and unexplained issues relating to the Company's and its subsidiaries' financial records identified by [KPMG]" in the course of KPMG's audit of the Company's 2010 Financial Statements, and that the Special Committee had retained O'Melveny & Myers, LLP ("O'Melveny") to conduct an independent investigation into these issues. Although the existence of these discrepancies and issues was not publicly disclosed until March 15, 2011, the Special Committee's investigation later revealed that they had been ongoing since 2007 (or earlier) but had not been detected by Hansen (or its successor, KPMG).

46. Also on March 15, 2011, ShengdaTech announced that the SEC had been informed of the internal investigation, and that the Company would not timely file its 2010 Form 10-K. In response to this announcement, the NASDAQ suspended trading in the Company's shares.

47. Although not publicly disclosed until April 29, 2011, (i) KPMG informed the Company on April 19, 2011 that ShengdaTech's senior management had not taken timely and appropriate remedial action with respect to the discrepancies and issues that KPMG had identified in the course of its 2010 audit, and (ii) NASDAQ informed the Company on April 20, 2011 that its shares would be delisted.

48. On April 29, 2011, the Company issued a press release disclosing NASDAQ's April 20, 2011 decision to delist ShengdaTech's shares. The press release stated that the April 20, 2011 letter from the NASDAQ Listing Qualifications Department had cited the following criteria in support of its decision to delist ShengdaTech:

> (1) public interest concerns under Nasdaq Listing Rule 5101 raised by the ***serious accounting and operational issues uncovered by KPMG, the Company's independent registered public accounting firm; the deliberate and ongoing efforts of the Company's Chief Executive Officer and Acting Chief Financial Officer, Mr. Xiang Zhi Chen and Ms. Anhui Guo, respectively, to obstruct an internal investigation into these matters; the Company's failure to promptly disclose material information related to that investigation; and the Company's violation of the rules setting forth the responsibilities and authority of the Audit Committee***;
>
> (2) the Company's failure to make prompt public disclosure of material developments relating to the investigation, as required by Nasdaq Listing Rule 5250(b)(1) and IM-5250-1;
>
> (3) the Company's violations of Nasdaq Listing Rule 5605(c)(3) and IM-5605 as well as the statutory responsibilities and authority of the Audit Committee set forth in Section 10A(m)(2) of the Securities and Exchange Act of 1934 caused by the obstructive conduct of the Company's executive management, including failure to pay for advisors engaged to assist with the internal investigation by the special committee of the Board of Directors of the Company; and
>
> (4) the Company's failures to timely file with the Securities and Exchange Commission its Annual Report on Form 10-K for the

> period ended December 31, 2010, as required by Nasdaq Listing Rule 5250(c)(1), and to present a definitive plan that demonstrates its ability to regain compliance within the time period permitted under Nasdaq's Listing Rules.

(emphasis added).

49. Also on April 29, 2011, ShengdaTech announced that Guo had resigned, effective immediately.

50. On May 5, 2011, ShengdaTech filed another Form 8-K with the SEC in which it announced that KPMG had resigned, effective April 29, 2011. In this Form 8-K, ShengdaTech provided additional details concerning the "serious discrepancies and unexplained issues" KPMG had identified in its audits of the Company's 2010 Financial Statements, noting that these "concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) [value-added tax] invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables."

51. In addition, the May 5, 2011 Form 8-K made the stunning revelation that the Company's previously-issued financial statements for the 2008 and 2009 fiscal years should no longer be relied upon:

> ***On April 29, 2011, we were also informed by KPMG, our former independent accounting firm, that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.***
>
> KPMG stated that the manner of management's conduct during the investigation by a special committee of the Company's Board of Directors ***raised doubts about management's representations provided to KPMG in connection with KPMG's 2008 and 2009 audits of the consolidated financial statements and the***

> ***effectiveness of our internal control over financial reporting of the Company.*** The Chairman of our Audit Committee discussed the foregoing issues with KPMG, and the Company will authorize KPMG to respond fully to inquiries of the successor accountant, when hired, concerning the foregoing.

(emphasis added).

52. On June 8, 2011, the NASDAQ Listing Qualifications Panel (the "Panel") affirmed its decision to delist ShengdaTech. In support of its decision, the Panel cited, among other things, the discrepancies found by KPMG. The Panel further noted that ShengdaTech management was obstructing the Special Committee's ability to fulfill its duties and responsibilities under Listing Rule 5603(c)(3) and Section 10A(m)(2) of the Exchange Act. Trading in ShengdaTech's common stock was suspended on June 10, 2011.

53. On June 9, 2011, the Company announced that it would be defaulting on its obligations to the holders of the 6.0% Notes. In a Form 8-K filed that day, ShengdaTech stated:

> Pursuant to the terms of an Indenture, dated as of May 28, 2008 (the "Indenture"), between [ShengdaTech] and The Bank of New York (the "Trustee"), holders of the [6.0% Notes] had the contractual right (the "Put Option") to require the Company to purchase on June 1, 2011 (the "Purchase Date") any or all of the outstanding Notes held by each such holder at a purchase price of 100% of the principal amount thereof, plus any accrued and unpaid interest up to but excluding the Purchase Date, payable in cash (the "Purchase Price"). In accordance with the terms of the Indenture and the Notes, a notice of the Put Option was sent to holders of the Notes. As of May 24, 2011, the deadline for holders to exercise the Put Option, ***holders of all of the Notes had exercised the Put Option in the aggregate sum of $25,578,000. The Company did not pay the Purchase Price for the Notes on the Purchase Date.*** Based on the nonpayment, the aggregate principal amount of the Notes, plus any accrued and unpaid interest and any other amounts due and owing on the Notes could be declared immediately due and payable by the Trustee or by holders of 25% or more of the aggregate principal amount of the Notes.

(emphasis added).

54. On June 15, 2011, ShengdaTech became obligated to pay interest on the 6.5% Notes in the amount of approximately $4.4 million. ShengdaTech failed to pay any portion of this interest, and defaulted on the 6.5% Notes.

55. On August 11, 2011, the SEC initiated a regulatory proceeding titled *In re ShengdaTech, Inc.* (LA-3397). The formal order entered by the SEC in connection with this proceeding challenged, among other things, false statements in the Company's financial results for the fiscal years 2009 and 2010.

56. On August 19, 2011, ShengdaTech filed for bankruptcy protection in the United States Bankruptcy Court for the District of Nevada. ShengdaTech acknowledged in a Form 8-K filed with the SEC on August 23, 2011 that the bankruptcy filing constituted an "event of default" on the 6.0% Notes and the 6.5% Notes.

57. Also on August 19, 2011, the Special Committee announced that it had removed all members of ShengdaTech's management – including Chen – from their positions, effective immediately. Michael Kang of Alvarez & Marsal North America LLP was appointed to act as Chief Restructuring Officer ("CRO") and ShengdaTech's sole officer with responsibility to (i) manage ShengdaTech's business and operations, (ii) assist ShengdaTech in conducting its ongoing investigation, and (iii) restructure ShengdaTech's operations.

58. On August 22, 2011, the SEC served ShengdaTech with a subpoena for documents in connection with a fact-finding investigation by the SEC with regard to the Company.

59. On December 15, 2011, NASDAQ officially delisted ShengdaTech. The stock had not traded on NASDAQ since its June 10, 2011 suspension.

60. On February 15, 2012, the SEC filed a proof of claim against ShengdaTech. In this proof of claim, the SEC indicated that its investigation into the Company was continuing and that it may file a civil action against ShengdaTech based on possible violations of the federal securities laws.

**C. The Special Committee's Investigation And Findings**

61. The Special Committee's internal investigation, which began in March 2011, did not conclude until more than eighteen months later. In a press release dated October 12, 2012, ShengdaTech announced that "[t]he Special Committee's investigation, among other key findings, confirmed KPMG's initial reports concerning discrepancies and/or issues relating to the

Company's financial records that were identified during the course of the audit for the year ended December 31, 2010." Although the details of that investigation were not made public, Plaintiffs' counsel have interviewed individuals who participated in that investigation and have obtained information concerning both the discrepancies and issues that KPMG itself found while auditing the 2010 Financial Statements, and the additional discrepancies and misstatements (dating back to 2007 and in some instances even earlier) that the Special Committee uncovered through its investigation. The allegations in this section of the complaint are based on those interviews, on written summaries that KPMG provided to the Audit Committee concerning its findings during the 2010 Financial Statement audit, and on documentation that the Special Committee and its advisors obtained during their investigation.

62. The genesis of the Special Committee investigation was a report from KPMG to ShengdaTech's Audit Committee in early 2011 concerning issues and discrepancies uncovered while auditing the 2010 Financial Statements. Plaintiffs have learned based on interviews with persons involved in the investigation that KPMG discovered these discrepancies as a result of being directed by the Audit Committee to take audit steps it had not taken in prior years (and that Defendant Hansen never took during its audit of the 2007 Financial Statements). Specifically, during KPMG's audit of ShengdaTech's 2009 Financial Statements, KPMG had received an unusually high volume of responses to the confirmation requests it had sent to third parties. KPMG, however, did not consider this fact to be significant and did not alter its audit procedures for the 2009 Financial Statements based on this high volume of confirmation responses. Instead, KPMG simply accepted the responses at face value and assumed they were accurate.

63. In or about May 2010, during a meeting regarding KPMG's review of ShengdaTech's quarterly financial statements, KPMG's lead audit partner casually mentioned to a member of ShengdaTech's Audit Committee that KPMG had received a higher-than-usual number of confirmation replies when auditing the 2009 Financial Statements. The Audit Committee member recognized the potential significance of this information and demanded that KPMG look more closely at third party audit confirmations when auditing the 2010 Financial Statements. When KPMG did so, it quickly uncovered major problems.

64. On March 2, 2011, while the 2010 Financial Statement audit was ongoing, KPMG contacted the Chairman of ShengdaTech's Audit Committee and informed him of KPMG's discovery of "potentially serious discrepancies and unexplained issues" after performing the requested additional procedures on the 2010 Financial Statements. KPMG then provided a draft letter to the Audit Committee dated March 3, 2011 that described some of the issues KPMG had uncovered. For example:

a. KPMG had selected a number of ShengdaTech customers for confirmation of sales amounts, terms, and outstanding balances, and had sent written confirmation requests to those customers using addresses provided by ShengdaTech management. As shown in the chart below, for certain customers, the information received in response to those written confirmations was consistent with ShengdaTech's own records, but the information KPMG obtained after contacting those customers directly was materially different and showed a substantially smaller amount of sales (or no sales):

| **Customer** | **2010 Sales Recorded in ShengdaTech's Books (RMB)**[4] | **2010 Sales Confirmed Via Inquiry Sent to Address Provided by ShengdaTech Management (RMB)** | **2010 Sales Confirmed Via Direct Customer Contact (RMB)** |
|---|---|---|---|
| Xika (China) | 7,667,094 | 7,667,094 | 0 |
| Zhengzhou Minghua | 7,621,367 | 7,621,367 | 114,000 |
| Zhengzhou Zhongyuan | 9,525,897 | 9,525,897 | 662,000 |

b. KPMG mailed customer sales and accounts receivable confirmations to customers of ShengdaTech's Shaanxi Haize subsidiary and also to customers of ShengdaTech's subsidiaries in Shangdong province. These confirmations were separately mailed from Shangdong and Shaanxi by different audit teams, and the two sets

[4] RMB refers to Renminbi, the currency of the People's Republic of China, also referred to as the Chinese Yuan ("CNY"). At current exchange rates, RMB 100 is approximately equivalent to US $16.10.

of confirmations were accompanied by return envelopes bearing different addresses – one for the Shangdong subsidiaries' customers and one for the Shaanxi Haize customers. However, the confirmations returned by five of the Shangdong subsidiaries' customers were returned in the envelopes for the Shaanxi Haize customers. Because these customers were not related to one another, the only plausible explanation is that ShengdaTech management had misdirected, intercepted and/or otherwise interfered with these confirmation requests and responses, and had caused falsified responses to be returned to KPMG in the wrong envelopes.

c. The PRC Subsidiaries' customers in China paid for their purchases of goods and services by submitting "bills" to the PRC Subsidiaries. Although KPMG had instructed the PRC Subsidiaries to retain copies of all such bills, the PRC Subsidiaries provided KPMG with copies of only six bills. Of these six, five were issued by entities (the "bill issuers") other than the PRC Subsidiaries' customers, yet the PRC Subsidiaries had listed the customers' names on the bank deposit slips instead of the bill issuers' names, in an effort to conceal the fact that the bills were not actually issued by the customers with whom the PRC Subsidiaries claimed to have done business. When KPMG performed background checks on the bill issuers, it determined that three of them ***had no offices*** at their registered business addresses (including one whose business address was the home address of an executive of one of the PRC Subsidiaries and was also the registered business address of another entity controlled by Chen). The registered business address of a fourth bill issuer was ***a hotel room in a hotel that KPMG was unable to locate***.

d. KPMG tried to perform a site visit to Beijing Xiling, for which the Company had recorded RMB 15.5 million of sales in 2010, making it the Company's second largest customer. KPMG found that the company had ***no offices*** at the address typed on the sales invoices issued to it. The gatekeeper at that building advised KPMG that Beijing Xiling had moved its office out of the building ***5-6 years earlier***. ShengdaTech management then provided a different Beijing Xiling address to KPMG for

sales confirmation purposes, but KPMG found that this address was registered to an entity other than Beijing Xiling.

65. On March 9, 2011, KPMG informed the Audit Committee in writing that it had "become aware of information indicating that an illegal act has or may have occurred" in relation to the matters communicated by KPMG the previous week.

66. On March 14, 2011, KPMG informed the Audit Committee by telephone of additional matters that it had discovered, involving irregularities in customer confirmations and bank confirmations. According to a written report that KPMG later sent to the Audit Committee to memorialize that discussion:

a. KPMG had received another communication directly from one of the customers whose purchases KPMG had sought to confirm. That customer, Jiangsu Libao, stated that it had purchased ***nothing*** from the Company in 2010. By contrast, the Company's books, as well as the written confirmations KPMG had received in response to an inquiry sent to the address provided by Company management, indicated that the Company sold RMB 7,850,769 in goods to this customer during 2010.

b. On March 9, 2011, KPMG had received information from the Bank of China, Tai'an Branch, indicating that the Company's account balance as of December 31, 2010 was RMB 89,949.48 (USD $67.61) – only a tiny fraction of the RMB 13,282,581.99 (USD $50,054.18) balance shown on the Company's books for this bank branch as of December 31, 2010.

67. On March 17, 2011, KPMG informed the Audit Committee that it had uncovered the following additional irregularities, as memorialized in a document prepared by KPMG with the title "Additional matters communicated to the Audit Committee":

a. When KPMG tried to confirm the Company's accounts payable balances with Xianyang Chuangfa and Xingtai Guangfa, two of the Company's top ten suppliers (primarily for coal) in 2010, ShengdaTech management informed KPMG that the suppliers would not agree to site visits. KPMG then independently contacted Xianyang Chuangfa and was told that Xianyang Chuangfa had no balances with the Company and

had not done any business with the Company for a long time, other than sending some samples to Shaanxi Haize in 2006 or 2007. KPMG attempted to contact Xingtai Guangfa but was unable to find a working phone number for that entity.

b. KPMG received an email, purportedly from the Agricultural Bank of China, Qianxian Branch, confirming the account balance of RMB 553,062,048.83 as reported in the Company's books as of December 31, 2010. However, when KPMG contacted the bank branch by telephone, they were told that the branch had never received KPMG's confirmation request, and that the Company's reported balance could not possibly be correct because the total of ***all*** business accounts maintained at this branch was only about RMB 200 million. The bank declined to provide KPMG with the correct balance.

c. KPMG contacted China Merchants Bank ("CMB") – Jinan Branch to try to confirm the Company's recorded account balance of USD $73,118,638.32 as of December 31, 2010. KPMG was informed that this was an offshore account, and therefore any confirmation and chop would have to come from the Shenzhen Head Office – Offshore Department. The confirmations KPMG had received for the year-end bank balances for 2008 and 2009, however, had each borne the chop from the Jinan Branch and had arrived in envelopes from the Jinan Branch.

d. KPMG selected six copies of VAT invoices that it had received from the Company, and checked them against the information posted by the National Taxation Bureau of Shangdong ("NTBS").[5] On the two invoices relating to product sales by the Company, the name of the seller/issuer on the VAT invoice copies did not match the issuer's name in the NTBS online system. On the four invoices relating to purchases made by the Company, the name of the service provider/issuer on the invoices did not match the issuer's name in the online system.

[5] VAT is the basis of the taxation system in the People's Republic of China and is the major source of fiscal revenue for the Chinese government. In essence, those who sell merchandise, provide processing, repairing, or assembling service, or import goods within the territory of the People's Republic of China are required to pay tax on the added value derived from their sales or services.

68. The discrepancies described above in paragraphs 64-67 were uncovered by KPMG during its audit of the 2010 Financial Statements, and therefore they primarily (though not entirely) relate to the 2010 Financial Statements. However, those discrepancies were uncovered only as a result of additional scrutiny that the Audit Committee insisted be applied in light of the unusually high number of confirmation responses during the audit of the 2009 Financial Statements. As discussed below, the Special Committee's investigation has revealed that the 2007 Financial Statements that were published in ShengdaTech's Forms 10-K and in the Offering Memoranda for the Notes, as well as the 2008 and 2009 Financial Statements, were materially false and suffered from discrepancies similar to those in the 2010 Financial Statements.

69. In response to the discovery of discrepancies concerning the Company's bank account balances, the Special Committee sought to implement a cash control plan, under which all of the Company's cash assets would be transferred into accounts over which the Audit Committee would have signature authority. The Special Committee experienced trouble implementing the cash control plan when the PRC Subsidiaries' banks indicated that they would require the authorization of ShengdaTech's management – namely, Chen. Despite opposition from Chen, two Special Committee members were eventually named signatories under the cash control plan. However, Chen transferred ***only about $14 million*** from the PRC Subsidiaries' and Faith Bloom's accounts into the cash control account – a far cry from the $110-plus million in cash that ShengdaTech had reported having in its most recent financial statements.

70. When questioned by the Special Committee about the location of the remaining funds, Chen claimed that certain of the Company's cash was tied up in certificates of deposit ("CDs") and that he was in the process of negotiating their liquidation. The Special Committee was unable to verify the existence or authenticity of these CDs. Chen provided the Special Committee with photocopies of what purported to be $65 million worth of CDs, but he was unresponsive to requests for further information. The Special Committee subsequently learned that the bank that purportedly issued the CDs was unable to verify them and, in fact, had no record of issuing them to the ShengdaTech subsidiary (Faith Bloom) that reportedly held them.

71. The Special Committee also uncovered that ShengdaTech had materially overstated its sales figures by, among other things, reporting fictitious transactions. When the Special Committee's advisors directly contacted certain of the PRC Subsidiaries' customers and vendors as part of their internal investigation – a step Hansen (and KPMG) obviously never took during their audits – they discovered that the 2007, 2008 and 2009 Financial Statements that were reported in the Company's Forms 10-K and in the Offering Memoranda for the Notes reflected numerous transactions that had never actually taken place. For example:

a. Six customers told the Special Committee's accounting advisor, PricewaterhouseCooopers LLP ("PwC"), that they had never purchased ***anything*** from Shaanxi Haize (and three of them had never even heard of that entity), yet the Company's reported sales figures that were reported in the Company's Forms 10-K and in the Offering Memoranda for the Notes included sales by Shaanxi Haize to each of these six customers in 2006 through 2007. These phantom sales included over RMB 15 million in 2006 and approximately RMB 57 million in 2007.

b. Another customer stated that it never received an invoice in excess of RMB 100,000 from Shaanxi Haize, and that the total invoices it received each year from that entity were around RMB 700,000 or 800,000. ShengdaTech's records, however, showed invoices from Shaanxi Haize to this customer totaling RMB 9,420,500 in 2007, and each of the individual invoices for these years was in excess of RMB 100,000.

c. Another customer stated that it had been purchasing from Shaanxi Haize since 2007 at an average rate of RMB 500,000 or 600,000 per year. The Company's reported sales for 2007, however, included sales from Shaanxi Haize to this customer of RMB 10,577,300.

72. The Special Committee's investigation thus revealed that the sales figures reported in ShengdaTech's 2007 Financial Statements, which were published in the Company's Forms 10-K and in the Offering Memoranda for the Notes and which were audited by Hansen, were overstated by at least RMB 75 million in 2007 (equivalent to more than $10.2 million based on the exchange rate as of December 31, 2007).

73. During its investigation, the Special Committee also discovered fake "chop"[6] templates on the Company's computers for eleven entities with which the Company claimed to have done business, indicating that Company employees were falsifying transaction documents and/or confirmations and passing them off to the auditors as legitimate. Hansen's audit procedures should have included procedures reasonably designed to verify the authenticity of the chops accompanying the confirmation replies and other documents that purported to have been generated by the PRC Subsidiaries' counterparties. Hansen failed to perform such procedures.

74. The Special Committee's investigation further revealed that ShengdaTech's bank accounts held substantially less cash than what was reported in its financial statements. For example, according to bank statements the Special Committee obtained from the various banks in which the Company and its subsidiaries (Faith Bloom and the PRC Subsidiaries) held accounts, those accounts contained less than $68.5 million as of December 31, 2008, and less than $35.9 million as of December 31, 2009 – far short of the $114.3 million and $116 million in cash and cash equivalents that were reported in the 2008 Financial Statements and 2009 Financial Statements, respectively, that were included in the Company's Forms 10-K and the Offering Memoranda for the Notes. Thus, the Company's cash asset balances were overstated by approximately 67% in 2008 and 223% in 2009. Although the Special Committee's attempts to confirm bank account balances did not extend back to 2007, it is reasonable to conclude that the Company's cash asset balances were similarly overstated in the 2007 Financial Statements that appeared in the Company's Forms 10-K and the Offering Memoranda for the Notes, particularly given the evidence described above indicating that the Company's falsification of sales was occurring throughout 2006-2007, as well as the fact that Chen was the Company's CEO throughout that period.

75. Based upon what KPMG found during its audit of the 2010 Financial Statements, and what the Special Committee's subsequent investigation revealed, it is clear that ShengdaTech management was materially misstating the Company's financial results throughout

[6] A "chop" is a stamp imprinted with a unique composition of Chinese characters, which is akin to a corporate seal and is used in lieu of a signature.

the Loss Period and disseminating these falsified results to investors in its Forms 10-K and Offering Memoranda, and that Hansen could have readily discovered this by sending confirmation requests to ShengdaTech's banks and transaction counterparties directly and taking steps to ensure that ShengdaTech management did not interfere with the confirmation process, as required by GAAS.[7] Indeed, that is precisely what KPMG did during its audit of the 2010 Financial Statements (at the behest of the Audit Committee) that led to the misstatements being revealed. Hansen failed to take these basic steps.

76. Based on the Special Committee's findings, the ShengdaTech Liquidating Trust – which was created as part of the Company's bankruptcy proceedings and holds title to all causes of action belonging to ShengdaTech – brought suit against Hansen for professional malpractice, among other claims, based on Hansen's audit of the 2007 Financial Statements. *See ShengdaTech Liquidating Trust v. Hansen, Barnett & Maxwell, et al.*, Adv. No. 13-05046-btb (Bankr. D. Nev.) (filed on August 15, 2013) (the "Trust Action").

**D. ShengdaTech's Form 10-K Filings And Offering Memoranda Contained Material False And Misleading Statements**

77. Though Plaintiffs had no way of knowing it at the time they purchased the Notes during the Loss Period, the documents upon which they relied in making those purchases – ShengdaTech's Form 10-K filings and Offering Memoranda – contained material false statements and omitted material facts. The false and misleading statements in the Form 10-K filings and Offering Memoranda included an unqualified audit opinion by Hansen on the Company's 2007 Financial Statements, stating: (a) that it had conducted its audits "in accordance with the standards of the Public Company Accounting Oversight Board (United States)," (b) that those financial statements "present[ed] fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries … and the results of their operations and

[7] *See* paragraphs 100-108, *infra*, for a discussion of how Hansen's confirmation procedures violated GAAS, including provisions requiring auditors to: "establish[] direct communication [with] the intended recipient … to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests and responses" (AU § 330.28) and "perform[] procedures to verify that the confirmation is being directed to the intended recipient" (AU § 9330.04).

cash flows … in conformity with [US GAAP]," and (c) that the Company maintained effective internal controls over financial reporting. All of these statements were highly material to Plaintiffs, as they gave Plaintiffs comfort that they could rely on the Company's financial statements when deciding whether to invest in the Notes, and when evaluating the Company's ability to repay the Notes.

78. Hansen's unqualified audit opinion on the Company's 2007 Financial Statements and internal controls was false because Hansen's audit was *not* conducted "in accordance with the standards of the Public Company Accounting Oversight Board (United States)" – *i.e.*, U.S. GAAS – and because ShengdaTech's 2007 Financial Statements did *not* present the Company's financial position and results fairly, in all material respects, in conformity with U.S. GAAP. To the contrary, those financial statements materially misrepresented the Company's financial position and results in violation of GAAP, and Hansen's audit violated GAAS in a number of significant respects. Additionally, the Company at all times failed to maintain effective internal controls over financial reporting – a condition that Hansen should have known to exist. Given Hansen's GAAS violations and the red flags that it chose to ignore, Hansen had no reasonable basis to believe – much less to represent to Plaintiffs – that the Company's financial statements complied with GAAP or that it maintained effective internal controls.

79. SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP. Financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1). Some of the GAAP principles that were applicable to ShengdaTech during the Loss Period include:

a) that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Financial Accounting Standards Board Statements ("FASB") Statement of Concepts No. 1, ¶ 40);

b) that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

c) that financial reporting should provide information about how management of an enterprise has discharged its stewardship

responsibilities to owners for the use of enterprise resources entrusted to it – to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

d) that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

e) that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶¶ 79, 80).

80. As discussed in more detail below, ShengdaTech's 2007 Financial Statements violated the foregoing GAAP principles and SEC regulations because, *inter alia*, they provided inaccurate information about ShengdaTech, its resources, and the claims against those resources; omitted information that was material to the investment and credit decisions of present and prospective investors and creditors; and presented information that was neither reliable nor complete.

**1. The 2007 10-K/A and the 6.0% Notes Offering Memorandum**

81. The 2007 10-K/A and the 6.0% Notes Offering Memorandum each included the Company's 2007 Financial Statements, which reported, *inter alia*, cash and cash equivalents of $26,366,568; total assets of $100,943,938; sales of $100,654,793; and net income of $27,030,345.

82. The investigation conducted by the Special Committee and PwC revealed that the Company's reported sales for 2007 included at least RMB 75 million (equivalent to more than $10.2 million) of phony sales, representing an overstatement of 2007 sales by over 11%, based on PwC's review of invoices from only eight customers for 2007. The total overstatement of 2007 sales was likely even greater. The Company's net income was likewise materially overstated, by virtue of the inflation of its sales figures.

83. The Company's cash and total asset figures were likewise materially overstated in the 2007 Financial Statements. This is evidenced by, *inter alia*: (1) the material disparities between the Company's reported bank balances and the bank balances that the Special

Committee obtained directly from the banks for the years 2008 and 2009; (2) the Special Committee's discovery that the Company's management had been inflating the Company's sales figures every year since 2006 by reporting millions of RMB in phony sales to numerous entities that either purchased nothing from the Company, or purchased substantially less than what management claimed; (3) the strong probability that if management was inflating its sales by reporting fictitious transactions in 2007, the inflation of assets that was occurring in 2008 and 2009 was likewise occurring in 2007; and (4) the fact that the ShengdaTech Liquidating Trust, which holds title to all legal claims belonging to ShengdaTech, filed a lawsuit against Hansen alleging that "the Special Committee determined that ShengdaTech's bank accounts contained substantially less money in 2007-2009 than was reported in the [2007-2009] Financial Statements …" and that "Hansen negligently failed to discover that the 2007 Financial Statements … were inaccurate and/or misleading, and that ShengdaTech management was diverting corporate funds to non-corporate uses." *ShengdaTech Liquidating Trust v. Hansen, Barnett & Maxwell, et al.*, Adv. No. 13-05046-btb, Complaint at ¶¶ 62, 103 (Bankr. D. Nev.) (filed on August 15, 2013).

84. Because the 2007 Financial Statements materially overstated ShengdaTech's cash, total assets, sales, and net income, they violated GAAP and were false and misleading.

85. In accordance with its engagement letter, Hansen reviewed the 2007 10-K/A and the 6.0% Notes Offering Memorandum before they were disseminated, and consented to the inclusion in both documents of its March 14, 2008 audit opinion on ShengdaTech's 2007 Financial Statements. Hansen's opinion stated, in pertinent part:

> We have audited the accompanying consolidated balance sheets of ShengdaTech Inc. and subsidiaries (the Company) as of December 31, 2007 … and the related consolidated statements of income and comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2007. We also have audited the Company's internal control over financial reporting as of December 31, 2007 based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)....

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of the financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements….

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007 … and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, Shengdatech Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2007***, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of

> Sponsoring Organizations of the Treadway Commission (COSO)….

(emphasis added).

86. Hansen's audit report was materially false and misleading because, as evidenced by the Special Committee's investigation: the 2007 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and, as discussed in more detail below, Hansen did not conduct its audits in accordance with the standards of GAAS and the Public Company Accounting Oversight Board ("PCAOB") and therefore lacked a reasonable basis for its opinions concerning the Company's 2007 Financial Statements and internal controls.

**2. The 2008 10-K**

87. On April 1, 2009, ShengdaTech filed the 2008 10-K with the SEC. Like the 6.0% Notes Offering Memorandum, the 2008 10-K included the Company's 2007 Financial Statements, which materially overstated the Company's cash, total assets, net sales, and net income figures, as described above.

88. Hansen consented to the inclusion of its audit opinion concerning the Company's 2007 Financial Statements in the 2008 10-K, stating that the Company's 2007 Financial Statements presented fairly, in all material respects, ShengdaTech's financial position in accordance with GAAP:

> We have audited the accompanying consolidated balance sheet of Shengdatech Inc. and subsidiaries (the Company) as of December 31, 2007, and the related consolidated statements of income, shareholders' equity and comprehensive income and cash flows for each of the two years in the period ended December 31, 2007….
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audits provide a reasonable basis for our opinions.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Shengdatech Inc. and subsidiaries as of December 31, 2007, and the results of their operations and their cash flows for each of the two years in the period ended December 31, 2007 in***

> ***conformity with accounting principles generally accepted in the United States of America.***

(emphasis added).

89. The foregoing statements by Hansen were materially false and misleading because, as the Special Committee determined in its investigation, the 2007 and 2008 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately, and because Hansen did not conduct its audit in accordance with the standards of GAAS and the PCAOB. Because Hansen did not conduct a GAAS-compliant audit, it lacked a reasonable basis for its statements that the Company's 2007 Financial Statements presented the Company's financial position fairly and accurately in accordance with GAAP, and as a result its unqualified audit opinion was materially false and misleading.

**3. The 2009 10-K and 2009 10-K/A**

90. On March 15, 2010, ShengdaTech filed its 2009 10-K with the SEC. The 2009 10-K included the Company's Consolidated Statements of Income for the year ended December 31, 2007, which reported, *inter alia*, net sales of $46,721,673 and net income of $27,030,345. Subsequently, on September 15, 2010, ShengdaTech filed its 2009 10-K/A with the SEC, reporting the same financial results as the 2009 10-K.

91. With Hansen's consent, the 2009 10-K and 2009 10-K/A also included Hansen's audit opinion concerning the Company's Consolidated Statements of Income for 2007, which stated:

> We have audited the accompanying consolidated statements of income, shareholders' equity and comprehensive income, and cash flows of Shengdatech Inc. and subsidiaries (the Company) as of December 31, 2007.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)…. We believe that our audits provide a reasonable basis for our opinion.
>
> ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations of Shengdatech Inc. and subsidiaries and their cash***

> ***flows for the year ended December 31, 2007 in conformity with U.S. generally accepted accounting principles.***

(emphasis added).

92. The foregoing statements by Hansen were materially false and misleading because, as the Special Committee determined in its investigation, the 2007 Financial Statements (which included the Consolidated Statements of Income) violated GAAP and did not present the Company's operational results fairly or accurately, and because Hansen did not conduct its audit in accordance with the standards of GAAS and the PCAOB. Because Hansen did not conduct a GAAS-compliant audit, it lacked a reasonable basis for its statements that the Company's 2007 Consolidated Statements of Income presented the Company's results of operations fairly and accurately in accordance with GAAP, and as a result its unqualified audit opinion was materially false and misleading.

**4. The 6.5% Notes Offering Memorandum**

93. The 6.5% Notes Offering Memorandum included the Company's 2007 Financial Statements, which reported, *inter alia*, cash of $26,366,568; total assets of $100,943,938; net sales of $46,721,673; and net income of $27,030,345. As described above, the 2007 Financial Statements were false and misleading and violated GAAP because they materially overstated the Company's cash, total assets, sales, and net income.

94. In accordance with its engagement letter, Hansen reviewed the 6.5% Notes Offering Memorandum before it was disseminated, and consented to the inclusion of its March 14, 2008 audit opinion on the Company's 2007 Financial Statements in that document. Hansen's statements in that audit opinion were materially false and misleading because, as described above: the 2007 Financial Statements violated GAAP and did not present the Company's financial position fairly or accurately; ShengdaTech's internal controls over financial reporting were severely deficient; and Hansen did not conduct its audits in accordance with the standards of GAAS and the PCAOB. Further, because Hansen failed to conduct a GAAS-compliant audit, it lacked a reasonable basis for its opinion that the Company's financial statements presented the

Company's financial position fairly and accurately, and its unqualified audit opinion, accordingly, was materially false and misleading.

**E. Hansen Failed To Conduct Its Audit In Accordance With GAAS And PCAOB Standards**

95. The federal securities laws require public companies to have annual audits conducted by outside audit firms. The reason for this requirement is to provide an independent "check" on the conduct of company management, and to provide investors with a level of comfort that a company's financial condition and results are not being misrepresented by management. In order to provide that comfort, audits are required to be conducted in accordance with the standards of the PCAOB.

96. Hansen, as auditor of a U.S. public company, was therefore required to perform its audits in accordance with the PCAOB standards, and indeed its audit opinion stated that it had done so. The PCAOB standards, in turn, required Hansen to perform its audit services in accordance with United States GAAS, which include various auditing standards issued by the American Institute of Certified Public Accountants.[8] The PCAOB standards permitted Hansen to issue unqualified opinions on ShengdaTech's financial statements ***only if*** the financial statements were fairly presented in accordance with GAAP.

97. Hansen was fully aware at all relevant times that its audit reports would be reviewed and relied upon by investors and potential investors in ShengdaTech. Indeed, Hansen expressly consented to the inclusion of its audit report in the Company's Form 10-K filings and in the Offering Memoranda for ShengdaTech's Notes, knowing that those documents – and their own assurances of the financial statements' compliance with GAAP – would form the basis for investors' decisions about whether to purchase the Notes. Under the circumstances, Hansen assumed a special duty to Plaintiffs and others who purchased the Notes in the Offerings to issue its audit reports and opinions in a careful and non-negligent fashion in compliance with GAAS

[8] These AICPA standards are sometimes referred to herein as "AU" standards. References herein to particular AU standards or other GAAS provisions are to the provisions that applied to the audits at issue in this litigation. Some of those provisions have been subsequently amended and/or superseded.

and PCAOB standards. Had Hansen done so, it would have known that the Company's financial statements were materially false and would have either demanded that the Company report the correct numbers, or refused to issue unqualified audit opinions.

98. Instead, as described in detail below, Hansen fell down on the job and violated numerous GAAS standards. As a result, it had no reasonable basis upon which to form the opinions expressed in its audit report concerning the Company's internal controls and whether the Company's 2007 Financial Statements were fairly presented in accordance with GAAP. The ShengdaTech Liquidating Trust, which holds title to all legal claims belonging to ShengdaTech, has acknowledged that the 2007 Financial Statements violated GAAP and has sued Hansen for malpractice and failure to comply with GAAS and the PCAOB standards in its audit of those financial statements.

99. Because Plaintiffs do not have access to a full set of Hansen's audit workpapers, they have no way of identifying every respect in which Hansen's audit failed to comply with GAAS. However, the facts uncovered to date indicate a number of GAAS violations. Below is a summary of some provisions of GAAS that Hansen failed to follow.

**1. Hansen Violated GAAS By Failing To Plan And Execute Appropriate Confirmation Procedures**

100. For the audit year in question, GAAS Standard of Fieldwork No. 3 required an auditor to obtain "[s]ufficient competent evidential matter . . . through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU §§ 150.02, 326.01. A critical component of obtaining "sufficient competent evidential matter" is the design and execution of a process whereby the auditor obtains independent third party confirmation of financial statement assertions made by management, because GAAS recognizes that "[w]hen evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability … than that secured solely within the entity." AU §§ 326.21, 330.06.

101. Under GAAS, auditors must affirmatively perform the following steps in completing a confirmation: (i) select items for which confirmations are to be requested; (ii)

design the confirmation request; (iii) communicate the confirmation request to the appropriate third party; (iv) obtain responses from the third party; and (v) evaluate the information, or lack thereof, provided by the third party about the audit objectives, including the reliability of the information. AU § 330.04. "The auditor should direct the confirmation request to a third party who the auditor believes is knowledgeable about the information to be confirmed." AU § 330.26.

102. In evaluating responses to confirmation requests, auditors must "assess whether the evidence provided … reduces audit risk for the related assertions to an acceptably low level." AU § 330.09. "The auditor's consideration of the reliability of the information obtained through the confirmation process to be used as audit evidence includes consideration of the risk[] that … the information obtained may not be from an authentic source; … or the integrity of the information may have been compromised." AU § 9330.03. If the responses to the auditor's confirmation requests are deemed insufficient, the auditor must perform additional procedures and then determine whether the combined evidence provided by the confirmations and the alternative procedures provides sufficient audit evidence. AU §§ 330.09, 330.33.

103. Significantly, AU Section 330.28 requires that auditors take steps to prevent management from interfering with or tainting the confirmation process:

> During the performance of the confirmation procedures, ***the auditor should maintain control over the confirmation requests and responses***. Maintaining control means ***establishing direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses***.

(emphasis added).

104. The GAAS requirement of "maintaining control" over the confirmation process "includes performing procedures to verify that the confirmation is being directed to the intended recipient." AU § 9330.04. "For example, just as the auditor might perform procedures to verify the physical address of a recipient for a confirmation to be sent through the postal service, the

auditor would perform similar procedures to verify the email address supplied by the auditor's client for a confirmation request to be sent to that recipient's email address." *Id.*

105. Hansen violated GAAS by failing to properly plan and conduct confirmations of the Company's assets, sales and purchases; by failing to maintain control over the confirmation process, including failing to verify the addresses provided by management before sending the confirmation requests to those addresses; by failing to adequately assess the risk of error and reliability of information received from unqualified and untrained employees at ShengdaTech (as described more fully below in paragraphs 111-112); and by failing to perform additional procedures to obtain competent audit evidence of the Company's reported cash assets, sales, and net income. As alleged herein, it is clear from what KPMG discovered when it performed more fulsome confirmation procedures during the 2010 Financial Statement audit (after the Audit Committee directed it to do so) that ShengdaTech management was providing fake addresses for its auditors to use when sending confirmation requests and/or was intercepting or misdirecting those confirmation requests, and that ShengdaTech managers were causing falsified responses to be sent to the auditors. For example, numerous customers, suppliers and banks from which KPMG had received confirmation responses for the 2010 Financial Statement audit later told KPMG that they had not sent those responses, and that the information in the responses was nowhere close to being accurate.

106. Management's interference with the confirmation process began as early as 2006 and was not detected because Hansen failed to comply with GAAS. This is evidenced by, for example:

a. The Special Committee's communications with purported ShengdaTech customers, which revealed, *inter alia*, that: six customers to whom a Company subsidiary had recorded over RMB 190 million in sales during the period from 2006 to 2009, including RMB 15 million in 2006 and RMB 57 million in 2007, had never purchased anything from that subsidiary; another customer had been purchasing from ShengdaTech since 2007 at an average rate of RMB 500,000 to RMB 600,000 per year and yet ShengdaTech's financial statements included sales to this customer of RMB 10,577,300

in 2007; and another customer had purchased only about RMB 700,000 to 800,000 from ShengdaTech per year while the Company claimed to have RMB 9,420,500 in sales to this customer in 2007 – discrepancies that Hansen would have easily discovered if it had conducted a GAAS-compliant confirmation process during its audit of the 2007 Financial Statements and the discovery of which could have forestalled management's financial misstatements from occurring in each of the subsequent audit years;

b. KPMG's discovery in 2011 that the entity ShengdaTech claimed was its second largest customer did not have an office at the address listed on ShengdaTech's bills, and had moved out of that address ***5-6 years*** earlier – a fact that Hansen would have discovered if it had sent confirmations to that address during its audit of the 2007 Financial Statements; and

c. The Special Committee's discovery in 2011 that the bank that had purportedly issued $65 million in CDs to Faith Bloom had no record of those CDs – a fact that would have been readily discovered in 2007 had Hansen sent appropriate confirmations to the bank.

107. Had Hansen complied with GAAS, including maintaining proper control over the confirmation process during the 2007 Financial Statement audit, it would have discovered, *inter alia*, vast disparities in bank account balances, fictitious sales to phantom clients, and/or the proffering of phony certificates of deposit by ShengdaTech management. Any one of these discoveries should have prompted Hansen to refuse to issue an unqualified audit opinion on the Company's financial statements and to refuse to have consented to the inclusion of these unqualified audit opinions in the Company's Form 10-K filings and in the Offering Memoranda. Without an unqualified audit opinion by Hansen, ShengdaTech could not have issued the Notes.

108. Because of its failure to conduct a GAAS-compliant confirmation process, Hansen did not identify material misstatements in the 2007 Financial Statements, and it lacked a reasonable basis for its unqualified audit opinion concerning the Company's 2007 Financial Statements and internal controls.

### 2. Hansen Violated GAAS By Failing To Detect And/Or Address ShengdaTech's Lack Of Internal Financial Expertise, Lack of Internal Audit Function, And Material Weaknesses In Internal Controls Over Financial Reporting

109. GAAS requires auditors to make an overall assessment of the risk of material misstatement when planning their audits, and to "design and perform … audit procedures whose nature, timing, and extent are responsive to the assessed risks of material misstatement." AU §§ 318.07, 322.15. In making their risk assessments, auditors must obtain a sufficient understanding of the company and its internal control structure to plan an effective audit. AU §§ 150.02, 319. "Internal Control" is defined as a process "designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations." AU § 319.06.

110. The presence of an independent internal audit function within a company is an important internal control, whose existence (or non-existence) should be considered by the auditor when determining the nature, timing and extent of auditing procedures to be performed. AU § 322.01.

111. From 2006 through the first half of 2008, the time that Hansen was ShengdaTech's auditor, the Company did not have an internal audit function. In December 2007, ShengdaTech resolved to outsource its internal audit function to ShengdaGroup (a company owned and controlled by Chen), for one quarter only, through March 2008. As of June 25, 2008, the Company had still not hired an internal auditor.

112. In August 2008, the Board authorized the retention of Ernst & Young ("E&Y") to perform the internal audit function. By September 2008, E&Y had already identified and discussed with the Board's Audit Committee that a "severe lack of experienced/trained people in [ShengdaTech's] accounting department" was a key issue requiring corrective action. At all times relevant to the 2007 audit year, the Company's accounting and finance departments were composed of inexperienced personnel who were untrained and lacked basic understanding regarding US GAAP and SEC reporting requirements. ShengdaTech likewise utilized outdated

financial reporting systems that were not equipped to handle relevant changes in PRC accounting standards and US GAAP reporting requirements.

113. Hansen was negligent in failing to recognize, and failing to adjust its audit and review procedures to take into account, the lack of sophistication in ShengdaTech's accounting and finance departments and the fact that ShengdaTech did not have an internal audit function during 2007 or much of 2008. Because an internal audit function is an important safeguard against misstatements of financial results, Hansen should have been particularly vigilant in investigating the accuracy of management's representations and the Company's reported financial results during the period when no such function existed. This responsibility for vigilance was further heightened by the lack of qualifications and expertise in the Company's own accounting and finance ranks, which enhanced the risk of misstatements.

114. In November 2008, shortly after the Company retained E&Y to perform the Company's internal audit function, ShengdaTech's Audit Committee fired Hansen and retained KPMG to serve as the Company's outside auditor. The Audit Committee expected that KPMG would scrutinize the Company's internal controls more thoroughly than Hansen had done, as one of its members noted in an October 2008 memo that "[a] Big 4 firm will test deeper and be much less flexible on IC [internal control] issues; could lead to required disclosures of Material or Substantial IC weaknesses that could possibly have been remediated to [Hansen's] satisfaction."

115. Chen likewise expected that KPMG would test much deeper than Hansen had done in previous years. Fearing that the change of auditors would lead to discovery of his defalcations, soon after the KPMG engagement agreement was signed, Chen began lobbying the Audit Committee to go back to a smaller auditor like Hansen. The Audit Committee would not accede to Chen's request to abandon ShengdaTech's contract with KPMG.

116. From the outset of its engagement, KPMG was alerted to problems with the Company's financial reporting. Within a few months after it was retained, KPMG reported that it had found material weaknesses in the Company's internal controls. KPMG's March 31, 2009 report on its audit of ShengdaTech's internal controls for the year 2008 stated, *inter alia*:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that

> there is a ***reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected*** on a timely basis. ***Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.***
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.
>
> ***In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008***, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(emphasis added).

117. The fact that "material weaknesses" existed and were uncovered by a new auditor within mere months of its retention, coupled with the fact that ShengdaTech was later revealed to have falsified transaction documents and misstated such basic information as the Company's cash balances and its sales and payments to third parties, demonstrate that such weaknesses existed during Hansen's audit of ShengdaTech's 2007 Financial Statements, and that Hansen was negligent in issuing an unqualified audit opinion on those financial statements and on ShengdaTech's internal controls as of December 31, 2007 and in consenting to the inclusion of this unqualified audit opinion in the Company's Form 10-K filings and Offering Memoranda.

### 3. Hansen Violated GAAS By Failing To Account For Risks Associated With ShengdaTech's Operations In China

118. The fact that ShengdaTech's five operating subsidiaries were all located in China posed a heightened danger of fraud. AU 316.85A.2 provides that auditors should consider fraud risk where "[s]ignificant operations [are] located or conducted across international borders in jurisdictions where differing business environments and cultures exist." That risk was particularly great with ShengdaTech, which – as Hansen knew – was formed through a reverse merger process, and therefore entered the U.S. capital markets without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors. Because of this, the role of the outside auditor assumes special importance at "reverse merger" companies, as the audit opinion is the primary safeguard against fraudulent financial reporting.

119. In recent years, many China-based companies that have accessed the United States capital markets through reverse mergers have come under scrutiny by the SEC, the securities exchanges on which they are listed, and the investing public because of accounting issues and fraudulent representations concerning the companies' financial performance and liquidity. All too often, these companies' auditors failed to follow the appropriate procedures and precautions when conducting their audits, and issued unqualified audit opinions notwithstanding the existence of serious internal control deficiencies and non-compliance with GAAP.

120. ShengdaTech is a prime example of a reverse-merger company whose auditors failed to fulfill their duties of ensuring that truthful and accurate information was presented to the investing public. Hansen knew that ShengdaTech was a Chinese company formed through a reverse-merger transaction, and given the inherent lack of regulation involved in such transactions, Hansen should have been on heightened alert to the possibility of fraud. Hansen's violations of GAAS, as described herein, make clear that it was not, and that it accorded undue deference to management's representations.

121. Hansen also missed an easy opportunity to detect the misstatements in the 2007 Financial Statements when it failed to compare those financial statements to the financial results

the PRC Subsidiaries reported to the Chinese Administration of Industry and Commerce (the "AIC"). Because the PRC Subsidiaries were owned by a foreign company (*i.e.*, ShengdaTech), their AIC submissions were required to be audited. These AIC filings also were required to be signed by a legal representative attesting that "the content of the submitted company's annual inspection report is true." A competent auditor would have obtained and reviewed the PRC Subsidiaries' AIC filings as a crosscheck of what ShengdaTech was reporting to the SEC.

122. The results ShengdaTech reported to the AIC so materially diverged from what was reported to the SEC as to constitute the proverbial "two sets of books." These discrepancies were sufficiently large that they cannot be "explained away" as the result of differences between reporting standards between the AIC and the SEC. Had Hansen reviewed these AIC filings, it would have readily noted these material discrepancies.

## VI. LOSS CAUSATION

123. As described herein, Hansen made or caused to be made a series of materially false or misleading statements about ShengdaTech's financial condition and the adequacy of its financial controls. These material misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects, and operations, thus creating a market for the Notes and causing the Notes to be overvalued and artificially inflated at all times relevant hereto.

124. Hansen's materially false and misleading statements resulted in Plaintiffs and the Damaged Funds purchasing or otherwise acquiring Notes that would never have come into the market but for the false statements or, at a minimum, would have come into the market at substantially lower prices and/or on terms far more favorable to investors. But for Hansen's misrepresentations, Plaintiffs and the Damaged Funds would not have purchased the Notes at all, or would not have purchased them on the terms and at the artificially inflated prices at which they entered the market.

125. As the truth about ShengdaTech began to be revealed, the inflation caused by Hansen's misrepresentations was eliminated from the price of the Notes and ShengdaTech defaulted on the Notes, causing damages to the Damaged Funds. Having purchased the Notes at

or near par value, the Damaged Funds are now left holding Notes worth only a small fraction of what was paid for them, if indeed they have any value at all. ShengdaTech's Plan of Reorganization has been confirmed by the Bankruptcy Court, and to date Plaintiffs and the Damaged Funds have recovered nothing on the Notes.

126. Plaintiffs and the Damaged Funds purchased Notes in the offerings and in the secondary market at or near par, and in many cases above par value. The Notes prices fell precipitously in response to the revelations of the financial irregularities at ShengdaTech. After trading at or above $96 during the two weeks ended March 11, 2011, the 6.5% Notes fell to price of approximately $82 the following week. The price declined into the $70 range in May 2011, and by mid-June 2011 the 6.5% Notes were trading at less than $20.

127. ShengdaTech defaulted on both the 6.0% Notes and the 6.5% Notes. Its default on the Notes was caused, in substantial part, by the revelation that ShengdaTech's financial statements for 2007-2009, which were incorporated in the Offering Memoranda for the Notes along with Hansen's audit opinions on the 2007 Financial Statements, were materially false and unreliable, and that the Company did not actually possess all of the assets reflected on its financial statements.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

128. On March 15, 2012, Oaktree, LAM, Angelo Gordon, Zazove, CNH, Advent, AQR, and HFR, on behalf of themselves and the funds and accounts for whom they purchased ShengdaTech Notes (including all Damaged Funds) entered into agreements with Hansen whereby all statutes of limitations and repose for Plaintiffs' and the Damaged Funds' claims against Hansen were tolled from March 15, 2012 through the termination of the agreements. The agreements were later terminated, effective on June 6, 2012.

129. All of the claims asserted herein have been brought within the applicable statutes of limitations, after giving effect to tolling.

## VIII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 18 of the Exchange Act
### (For False Statements In The 2007 10-K/A)

130. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131. This claim is asserted against Hansen for violation of Section 18 of the Exchange Act.

132. This claim is asserted to recover damages arising from Plaintiffs' purchases of ShengdaTech Notes after March 14, 2009.

133. As set forth above, Hansen made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts in the Company's 2007 10-K/A.

134. In connection with their decisions to purchase the Company's Notes, Plaintiffs and the Damaged Funds read and relied upon the Company's 2007 10-K/A. Specifically, Plaintiffs and the Damaged Funds read and relied on the Company's 2007 Financial Statements contained in the 2007 10-K/A. Plaintiffs and the Damaged Funds also read and relied upon the unqualified audit opinion issued by Hansen in connection with the 2007 Financial Statements, in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP and that the Company maintained effective internal controls over financial reporting during that year.

135. For purposes of this Count:

a. allegations that the LAM Clients, the LAM Fund and HFR read and relied upon statements in the 2007 10-K/A refer to LAM's reading and reliance as agent on behalf of the LAM Clients, the LAM Fund and HFR;

b. allegations that the Oaktree Funds, the Oaktree Clients, and DPERS read and relied upon statements in the 2007 10-K/A refer to Oaktree's reading and reliance as agent on behalf of the Oaktree Funds, the Oaktree Clients, and DPERS;

c. allegations that AG OFCON read and relied upon statements in the 2007 10-K/A refer to Angelo Gordon's reading and reliance as agent on behalf of AG OFCON;

d. allegations that the Zazove Clients read and relied upon statements in the 2007 10-K/A refer to Zazove's reading and reliance as agent on behalf of the Zazove Clients;

e. allegations that the CNH Funds read and relied upon statements in the 2007 10-K/A refer to CNH's reading and reliance as agent on behalf of the CNH Funds;

f. allegations that the Advent Fund read and relied upon statements in the 2007 10-K/A refer to Advent's reading and reliance as agent on behalf of the Advent Fund; and

g. allegations that the AQR Funds read and relied upon statements in the 2007 10-K/A refer to AQR's reading and reliance as agent on behalf of the AQR Funds.

136. Plaintiffs and the Damaged Funds reasonably relied on these statements, not knowing that they were false or misleading, when purchasing ShengdaTech Notes after March 14, 2009.

137. When the truth began to emerge about the false and misleading statements in the Company's 2007 10-K/A, the Damaged Funds were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

138. As a direct and proximate result of Hansen's wrongful conduct, the Damaged Funds suffered damage in connection with Plaintiffs' purchases of the Notes.

139. By virtue of the foregoing, Hansen has violated Section 18 of the Exchange Act.

## SECOND CLAIM FOR RELIEF
## Violation of Section 18 of the Exchange Act
## (For False Statements In The 2008 10-K)

140. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141. This claim is asserted to recover damages arising from Plaintiffs' purchases of ShengdaTech Notes after March 14, 2009.

142. As set forth above, Hansen made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2008 10-K.

143. In connection with their decisions to purchase the Company's Notes, Plaintiffs and the Damaged Funds specifically read and relied upon the Company's 2008 10-K. Specifically, Plaintiffs and the Damaged Funds read and relied on the Company's 2007 Financial Statements contained in the 2008 10-K, as well as the unqualified audit opinion in which Hansen stated that the 2007 Financial Statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP.

144. For purposes of this Count:

a. allegations that the LAM Clients, the LAM Fund and HFR read and relied upon statements in the 2008 10-K refer to LAM's reading and reliance as agent on behalf of the LAM Clients, the LAM Fund and HFR;

b. allegations that the Oaktree Funds, the Oaktree Clients, and DPERS read and relied upon statements in the 2008 10-K refer to Oaktree's reading and reliance as agent on behalf of the Oaktree Funds, the Oaktree Clients, and DPERS;

c. allegations that AG OFCON read and relied upon statements in the 2008 10-K refer to Angelo Gordon's reading and reliance as agent on behalf of AG OFCON;

d. allegations that the Zazove Clients read and relied upon statements in the 2008 10-K refer to Zazove's reading and reliance as agent on behalf of the Zazove Clients;

e. allegations that the CNH Funds read and relied upon statements in the 2008 10-K refer to CNH's reading and reliance as agent on behalf of the CNH Funds;

f. allegations that the Advent Fund read and relied upon statements in the 2008 10-K refer to Advent's reading and reliance as agent on behalf of the Advent Fund; and

g. allegations that the AQR Funds read and relied upon statements in the 2008 10-K refer to AQR's reading and reliance as agent on behalf of the AQR Funds.

145. Plaintiffs and the Damaged Funds reasonably relied on these statements, not knowing that they were false or misleading, when purchasing ShengdaTech Notes after March 14, 2009.

146. When the truth began to emerge about the false and misleading statements and omissions in the Company's 2008 10-K, the Damaged Funds were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

147. As a direct and proximate result of Hansen's wrongful conduct, the Damaged Funds suffered damage in connection with Plaintiffs' purchases of the Notes.

148. By virtue of the foregoing, Hansen has violated Section 18 of the Exchange Act.

**THIRD CLAIM FOR RELIEF**

**Violation of Section 18 of the Exchange Act**

**(For False Statements In The 2009 10-K And 2009 10-K/A)**

149. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150. This claim is asserted to recover damages arising from Plaintiffs' purchases of ShengdaTech Notes after March 14, 2009.

151. As set forth above, Hansen made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in the Company's 2009 10-K and 2009 10-K/A.

152. In connection with their decisions to purchase the Company's Notes, Plaintiffs and the Damaged Funds read and relied upon the Company's 2009 10-K and 2009 10-K/A. Specifically, Plaintiffs and the Damaged Funds read and relied on the Company's 2007 Consolidated Statements of Income contained in the 2009 10-K and 2009 10-K/A, as well as the unqualified audit opinion in which Hansen stated that the 2007 Consolidated Statements of Income fairly presented the Company's results of operations in accordance with GAAP.

153. For purposes of this Count:

a. allegations that the LAM Clients, the LAM Fund and HFR read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to LAM's reading and reliance as agent on behalf of the LAM Clients, the LAM Fund and HFR;

b. allegations that the Oaktree Funds, the Oaktree Clients, and DPERS read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Oaktree's reading and reliance as agent on behalf of the Oaktree Funds, the Oaktree Clients, and DPERS;

c. allegations that AG OFCON read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Angelo Gordon's reading and reliance as agent on behalf of AG OFCON;

d. allegations that the Zazove Clients read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Zazove's reading and reliance as agent on behalf of the Zazove Clients;

e. allegations that the CNH Funds read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to CNH's reading and reliance as agent on behalf of the CNH Funds;

f. allegations that the Advent Fund read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to Advent's reading and reliance as agent on behalf of the Advent Fund; and

g. allegations that the AQR Funds read and relied upon statements in the 2009 10-K and 2009 10-K/A refer to AQR's reading and reliance as agent on behalf of the AQR Funds.

154. Plaintiffs and the Damaged Funds reasonably relied on these statements, not knowing that they were false or misleading, when purchasing ShengdaTech Notes after March 14, 2009.

155. When the truth began to emerge about the false and misleading statements and omissions in the Company's 2009 10-K and 2009 10-K/A, the Damaged Funds were significantly damaged by the resulting drop in the value of the Notes and the Company's default on its obligations under the Notes.

156. As a direct and proximate result of Hansen's wrongful conduct, the Damaged Funds suffered damages in connection with Plaintiffs' purchases of the Notes.

157. By virtue of the foregoing, Hansen has violated Section 18 of the Exchange Act.

**FOURTH CLAIM FOR RELIEF**
**Common Law Negligent Misrepresentation**
**(On Behalf Of Plaintiff CNH Diversified Opportunities Master Account, L.P. For False Statements In The 6.0% Notes Offering Memorandum)**

158. Plaintiff CNH Diversified Opportunities Master Account, L.P. ("CNH Diversified") repeats and realleges each of the allegations set forth above as if fully set forth herein. For the purposes of this claim, CNH Diversified expressly disclaims any claim of fraud or intentional misconduct.

159. This claim is brought by CNH Diversified against Hansen under common law principles of negligence.

160. Hansen is in the business of auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

161. Hansen expressly consented to the incorporation in the 6.0% Notes Offering Memorandum of its audit opinion on the Company's 2007 Financial Statements and its statement that the Company maintained effective internal controls over financial reporting, knowing that the 6.0% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the 6.0% Notes for the purpose of soliciting those investors to purchase the Notes. Hansen knew and intended that potential purchasers who received the 6.0% Notes Offering Memorandum would rely on its contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.0% Notes.

162. The 6.0% Notes Offering was open only to qualified institutional buyers. CNH and CNH Diversified were members of the limited group of potential purchasers of the 6.0% Notes that received the 6.0% Notes Offering Memorandum and were solicited to purchase notes in the 6.0% Notes Offering.

163. Hansen owed a duty of reasonable care to the investors and investment managers that received the 6.0% Notes Offering Memorandum, including CNH and CNH Diversified, because they were foreseeable and intended beneficiaries of Hansen's audit opinions.

164. Hansen breached this duty by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in its 2007 audit opinion that it had audited the 2007 Financial Statements in accordance with GAAS and PCAOB auditing standards and that those financial statements were presented fairly and in accordance with GAAP.

165. At the time of the misrepresentations and omissions of material fact by Hansen, CNH and CNH Diversified were ignorant of their falsity and believed them to be true. CNH Diversified, through CNH, relied upon Hansen's superior knowledge and expertise, and read and justifiably relied to its detriment on the 2007 Financial Statements in the 6.0% Notes Offering Memorandum, on the unqualified opinion issued by Hansen in connection with those financial statements, and on Hansen's 2007 report concerning the Company's internal controls, when purchasing the 6.0% Notes in the 6.0% Notes Offering. Had CNH and CNH Diversified been aware of the true facts, they would not have purchased the 6.0% Notes.

166. Hansen's conduct constitutes the making of negligent misrepresentations under applicable state law. As a direct and proximate result of CNH Diversified's reliance on the negligent misrepresentations made by Hansen, CNH Diversified purchased 6.0% Notes in the 6.0% Notes Offering and suffered damages.

**FIFTH CLAIM FOR RELIEF**
**Common Law Negligent Misrepresentation**
**(On Behalf Of All Plaintiffs For False Statements In The 6.5% Notes Offering Memorandum)**

167. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein. For the purposes of this claim, Plaintiffs expressly disclaim any claim of fraud or intentional misconduct.

168. This claim is brought by all Plaintiffs against Hansen under common law principles of negligence.

169. Hansen is in the business of auditing and reviewing financial statements of public companies, issuing opinion letters concerning the financial statements audited, and providing and certifying such information for the benefit of investors and others to use in their dealings with others.

170. Hansen expressly consented to the incorporation of its audit opinion on the Company's 2007 Financial Statements in the 6.5% Notes Offering Memorandum, knowing that the 6.5% Notes Offering Memorandum would be disseminated to a limited group of potential purchasers of the 6.5% Notes for the purpose of soliciting those investors to purchase the notes. Hansen knew and intended that the potential purchasers who received the 6.5% Notes Offering Memorandum would rely on its contents, including the 2007 Financial Statements and Hansen's audit report, when deciding to purchase the 6.5% Notes.

171. The 6.5% Notes Offering was open only to qualified institutional buyers. Plaintiffs and the Damaged Funds were members of the limited group of potential purchasers of the 6.5% Notes that received the 6.5% Notes Offering Memorandum and were solicited to purchase notes in the 6.5% Notes Offering.

172. Hansen owed a duty of reasonable care to the investors and investment managers that received the 6.5% Notes Offering Memorandum, including Plaintiffs and the Damaged Funds, because they were foreseeable and intended beneficiaries of Defendant's audit opinion.

173. Hansen breached this duty by failing to conduct a reasonable and GAAS-compliant audit, and by falsely representing in its audit opinion that it had audited the financial statements in accordance with GAAS and PCAOB auditing standards, that those financial statements were presented fairly and in accordance with GAAP, and that the Company had adequate internal controls.

174. At the time of the misrepresentations of material fact by Hansen, Plaintiffs and the Damaged Funds were ignorant of their falsity and believed them to be true. Plaintiffs and the Damaged Funds relied upon Hansen's superior knowledge and expertise, and read and justifiably relied (to the detriment of the Damaged Funds) on the audited financial statements in the 6.5% Notes Offering Memorandum, on Hansen's report concerning the Company's internal controls,

and on the unqualified audit opinion issued by Hansen in connection with the 2007 Financial Statements when purchasing 6.5% Notes in the 6.5% Notes Offering. Had Plaintiffs been aware of the true facts, they would not have purchased the 6.5% Notes.

175. For purposes of this Count:

a. allegations that the LAM Clients, the LAM Fund and HFR read and relied upon statements in the 6.5% Notes Offering Memorandum refer to LAM's reading and reliance as agent on behalf of the LAM Clients, the LAM Fund and HFR;

b. allegations that the Oaktree Funds, the Oaktree Clients, and DPERS read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Oaktree's reading and reliance as agent on behalf of the Oaktree Funds, the Oaktree Clients, and DPERS;

c. allegations that AG OFCON read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Angelo Gordon's reading and reliance as agent on behalf of AG OFCON;

d. allegations that the Zazove Clients read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Zazove's reading and reliance as agent on behalf of the Zazove Clients;

e. allegations that the CNH Funds read and relied upon statements in the 6.5% Notes Offering Memorandum refer to CNH's reading and reliance as agent on behalf of the CNH Funds;

f. allegations that the Advent Fund read and relied upon statements in the 6.5% Notes Offering Memorandum refer to Advent's reading and reliance as agent on behalf of the Advent Fund; and

g. allegations that the AQR Funds read and relied upon statements in the 6.5% Notes Offering Memorandum refer to AQR's reading and reliance as agent on behalf of the AQR Funds.

176. Hansen's conduct constitutes the making of negligent misrepresentations under applicable state law. As a direct and proximate result of Plaintiffs' reliance on the negligent

misrepresentations made by Hansen, Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering, and the Damaged Funds suffered damages.

## SIXTH CLAIM FOR RELIEF
## For Violation of Connecticut Uniform Securities Act § 36b-29(a)
## (Based On False Statements In The 6.5% Notes Offering Memorandum)

177. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

178. This claim is brought on behalf of the CNH Funds, the AQR Funds, and all other Damaged Funds located in Connecticut that purchased Notes in the 6.5% Notes Offering (together, the "Connecticut Plaintiffs") against Hansen pursuant to Connecticut Uniform Securities Act § 36b-29(a). This claim is brought on behalf of 50 or fewer persons.

179. Although ShengdaTech is not a party in this action, ShengdaTech offered and sold the 6.5% Notes in the 6.5% Notes Offering by means of untrue statements and/or omissions to state material facts in the 6.5% Notes Offering Memorandum, in violation of Connecticut Uniform Securities Act § 36b-29(a).

180. Hansen materially assisted ShengdaTech in selling the 6.5% Notes in the 6.5% Notes Offering. Hansen audited ShengdaTech's 2007 Financial Statements and consented to the inclusion of its unqualified audit opinions on the 2007 Consolidated Statements of Income in the 6.5% Notes Offering Memorandum. As set forth above, ShengdaTech accessed the United States capital markets via a "reverse merger" transaction, a process that allowed ShengdaTech to sell its securities publicly without undergoing the due diligence typically performed by underwriters in advance of an initial public stock offering and without significant vetting by investors. Because of this, the role of Hansen as ShengdaTech's outside auditor assumed special importance, as its audit opinion was the primary safeguard against financial fraud at ShengdaTech. The inclusion of Hansen's unqualified audit opinion in the 6.5% Notes Offering Memorandum materially assisted ShengdaTech to offer and sell the 6.5% Notes to the Connecticut Plaintiffs.

181. Hansen should have known, through the exercise of reasonable care in performing its auditing duties, that the Company's 2007 Consolidated Statements of Income incorporated in the 6.5% Notes Offering Memorandum were materially false and misleading and that, therefore, Hansen's unqualified audit opinion on those financial statements was also materially false and misleading.

182. Hansen owed the Connecticut Plaintiffs a duty to make a reasonable and diligent investigation of ShengdaTech's financial statements and its own unqualified audit opinion in the 6.5% Notes Offering Memorandum, to ensure that they did not contain untrue statements of material fact or omit to state material facts required to be stated therein or necessary to make the statements therein not misleading.

183. As alleged in detail herein, Hansen did not make a reasonable investigation of the 2007 Consolidated Statements of Income or its unqualified audit opinion thereon and did not possess reasonable grounds for believing that they did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

184. The Connecticut Plaintiffs purchased 6.5% Notes in the 6.5% Notes Offering based on the 6.5% Notes Offering Memorandum. The Connecticut Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements or omissions of material facts in the 2007 Consolidated Statements of Income or in Hansen's unqualified audit opinion in the 6.5% Notes Offering Memorandum.

185. The material false statements and omissions in the financial statements and audit opinions in the 6.5% Notes Offering Memorandum proximately caused the Connecticut Plaintiffs to purchase the Notes in the 6.5% Notes Offering and proximately caused the Connecticut Plaintiffs and/or the funds and accounts managed by the Connecticut Plaintiffs to suffer damages.

186. By reason of the foregoing, Hansen is liable to the Connecticut Plaintiffs for violations of Section 36b-29(a) of the Connecticut Uniform Securities Act.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Awarding compensatory damages to Plaintiffs, on behalf of themselves and the Damaged Funds, against Hansen, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

B. Awarding Plaintiffs the costs of this suit, including reasonable attorneys' and accountants' and experts' fees and other disbursements; and

C. Awarding Plaintiffs and the Damaged Funds such other and further relief as this Court may deem just and proper.

## X. JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

Dated: May 1, 2014

/s/ Gary R. Goodheart
GARY R. GOODHEART
Nevada Bar #1203
FENNEMORE CRAIG JONES VARGAS
300 S. Fourth Street, Suite 1400
Las Vegas, NV 89101

*Local Counsel for all Plaintiffs*

STUART M. GRANT
MEGAN D. MCINTYRE
BRENDA F. SZYDLO
CHRISTINE M. MACKINTOSH
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801

*Counsel for all Plaintiffs except Delaware Public Employees' Retirement System*

ANN MARIE JOHNSON
STATE OF DELAWARE
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801

*Counsel for Plaintiff Delaware Public Employees' Retirement System*